**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| STATE OF WEST VIRGINIA, et al., | ) | |
| | ) | |
| *Petitioners*, | ) | |
| | ) | |
| v. | ) | No. 24-1120 |
| | ) | |
| ENVIRONMENTAL PROTECTION | ) | consolidated with |
| AGENCY AND MICHAEL S. | ) | Nos. 24-1121, 24-1122, |
| REGAN, ADMINISTRATOR, | ) | 24-1124, and 24-1126 |
| UNITED STATES | ) | |
| ENVIRONMENTAL PROTECTION | ) | |
| AGENCY, | ) | |
| | ) | |
| *Respondents*. | ) | |

**MOTION OF ENVIRONMENTAL AND PUBLIC HEALTH
ORGANIZATIONS TO INTERVENE IN SUPPORT OF RESPONDENTS**

Pursuant to Federal Rule of Appellate Procedure 15(d) and D.C. Circuit Rule

15(b), the American Lung Association, Clean Air Council, the American Public

Health Association, Clean Wisconsin, and the Natural Resources Defense Council

(NRDC) (collectively, "Movants") move to intervene in support of Respondents

U.S. Environmental Protection Agency (EPA) and its Administrator, Michael

Regan, in the above-captioned challenge and consolidated challenges, to a set of

related rules titled: "New Source Performance Standards for Greenhouse Gas

Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric

Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule," 89 Fed. Reg. 39,798 (May 9, 2024) (collectively, the "Power Plant Rules" or "Rules"). Because Movants have significant interests in defending the Rules, existing parties may not adequately represent those interests, and this motion is timely, the Court should grant the request to intervene.

Counsel for Movants contacted counsel for Petitioners and Respondents for their positions on this motion. None of the parties who responded indicated an intent to oppose. Counsel for Petitioners who responded, as well as counsel for Respondents, stated that they take no position on the motion.

**BACKGROUND**

Section 111 of the Clean Air Act is aimed at mitigating harm to public health or welfare caused by air pollution from stationary sources. The Act requires EPA to issue standards of performance to control emissions from new stationary sources, and guidelines regulating emissions from existing stationary sources. 42 U.S.C. § 7411(b)(1)(A)-(B), *id.* § 7411(d); *see also West Virginia v. EPA*, 597 U.S. 697, 709-11 (2022). As the Supreme Court has affirmed in a number of recent cases, greenhouse gases, including carbon dioxide specifically, are pollutants that EPA must regulate under Clean Air Act section 111. *See Am. Electric Power v. Connecticut*, 564 U.S. 410, 424 (2011); *West Virginia*, 597 U.S. at 710-12; *see also*

*Massachusetts v. EPA*, 549 U.S. 497, 532 (2007) (holding that "greenhouse gases fit well within the Clean Air Act's capacious definition of 'air pollutant'").

Fossil fuel-fired power plants are collectively the United States' largest stationary source of greenhouse gas emissions, responsible for 25 percent of total U.S. greenhouse gas emissions in 2021. 89 Fed. Reg. at 39,799. The Rules establish performance standards for new gas-fired power plants and emission guidelines for existing coal-fired power plants; they also repeal the existing Affordable Clean Energy rule emission guidelines. *Id.* at 39,800-01. Elevated concentrations of greenhouse gases, including carbon dioxide, have been warming the planet, leading to more frequent and intense heat waves, increased ground-level ozone pollution, more intense hurricanes and other extreme weather events, rising seas, increased risk of storm surge and flooding in coastal areas, and more intense and larger wildfires. *See, e.g.*, *id.* at 39,807-10. Fossil fuel-fired power plants also emit other health-harming air pollutants such as nitrogen oxides, sulfur dioxide, and fine particulate matter that contribute to increased risk of heart attacks, asthma, and other respiratory disease. *Id.* at 39,804; EPA, Regulatory Impact Analysis at tbl. 4-4, Docket ID No. EPA-HQ-OAR-2023-0072-8913 (hereinafter, "RIA").

EPA projects that the Rules will reduce carbon dioxide emissions by almost 1.4 billion tons between 2028 and 2047 as compared to business as usual. 89 Fed. Reg. at 40,004. By avoiding these emissions, the Power Plant Rules will

substantially decrease climate and public health harms. In 2035 alone, EPA estimates the Rules will reduce emissions by 49,000 tons of nitrogen oxides, 90,000 tons of sulfur dioxide, and 1,000 tons of fine particulate matter, *id.* at 40,005 & tbl. 4, and will prevent 1,200 premature deaths, 360,000 cases of asthma symptoms, 48,000 school absences, and 57,000 lost workdays, *see* RIA, *supra*, at tbls. 4-7 & 4-12. Cumulatively, EPA projects that the present value in 2019 dollars of reducing greenhouse gas emissions in accordance with the Rules is approximately $120 billion for monetized health benefits and $270 billion for monetized climate benefits. 89 Fed. Reg. at 40,008.

Movants seek to intervene to protect their substantial interests in protecting the health and welfare of their members from the pollution that will be emitted if the Power Plant Rules are not fully and timely implemented.

## ARGUMENT

### I.  Movants satisfy the requirements for intervention

Intervenors seeking to join a case reviewing agency action in the court of appeals must file a motion within 30 days and provide a "concise statement" of interest and "grounds for intervention." Fed. R. App. P. 15(d). This Court has sometimes looked to district court intervention standards when evaluating motions in the court of appeals. *See Mass. Sch. of L. at Andover, Inc. v. United States*, 118 F.3d 776, 779-80 (D.C. Cir. 1997); *Bldg. & Constr. Trades Dep't v. Reich*, 40 F.3d

1275, 1283 (D.C. Cir. 1994) (noting the Supreme Court's recognition that "the policies underlying intervention [in district court] may be applicable in appellate courts" (quoting *Int'l Union v. Scofield*, 382 U.S. 205, 217 n.10 (1965))). In district court, a movant is entitled to intervene as of right when: (1) its motion is "timely"; (2) the movant claims an "interest" relating to the "subject of the action"; (3) disposition of the action "may as a practical matter impair or impede the movant's ability to protect its interest"; and (4) the existing parties may not "adequately represent" the movant's interest. Fed. R. Civ. P. 24(a)(2). In addition, parties may intervene permissively in district court if their motion is timely and they have "a claim or defense" that shares a question of law or fact with the main action. Fed. R. Civ. P. 24(b)(1)(B).

Movants satisfy each standard. This motion is timely filed within 30 days of the first petition for review. ECF No. 2053599 (filed May 9, 2024); Fed. R. App. P. 15(d). As outlined below, Movants have significant interests in the Rules, which will reduce carbon emissions and other air pollution from power plants, advancing their organizations' purposes and benefitting the health and welfare of their members. *See* Fed. R. Civ. P. 24(a)(2). Movants will be harmed if the Rules are vacated, delayed, or weakened by an adverse ruling, and existing parties may not adequately represent their interests. *Id.* At a minimum, Movants satisfy the permissive intervention standard because they will present a defense that shares a

5

question of law and fact in common with the main action. *See* Fed. R. Civ. P. 24(b)(1)(B).

**A.      Movants have significant interests in the Power Plant Rules**

Movants have an "interest" in this matter within the meaning of Federal Rule of Appellate Procedure 15(d) and Federal Rule of Civil Procedure 24(a)(2). Movants are organizations whose missions include protecting public health and the environment, and they have long engaged in advocacy and litigation to reduce emissions from power plants. The Rules' emissions standards and guidelines will mitigate both climate change and other air pollution, which directly harm Movants' members.

Movants have long advocated for strict emission controls under section 111 of the Clean Air Act. Movants participated in the regulatory processes and prior litigation that preceded the Power Plant Rules, *see* Kelly Decl. ¶¶ 9, 12; Benjamin Decl. ¶ 6; Wimmer Decl. ¶¶ 8-10, 12; Trujillo Decl. ¶ 6; Fox Decl. ¶¶ 11-12, including by submitting detailed comments on the proposal, *see, e.g.*, Comments of Clean Air Task Force (CATF) and NRDC, EPA Docket ID EPA-HQ-OAR-2023-0072-0893 (Aug. 8, 2023); Comments of Clean Wisconsin, EPA Docket ID EPA-HQ-OAR-2023-0072-0740 (Aug. 8, 2023). The comments called on EPA to make several revisions, such as tightening the proposed timelines and strengthening the requirements for retiring coal-fired units, and applying strict emission limits to a

larger percentage of new gas-fired plants. Comments of CATF and NRDC, *supra*, at 11-14; Comments of Clean Wisconsin, *supra*, at 4-5.

Movants have also litigated in this Court over power plant emission standards and guidelines under section 111 of the Clean Air Act, including as petitioners, *see Amer. Lung. Ass'n v. EPA*, No. 19-1140 (D.C. Cir. July 8, 2019) (lead case), ECF No. 1796317 (petition for review) & No. 19-1166 (D.C. Cir. Aug. 14, 2019), ECF No. 1802136 (petition for review), and as intervenors, *see West Virginia v. EPA*, No. 15-1363 (D.C. Cir. Oct. 27, 2015), ECF No. 1580219 (motion to intervene); ECF No. 1592885 (Jan. 11, 2016) (granting intervention). As part of their advocacy, Movants have also developed extensive expertise on power plant pollution, its effects on climate and health, and related legal and regulatory issues. *See, e.g.*, Clean Wisconsin, *Near-Term Emissions Reductions and Health Benefits from EPA's Proposed Regulations on Wisconsin-based Power Plants* (Aug. 2023); NRDC, *Curbing Power Plant Carbon Pollution Under the Clean Air Act* (Nov. 2023); American Lung Association, *State of the Air 2024 Report* (2024) (25th annual report); American Public Health Association, *The Lancet Countdown on Health and Climate Change: Policy Brief for the United States of America* (2023).[1]

---

[1] Available at: https://perma.cc/UJ3V-V2TX (Clean Wisconsin 2023); https://perma.cc/YA6Z-KEDC (American Lung Association 2024); https://perma.cc/AV34-4HCX (NRDC 2023); https://perma.cc/3RZH-ZY5S (Am. Public Health Assoc. 2023).

Effective implementation of the Power Plant Rules will mitigate climate-related harms suffered by Movants' members. These include experiencing extreme heat, more frequent and intense weather disasters such as hurricanes, exposure to wildfire smoke, sea level rise and coastal erosion, and flooding. Retana Decl. ¶¶ 15-21; Troisi Decl. ¶¶ 6-7, 9-13; Tower Decl. ¶¶ 3-13; Krebs Decl. ¶¶ 5, 7-10; Canty Decl. ¶¶ 5-6; Smith Decl. ¶¶ 6, 8-9; Jeffrey Decl. ¶¶ 4-10, 14-15; Hill Decl. ¶¶ 16-18; Anderson Decl. ¶¶ 8-13; Fox Decl. ¶ 15; *see also* 89 Fed. Reg. at 39,807-10 (describing consequences of increased greenhouse gas emissions). Movants also have members who live near existing coal-fired power plants and potential new natural gas-fired power plants and who suffer problems from air pollution, including asthma and heart conditions, that would be mitigated by the Power Plant Rules. Retana Decl. ¶¶ 3-5, 8, 10-14; Canty Decl. ¶¶ 3-4; Smith Decl. ¶¶ 4, 7; Anderson Decl. ¶¶ 14-21; *see also* RIA, *supra*, at 4-26 to -30, 4-49 to -58, 4-67 to -74, ES-5, ES-9 (describing the Rules' non-climate health benefits). As a result of climate change and air pollution, Movants' members have had to limit or cease desired activities. Retana Decl. ¶ 14; Canty Decl. ¶ 4; Troisi Decl. ¶¶ 12, 17; Krebs Decl. ¶ 7; Smith Decl. ¶ 9; Hill Decl. ¶ 18; Anderson Decl. ¶¶ 12, 15. These interests are sufficient to support intervention. *See Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 317 (D.C. Cir. 2015) (finding injury-in-fact for purposes of defensive intervention where party benefits from agency action, action

is challenged, and unfavorable decision would remove benefit); *id.* at 320 (noting that party with standing necessarily has "interest" for purposes of intervention).

**B.      Movants' interests would be threatened by an adverse ruling**

The Power Plant Rules will help reduce carbon and other air pollution from power plants, and thus, as described above, redress harms to Movants' members. Accordingly, an order weakening, delaying, or vacating the Rules would harm Movants and risk their members' health and welfare.

In addition, because this litigation concerns questions of law under the Clean Air Act, an adverse judgment "may as a practical matter impair or impede" Movants' ability to fully pursue their claims in other Clean Air Act litigation. *See Peters v. District of Columbia*, 873 F. Supp. 2d 158, 218 (D.D.C. 2012) ("Impairment exists when the decision in a pending matter would foreclose or adversely affect the rights of the proposed intervenor in a subsequent proceeding."). Movants regularly litigate issues under the Clean Air Act to protect their members' interests in robust emission reductions and correlative health benefits. The resolution of certain legal issues in this litigation could affect Movants' ability to protect those interests in other cases. Thus, the disposition of this case "may as a practical matter impair or impede" Movants' ability to protect their interest in regulation under Clean Air Act section 111 more broadly. *See* Fed. R. Civ. P. 24(a)(2).

**C. Movants' interests may not be adequately represented by EPA**

Finally, Movants' interests in this case are sufficiently distinct from EPA's, such that EPA may not adequately represent them. *See* Fed. R. Civ. P. 24(a)(2). The Supreme Court has described the burden to show inadequate representation for purposes of intervention as "minimal," *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972), and this Court has described it as "not onerous," *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986). It is sufficient that there may be a "possibility" of disparate interests, *NRDC v. Costle*, 561 F.2d 904, 912 (D.C. Cir. 1977), and this Court "look[s] skeptically on government entities serving as adequate advocates for private parties," *Crossroads*, 788 F.3d at 321, often concluding that "governmental entities do not adequately represent the interests of aspiring intervenors," *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003).

Movants readily meet this "minimal" burden of establishing that EPA's representation "may be" inadequate. *Trbovich*, 404 U.S. at 538 n.10. While EPA must balance multiple interests and stakeholder perspectives in defending the Rules, Movants' goals are narrower: to advance their organizational missions by protecting their members and ensuring that emissions standards achieve the greatest pollution reduction as soon as possible. Movants have a distinct interest in protecting the health and welfare of their members and supporters who are affected

by climate change or live near affected units. *See* Retana Decl. ¶¶ 3-5, 8, 10-21; Troisi Decl. ¶¶ 6-7, 9-13; Tower Decl. ¶¶ 3-13; Krebs Decl. ¶¶ 5, 7-10; Canty Decl. ¶¶ 3-6; Smith Decl. ¶¶ 4-9; Jeffrey Decl. ¶¶ 4-10, 14-15; Anderson Decl. ¶¶ 8-21. Indeed, in public comments, Movants advocated for more stringent requirements than EPA ultimately adopted. *Compare, e.g.*, Comments of CATF and NRDC, *supra*, at 72, 74, 81, *with* 89 Fed. Reg. at 39,913, 39,948, 39,838 (comments recommended (1) that EPA apply the least stringent, "low load" standards for new gas plants to fewer units than EPA chose, (2) that EPA set the "intermediate" load emissions standard for new gas plants at a significantly lower level than EPA chose, and (3) that EPA apply the most stringent standard for existing coal plants to more units than EPA chose, by applying it to plants retiring a year earlier than EPA's cutoff).

Based on these differences, Movants have sufficiently distinct interests to support intervention. *See Crossroads*, 788 F.3d at 321 (noting the government and intervenor's sufficiently different interests where they disagreed about the extent of the government's regulatory power, among other things); *Fund for Animals*, 322 F.3d at 737 ("Although there may be a partial congruence of interests, that does not guarantee the adequacy of representation."); *Costle*, 561 F.2d at 913 (finding that a shared "overall point of view" is not enough for adequate representation).

Further, Movants' participation will "serve as a vigorous and helpful supplement to EPA's defense." *Costle*, 561 F.2d at 912-13. Movants' interests and expertise provide them with perspectives different from EPA's. As discussed above, Movants engaged in extensive advocacy around the development of the Power Plant Rules and advocated for more stringent standards than EPA ultimately finalized. They have developed expertise in climate change and power plant emissions, and work to advance their organizational missions by protecting their members and supporters from the effects of such emissions. Movants' "experience and expertise . . . can reasonably be expected to contribute to the informed resolution[]" of this litigation. *Id.* at 913. And, consistent with this Circuit's rules, Movants will "focus on points not made or adequately elaborated upon in the [government's] brief." D.C. Cir. R. 28(d)(2).

**D.     Movants also satisfy the standard for permissive intervention**

Federal Rule of Civil Procedure 24 also grants the district courts discretion to allow "permissive" intervention when an applicant "has a claim or defense that shares with the main action a common question of law or fact," as long as it will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(1)(B), 24(b)(3); *see also Int'l Union*, 382 U.S. at 217 n.10 (citing both Rule 24(a) and (b) in noting that district court intervention policies may be applicable in appellate courts). Movants meet these requirements as well.

To establish a "common . . . defense" in a challenge to agency action, it is enough that Movants seek to defend the agency's decision. *See Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, 331 F.R.D. 5, 14 (D.D.C. 2019). Here, Movants intend to offer arguments defending the Power Plant Rules, which will share questions of law and fact with—indeed, will directly respond to—the underlying challenges. EPA's, Petitioners', and Movants' arguments will all likely be grounded in the Clean Air Act provisions under which EPA acted and in the administrative record. Moreover, Movants will not "unduly delay or prejudice" the adjudication of Petitioners' claims. *See* Fed. R. Civ. P. 24(b)(3). Movants will adhere to set briefing schedules and, as noted above, will avoid repetition of facts or arguments made in the principal respondent brief, focusing on relevant points that were inadequately developed or not addressed. *See* D.C. Cir. R. 28(d)(2).

## II. Movants have standing to intervene

Movants have Article III standing to intervene, should that be required.[2] This Court has described the standing inquiry for an intervening defendant as "the same

---

[2] The Supreme Court has called into question whether defendant-intervenors need to demonstrate standing, because they do not invoke a court's jurisdiction. *See Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019) (noting that a party intervening as a defendant or appellee, and thus not invoking the court's jurisdiction, did not need to demonstrate standing). Movants explain here why they have standing, however, as this Court has continued to require that defendant-intervenors establish standing. *See Yocha Dehe v. U.S. Dep't of the Interior*, 3 F.4th 427, 430 (D.C. Cir. 2021).

as for a plaintiff: the intervenor must show injury in fact, causation, and redressability." *Crossroads*, 788 F.3d at 316. An intervenor defending agency action can generally prove all three elements if it "benefits from [the] agency action, the action is then challenged in court, and an unfavorable decision would remove the . . . benefit." *Id.* at 317; *see also id.* at 316 (noting that if the party defending an agency action can show injury from a successful challenge, "it rationally follows" that the injury is traceable to the challenge and preventable by defeating the challenge). To demonstrate associational standing, organizations such as Movants must also show that (1) at least one of their members would have standing to intervene in their own right; (2) the interests the organizations seek to protect are germane to their purposes; and (3) the participation of individual members is not required. *Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791, 802 (D.C. Cir. 2021).

Movants' members would have standing to intervene in their own right. As described in detail above, they benefit from the health and environmental protections advanced by the Power Plant Rules. Movants' members are suffering from climate change harms, such as loss of coastal property and exposure to storms and extreme temperatures. *See* Retana Decl. ¶¶ 15-21; Troisi Decl. ¶¶ 6-7, 9-13; Tower Decl. ¶¶ 3-13; Krebs Decl. ¶¶ 5, 7-10; Canty Del. ¶¶ 5-6; Smith Decl. ¶¶ 6, 8-9; Jeffrey Decl. ¶¶ 4-10, 14-15; Hill Decl. ¶¶ 16-18; Anderson Decl. ¶¶ 8-13;

Fox Decl. ¶ 15. Movants' members are also suffering health harms from exposure to pollutants from nearby coal-fired power plants. *See* Retana Decl. ¶¶ 3-5, 8, 10-14; Canty Decl. ¶¶ 3-4; Smith Decl. ¶¶ 4, 7. Both types of harm will be mitigated by the Rules and demonstrate standing. *See NRDC v. Wheeler*, 955 F.3d 68, 77 (D.C. Cir. 2020) (finding petitioners had adequately linked the challenged rule to an injury-in-fact where the rule will lead to an increase in emissions that "will in turn lead to an increase in climate change, which will threaten petitioners' coastal property"); *NRDC v. EPA*, 755 F.3d 1010, 1016-17 (D.C. Cir. 2014) (finding environmental groups had standing based on members' concerns about effects of emissions on their health, and when some members would spend less time outdoors as a result); *see also Massachusetts*, 549 U.S. at 526 (noting that reduced risk of catastrophic climate change from greenhouse gas emissions supported state petitioner's standing). If Petitioners succeed in this challenge by delaying, vacating, or weakening the Rules, that "would remove the . . . benefit" of the Rules to Movants' members. *Crossroads*, 788 F.3d at 317. Movants' members would thus have standing in their own right to intervene to defend the Rules.

The interests Movants seek to protect are germane to their organizational purposes of reducing health-harming and climate-destabilizing air pollutants, including from sources covered under Clean Air Act section 111. Kelly Decl. ¶¶ 6-7, 14; Benjamin Decl. ¶¶ 5-6, 12; Wimmer Decl. ¶¶ 5-7, 18; Trujillo Decl.

¶¶ 4-6; Fox Decl. ¶¶ 7-11, 22; *see Chesapeake Climate Action Network v. EPA*, 952 F.3d 310, 318 (D.C. Cir. 2020) (finding environmental organization's members had interests in reducing exposure to pollution that were germane to the organization's purpose); *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 636 (D.C. Cir. 2000) (characterizing germaneness requirement as "undemanding").

Further, Movants' defense does not require participation of individual members. Petitioners' arguments are questions of law or fact that will be resolved on the administrative record and will not require any consideration of members' individual circumstances. *See Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597-98 (D.C. Cir. 2015) ("Member participation is not required where a suit raises a pure question of law and neither the claims pursued nor the relief sought require the consideration of the individual circumstances of any aggrieved member of the organization." (internal quotation marks omitted)).

A successful defense of the Power Plant Rules will obtain for Movants' members the full and timely benefits of significant reductions in emissions. Movants satisfy the requirements for Article III standing.

# CONCLUSION

For the foregoing reasons, this Court should grant Movants leave to intervene in support of Respondents.

DATED:    May 13, 2024

Respectfully submitted,

/s/ *Francis W. Sturges, Jr.*
(with consent)

Francis W. Sturges, Jr.
Alan Masinter
Ann B. Weeks
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(617) 624-0234
fsturges@catf.us

*Counsel for American Lung Association, Clean Air Council, American Public Health Association, and Clean Wisconsin*

/s/ *Catherine Marlantes Rahm*

Catherine Marlantes Rahm
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
(212) 727-4628
crahm@nrdc.org

David Doniger
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 321-3435
ddoniger@nrdc.org

*Counsel for Natural Resources Defense Council*

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Movants the American Lung Association, Clean Air Council, the American Public Health Association, Clean Wisconsin, and Natural Resources Defense Council state that they are non-profit environmental and public health organizations. None of the organizations has a parent corporation, and no publicly held corporation owns 10% or more of their stock.

DATED:    May 13, 2024

/s/ *Francis W. Sturges, Jr.*
(with consent)

Francis W. Sturges, Jr.
Alan Masinter
Ann B. Weeks
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(617) 624-0234
fsturges@catf.us

*Counsel for American Lung Association, Clean Air Council, American Public Health Association, and Clean Wisconsin*

Respectfully submitted,

/s/ *Catherine Marlantes Rahm*

Catherine Marlantes Rahm
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
(212) 727-4628
crahm@nrdc.org

David Doniger
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 321-3435
ddoniger@nrdc.org

*Counsel for Natural Resources Defense Council*

# CERTIFICATE OF PARTIES

Pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(1)(A), I certify that the parties to this case and the cases with which it is consolidated are set forth below:

Petitioners: State of West Virginia, State of Alabama, State of Alaska, State of Arkansas, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of New Hampshire, State of North Dakota, State of Oklahoma, State of Ohio, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, State of Utah, Commonwealth of Virginia, State of Wyoming, the National Rural Electric Cooperative Association, National Mining Association, America's Power, Oklahoma Gas and Electric Company.

Respondents: Environmental Protection Agency, Michael S. Regan, Administrator, United States Environmental Protection Agency.

Intervenors and Amici: There are no other movant-intervenors, intervenors, or amici curiae as of the time of this filing.

> DATED: May 13, 2024
>
> /s/ *Catherine Marlantes Rahm*
>
> Catherine Marlantes Rahm
> Natural Resources Defense Council

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

I hereby certify that the foregoing Motion to Intervene contains 3,669 words, excluding the items listed in Fed. R. App. P. 32(f), and was composed in Times New Roman font, 14-point. The motion complies with applicable type-volume and typeface requirements. Fed. R. App. P. 32(a)(5)-(6); Fed. R. App. P. 27(d)(2).

DATED: May 13, 2024

/s/ *Catherine Marlantes Rahm*

Catherine Marlantes Rahm
Natural Resources Defense Council

**CERTIFICATE OF SERVICE**

I certify that on this 13th day of May, 2024, the foregoing Motion to Intervene and attachments were filed with the electronic case filing (ECF) system of the U.S. Court of Appeals for the D.C. Circuit, which will provide electronic notice to all counsel of record.

DATED: May 13, 2024

/s/ *Catherine Marlantes Rahm*

Catherine Marlantes Rahm
Natural Resources Defense Council

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| STATE OF WEST VIRGINIA, et al., | ) | |
| | ) | |
| *Petitioners*, | ) | |
| | ) | |
| v. | ) | No. 24-1120 |
| | ) | |
| ENVIRONMENTAL PROTECTION | ) | consolidated with |
| AGENCY AND MICHAEL S. | ) | Nos. 24-1121, 24-1122, |
| REGAN, ADMINISTRATOR, | ) | 24-1124, and 24-1126 |
| UNITED STATES | ) | |
| ENVIRONMENTAL PROTECTION | ) | |
| AGENCY, | ) | |
| *Respondents*. | ) | |

**APPENDIX TO ENVIRONMENTAL AND PUBLIC HEALTH
ORGANIZATIONS' MOTION TO INTERVENE**

DATED:     May 13, 2024

Respectfully submitted,

/s/ *Francis W. Sturges, Jr.*
(with consent)

Francis W. Sturges, Jr.
Alan Masinter
Ann B. Weeks
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
(617) 624-0234
fsturges@catf.us

*Counsel for American Lung
Association, Clean Air Council,
American Public Health Association,
and Clean Wisconsin*

/s/ *Catherine Marlantes Rahm*

Catherine Marlantes Rahm
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
(212) 727-4628
crahm@nrdc.org

David Doniger
Natural Resource Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 321-3435
ddoniger@nrdc.org

*Counsel for Natural Resources Defense
Council*

# TABLE OF CONTENTS

| Attachment | Title | Page |
|---|---|---|
| 1 | Declaration of Catherine Anderson, Clean Air Council | A001 |
| 2 | Declaration of Georges C. Benjamin, American Public Health Association | A007 |
| 3 | Declaration of Theodore Canty, Natural Resources Defense Council | A011 |
| 4 | Declaration of Annie Fox, Clean Air Council | A014 |
| 5 | Declaration of David G. Hill, American Lung Association | A022 |
| 6 | Declaration of Paul Jeffrey, Natural Resources Defense Council | A029 |
| 7 | Declaration of Ryan Kelly, Clean Wisconsin | A037 |
| 8 | Declaration of Donna Krebs, Natural Resources Defense Council | A041 |
| 9 | Declaration of Nancy Retana, Clean Wisconsin | A045 |
| 10 | Declaration of Louis Smith, Natural Resources Defense Council | A051 |
| 11 | Declaration of Rita Tower, Natural Resources Defense Council | A054 |
| 12 | Declaration of Catherine Troisi, American Public Health Association | A059 |
| 13 | Declaration of Gina Trujillo, Natural Resources Defense Council | A064 |

| Attachment | Title | Page |
|---|---|---|
| 14 | Declaration of Harold Wimmer, American Lung Association | A067 |

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**DECLARATION OF CATHERINE ANDERSON
Submitted in Support of Clean Air Council**

I, Catherine Anderson, do hereby affirm and state:

1.  I am currently a member of the Clean Air Council (CAC). I have been a member of CAC for approximately one year.

2.  I joined CAC because of its involvement in challenging the proposed Allegheny Energy Center gas-fired power plant in Elizabeth Township, Pennsylvania. I have also been involved directly in that work.

3.  I am also a member of the Mountain Watershed Association and serve on its board. I am a member of PennEnvironment, Yough Communities CARE, and the Sierra Club.

4.  I have lived in Elizabeth, Pennsylvania, for approximately 25 years. I moved here because it is the location of my husband's family farm, which has been owned by his family since 1913.

5.  Elizabeth Township is a mixture of suburban and rural areas and includes several farms. It is mostly a working-class community.

1

6. I understand that carbon emissions from power plants contribute to climate change, and that power plant emissions can also impact local air quality.

7. We have a significant number of invasive species where we live. They cause problems because they are killing our native trees. I understand that poor local air quality and acid rain has encouraged the spread of these invasive species. I understand that climate change can also increase the impact of invasive species. We have spent a significant amount of time and money attempting to control invasives in our area.

8. I am aware that climate change can cause flooding because of its impact on weather patterns. My area has been heavily impacted by flooding and landslides.

9. My family lives near the Youghiogheny River, and there are many small streams that feed into the river. These streams often overflow during heavy rains and cause flooding. The impacts of the flooding are especially bad because of poor water quality caused by acid mine drainage.

10. There are two township roads that lead to my family's property. One of these roads was closed for nearly five years because runoff and landslides caused significant damage to the road that the town could not afford to repair.

2

**A002**

11.     The road closure also impacted our neighbors in Smithdale, an environmental justice community. Smithdale has a number of residents with high medical needs who are on oxygen, and on several occasions when residents had medical emergencies, ambulances were unable to get there quickly because of the road closure. On one occasion an ambulance had to use a bike trail because the road was impassable.

12.     In 2018, we had a lot of flooding in Elizabeth Township. It affected our day-to-day life because we needed to stay close to home and had to limit our plans outside of our property.

13.     I also understand that climate change causes extreme temperatures. I have noticed big changes in weather patterns and seasonal temperatures in my area. We grow several kinds of plants on my family's farm, and I have observed that they are blooming two or three weeks early in recent years because of changes in the climate.

14.     I am very concerned about the air quality in my area. Southwestern Pennsylvania generally has poor air quality and there are a lot of bad air days here. We live in a river valley with lots of inversions that trap pollutants and worsen air quality.

3

**A003**

15. There have been many times when I have gone outside the house to my deck and have immediately smelled a toxic rancid odor. We are not able to keep our windows open from approximately May to October each year due to air quality. We have used a PurpleAir monitor on our property during the last few years, and have observed that it is often in the orange or red zone, indicating poor air quality.

16. We have had to buy four large air filters for our home, each costing between $200 and $300, and need to use electricity to run them.

17. During the last several years, I was part of a coalition that advocated against the opening of the Allegheny Energy Center ("AEC"), a proposed gas-fired power plant in Elizabeth Township.

18. The proposed plant would have been located about 1,200 feet southeast of my house. In this area, airflow goes from south to north, so its emissions would have blown right over my home.

19. I was involved in community activism against the AEC for six years. There was widespread community opposition to its siting. During one community hearing in 2018, approximately 40 people testified, with only three people speaking in favor of rezoning the property to accommodate the AEC.

4

A004

20.     The AEC proposal was a major source of stress for myself and my family, as it would have added another major source of pollution to an area that already has poor air quality. We struggled with the decision about whether to try to sell the farm and leave the area; my husband's farm has been in his family for generations, so it would not have been an easy choice.

21.     Although the AEC developers have announced that they will not be building the plant, I am still very concerned about the possibility of future development in the area. The town rezoned the entire site to light industrial to accommodate the proposed plant. Although other community members and I have requested that the area be rezoned to agricultural/residential, the town has not done so and has not provided a reason, and I believe they would potentially support industrial development in the future.

22.     I understand that, in April 2024, the U.S. Environmental Protection Agency ("EPA") finalized a rule establishing new carbon dioxide emissions limits for new gas-fired and existing coal-fired power plants.

23.     I support EPA's rule. I understand that the power sector is the second-largest source of greenhouse gas emissions in the country, and believe it is essential to limit both greenhouse gas emissions and localized air pollution emissions from power plants.

5

A005

24.     EPA's rule will benefit my community and me by lessening the impacts of carbon emissions and air pollutants from power plants. I would not receive these benefits if the rule were delayed or overturned.

25.     It is my understanding that CAC intends to defend EPA's rule establishing new emissions limits for new gas-fired and existing coal-fired power plants against legal challenges. I support CAC joining a lawsuit to defend this rule.


I declare under the penalty of perjury that the foregoing is true and correct. Dated this 9th day of May, 2024

*Catherine Anderson*

Catherine Anderson

6

**A006**

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**DECLARATION OF GEORGES C. BENJAMIN, MD**
**Submitted in Support of American Public Health Association**

I, Georges C. Benjamin, MD declare as follows:

1.     I am the Executive Director of the American Public Health Association (APHA).

2.     I have worked at the APHA since December 2002. In my capacity as Executive Director, I am required to be familiar with the organization's structure, function, purpose, and membership.

3.     I am a medical doctor by training and began my career in 1981 after my residency training in internal medicine. I have been practicing public health and health policy since 1990.

4.     APHA is incorporated in Massachusetts and headquartered in Washington, D.C. APHA has 51 state and regional affiliates and members in all 50 states, the District of Columbia and Puerto Rico. APHA is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code.

5.     APHA champions the health of all people and all communities. We represent more than 24,000 individual members and strengthen the public health profession. We speak out for public health issues and policies backed by science.

1

A007

We are the only organization that combines a 150-year perspective, a broad-based member community, and the ability to influence federal policy to improve the public's health. APHA has long advocated in support of the Clean Air Act, including as a tool to combat climate change and for strong public health protections from ozone and other dangerous air pollutants.

6. The American Public Health Association submitted comments with a coalition of other national, state, and local public health, medical and nursing organizations on this rulemaking. In our comments, we explained that substantially reducing climate pollutants from power plants is a necessary and long overdue step in staving off the most catastrophic impacts of climate change.

7. Our support of EPA's power plant carbon performance standards and emission guidelines has its basis in scientific research that shows that human activities are emitting billions of tons of carbon dioxide each year. Carbon dioxide emissions contribute to the effects of climate change, including warmer temperatures that lead to the formation of ground level ozone, and heat waves and drought that lead to wildfires. These emissions accumulate in the atmosphere, trapping heat and changing the climate. Research shows that this creates conditions that increase the risk of harm to human health, especially for people with lung disease. For example, higher temperatures in the summer cause higher concentrations of ground level ozone, and climate change also makes the ozone

2

A008

season longer as well as more intense. Additionally, high levels of widespread particulate matter occur due to wildfires, which are more intense and happening more often due to hotter dryer conditions in certain areas of the country.

8. Power plants emit air pollutants in addition to greenhouse gases that can harm health and worsen local air quality. Burning fossil fuels results in emissions of fine particulate matter, nitrogen oxides, sulfur oxides, and volatile organic compounds. I understand because of my medical experience and training that exposure to both higher ozone levels and higher levels of particulate matter increase the risk of developing respiratory illnesses, increase the likelihood that existing respiratory conditions will worsen, and can increase the risk of premature death, among other serious harms. These changes are affecting APHA members and supporters, and their family members, across the country.

9. The APHA has members and supporters throughout the country who are over age 65, who have children under age 18, or who exercise or work outdoors. Research warns that climate change is expected to increase the risk of harm to these individuals who are most vulnerable to exposure to increased particulate matter, ozone, or other pollutants.

10. Risks and health harms to APHA members and supporters from these effects of climate change and air pollution are reduced by strict power plant

3

A009

emissions limits. APHA members and supporters would not enjoy these benefits if EPA's performance standards and emission guidelines were delayed or overturned.

11. APHA members and supporters across the country have a strong interest in supporting these standards and guidelines, and their positive effects on air quality and respiratory health. If these standards and guidelines were delayed or overturned, APAHA members and supporters would not receive these benefits.

12. I support APHA's efforts to defend the power plant carbon performance standards and emission guidelines. These efforts, including intervention in support of EPA in litigation over the final rules, are directly relevant to APHA's mission to protect the public health and advocate for policies backed by science.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this sixth day of May, 2024.

_____
Georges C. Benjamin. MD
800 I Street, N.W.
Washington, DC 20001

4

**A010**

# DECLARATION OF THEODORE CANTY

I, Theodore Canty, hereby declare as follows:

1. I am a current member of the Natural Resources Defense Council ("NRDC"). I have been a member for 20 years.

2. I have lived in Wimauma, FL for over 4 years and Florida for over 22 years.

3. I have been asthmatic since I was a child. For the past 10 years, I have had to use my inhaler as frequently as 3 times per year.

4. I live about 5 miles as the crow flies from Big Bend, a coal-fired power plant near Tampa, FL. It's not uncommon to see the steam plumes coming out of the plant. The winds change with the season and the wind will sometimes blow the pollution in my direction. There is a park by the plant where people go for walks. I have gone over there to look at the manatees and stop by a restaurant. I'm concerned about mercury pollution in the area. I am worried about how it affects water quality. I am worried about the ecosystem's health. When I've been to the salt marsh by the plant, I don't hear any frogs, and it feels like something is not right. Overall, the concerns I have about the area's toxicity keep me away from the area near the plant.

5. I have experienced property damage from storms in the past, and I believe these storms keep getting bigger because of climate change. At one of

**A011**

my previous homes in Florida, I had to evacuate for hurricane Matthew. The storm surge from that hurricane killed many of the live oaks in my area. I had thousands of dollars in property damage to my home, roof, and screen room. Many trees on my property came down, and I had to have many others cut down. As a result of hurricane Irma, my home was flooded 2 feet deep with water.

6. Power outages from storms are a big problem as well. I suffered a heart attack 7 years ago. I was recovering still when hurricane Irma came to my area, and we lost power for 4 days. With the air conditioning broken, the stress of the heat on my body was unbearable. I had to book a hotel.

7. I am concerned that these events are worsened by climate change. There are more storms than there used to be. I hear warnings about hurricanes in March and April now, which is earlier than it used to be.

8. I understand EPA recently issued regulations restricting carbon pollution from power plants. If those go into effect, it would help me by preventing greenhouse gas pollution that is contributing to climate change and extreme weather events, and by limiting or eliminating the pollution from coal-fired power plants like the one near me.

**A012**

I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on May 2, 2024.

Signature: *Theodore J Canty*

Name: Theodore Canty

A013

**DECLARATION OF ANNIE FOX**

I, Annie Fox, declare and state as follows:

1. This declaration is based on my personal and professional knowledge, information, and belief. I am over the age of eighteen (18) and suffer no legal incapacity.

2. I submit this declaration in support of the Motion to Intervene in Support of Respondent U.S. Environmental Protection Agency ("EPA") by Clean Air Council ( "CAC" or "the Council") in challenges to EPA's rulemaking titled "New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule," signed on April 24, 2024 (the "Final Rule").

3. I am currently a Law Clerk for CAC, as I have been since January 2022. My duties include regularly meeting with our members and supporters from Southwest Pennsylvania who suffer health and other injuries from air pollution and climate change; researching and drafting comments on proposed federal, state, and local regulations related to air quality, environmental health, and environmental justice; and supporting CAC's community advocacy, regulatory work, and

A014

litigation with goals which include limiting climate change and improving Pennsylvania's air quality and the health of those in the region, including CAC's members. I also participated in the development of CAC's Strategic Plan. My duties have required me to be familiar with the organization's structure, function, purpose, and membership.

4. I am also a member of Clean Air Council.

5. CAC is incorporated in Pennsylvania with headquarters in Philadelphia, Pennslvania. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code.

6. CAC has thousands of members throughout Pennsylvania and the Mid-Atlantic Region. CAC's members and supporters include people who suffer from health injuries from their proximity to coal- or gas-fired power plants and residents of environmental justice communities that have long been overburdened with the cumulative effects of air pollution from industrial sources. The Council has advocated for members threatened by proposed new gas-fired power plants in their communities, and will continue to do so as the need arises. Many of the Council's members seek to protect themselves and their families from the often intertwined health burdens flowing from air pollution and climate change.

7. CAC is dedicated to protecting and defending everyone's right to a healthy environment, including everyone's right to breathe clean air. The Council

2

A015

works through a broad array of sustainability and public health initiatives using public education, community action, government oversight, and enforcement of environmental laws.

8.    CAC's climate policy, as expressed on the organization's website, states that, "The climate crisis is accelerating and intensifying. Clean Air Council urges sweeping policy efforts at the local, state, and federal levels to dramatically cut greenhouse gas (GHG) pollution by 2030 to maintain the possibility of avoiding the worst impacts of climate change."

9.    The Council envisions a future in which humanity acts in time to avert climate catastrophe, everyone breathes clean air, and communities have access to effective, clean power sources with net-zero GHG emissions.

10.    The Council has long recognized that climate change poses an existential threat and is already harming the health of our members in multiple ways, such as causing more frequent and intense heat waves and increased levels of dangerous air pollution, including fine particulate matter ("$PM_{2.5}$"), and ground-level ozone.

11.    The purpose of my declaration is to provide organizational information regarding CAC's support of the Final Rule. The Council has a long and extensive history of advocating for stronger local, state, and federal regulations to reduce air pollution in the form of GHGs, $PM_{2.5}$, ozone, nitrogen oxides

3

A016

("NOx"), sulfur dioxide ("$SO_2$"), volatile organic compounds ("VOCs"), and hazardous air pollutants ("HAPs"). The Council has also regularly been a plaintiff or intervenor in litigation to challenge inadequate air pollution permits or support regulations that protect public health and air quality. For example, the Council challenged the "Affordable Clean Energy" rule in this Court. Taking legal action in support of the Final Rule is well within CAC's organizational mission and interests.

12. The Council submitted comments on this rulemaking, explaining the adverse impacts of climate change and advocating for the Final Rule to include the strongest possible measures to limit the exacerbation of the climate crisis from coal- and gas-fired power plants.

13. The Council's support for the Final Rule is firmly rooted in science. The overwhelming scientific consensus is that human activities are generating billions of tons of GHGs each year, a substantial portion of which is from the power sector. These anthropogenic GHG emissions accumulate in the atmosphere, trapping heat and driving the climate crisis. The harms from higher temperatures include increased formation of ground level ozone, as well as heat waves and drought that lead to wildfires. In particular, higher temperatures in the summer elevate concentrations of ground level ozone, and climate change also makes the ozone season longer as well as more intense. Additionally, high levels of

4

A017

widespread particulate matter occur due to wildfires, which are more intense and happening more often due to hotter dryer conditions in several areas of the United States and Canada.

14. In the summer of 2023, Pennsylvania experienced several days with dangerously low air quality due to such wildfires in Canada. Exposures to higher ozone levels and/or higher levels of particulate matter increase the risk of developing respiratory and cardiovascular illnesses, may increase dementia risk, and has a causal relationship to an increased risk of premature death, among other serious harms. These effects are keenly felt by the Council's members and their families, perhaps most acutely in environmental justice communities where the health injuries are often compounded by inadequate access to health care and the cumulative pollution from vehicular traffic and a concentration of polluting industrial facilities, including power plants.

15. My family and I are also suffering health and economic impacts from climate change. I must avoid going outdoors on days with poor air quality and sometimes feel short of breath at such times even when I remain indoors. My older son has numerous health challenges, including autonomic dysregulation and gastrointestinal problems. Maintaining proper hydration is vital to his health, yet he is often unable to do so on the increasing number of excessively hot days which overwhelm the capacity of our air conditioning system to adequately control our

5

A018

home's air temperature. Climate change has also already lengthened the allergy season and increased the risk of being bitten by disease-carrying ticks, both of which impede my family's enjoyment of the outdoors. Additionally, my family has been attempting to purchase a house for over six months, a process which is being prolonged and will be more expensive due to the need to avoid many otherwise attractive and affordable properties because of excessive and increasing flood or fire risks caused by climate change.

16. EPA's GHG emissions standards in the Final Rule are a vital tool in combatting the climate crisis. In a 2023 Report, the Intergovernmental Panel on Climate Change ("IPPC") found that "Global GHG emissions in 2030 implied by nationally determined contributions (NDCs) announced by October 2021 make it likely that warming will exceed 1.5°C during the 21st century and make it harder to limit warming below 2°C." The IPCC also noted that "[d]eep, rapid, and sustained reductions in greenhouse gas emissions would lead to a discernible slowdown in global warming within around two decades, and also to discernible changes in atmospheric composition within a few years." The Final Rule will result in substantial cumulative net GHG emissions reductions. Any additional delay in achieving such reductions jeopardizes the success of efforts to mitigate the climate crisis.

6

A019

17. The Final Rule is also projected to decrease emissions of other harmful air pollutants, including NOx and $PM_{2.5}$, that are generated by the power sector and that can have a range of negative health impacts including asthma attacks, lung cancer, strokes, and premature death.

18. The Council has many members with respiratory and cardiovascular conditions who face increased risk of asthma attacks, heart attacks, hospitalizations, and missed work because of elevated concentrations of ozone and particulate matter resulting from climate change, and also resulting from the additional air pollution directly produced by the power sector. The Final Rule will directly reduce these health impacts and have tangible benefits for people at risk of adverse health effects from climate change and other air pollutants.

19. Many of the Council's members and supporters live in communities already overburdened by air pollution and suffer from the corresponding elevated health risks. For example, in Allegheny County and in Chester, Pennsylvania, the childhood asthma rates are more than double and more than four times the national average, respectively. Residents also have elevated risks of death from cardiovascular disease. The standards in the Final Rule will reduce these risks.

20. CAC has members and supporters throughout the Mid-Atlantic region who are members of populations more vulnerable to adverse health impacts from

7

A020

air pollution and climate change, including members over 65 or with pre-existing health conditions.

21. Additionally, part of the Council's work is to encourage people to bicycle and walk more frequently, including by commuting to work and by enjoying hiking on nature trails. The scientific community warns that climate change is already raising the risk of harm to individuals in the above-referenced groups and people who regularly engage in outdoor exercise by increasing levels of $PM_{2.5}$ or ground-level ozone. Climate change is also increasing the number of extremely hot days that put people at risk of heat stroke or other health harms if they exercise outdoors, an effect which directly interferes with the Council's goal of reducing pollution and promoting health by spurring our members and the public to spend more time walking and biking outdoors.

22. CAC's members and supporters throughout the Mid-Atlantic region have a strong interest in supporting the Final Rule and its positive effect on air quality and respiratory health. For all of these reasons, the Council supports the Final Rule.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of May 2024.

_Annie Fox_
_____
Annie Fox
1617 JFK Boulevard, Suite 1130
Philadelphia, PA 19103

A021

**DECLARATION OF DAVID G. HILL, MD, FCCP**
**Submitted in Support of American Lung Association**

I, David G. Hill, hereby declare and state as follows:

1.     I am a volunteer with the American Lung Association and currently serve on several American Lung Association boards, including the American Lung Association's Board of Directors. Currently, I am chair-elect of the Board of Directors and chair of the Public Policy Committee. I have served on American Lung Association boards since 2004 and have been a National Board Member since 2017.

2.     I joined the American Lung Association as a volunteer in order to be a part of an organization that does what I, as a single physician, cannot do, namely national patient education and advocacy for policies that support people with chronic lung disease and help to protect others from contracting lung disease including through legal actions to secure reductions in the air pollution that causes and exacerbates these conditions.

3.     I am aware through my service with the American Lung Association that the organization has a vision of a world free from lung disease. Because climate change causes conditions, including increased air pollution, that research shows will exacerbate lung diseases and their symptoms, a central part of the American Lung Association mission is to advocate for strong regulations to mitigate climate change.

1

A022

4. I understand that human activities, including emissions from power plants, have already resulted in significantly elevated levels of carbon dioxide pollution. Carbon dioxide in the earth's atmosphere acts like a blanket, trapping heat that would otherwise escape. This "greenhouse effect" is causing climactic and environmental changes in my area and around the country. These changes include warmer summers, warmer winters, and more frequent and severe heat waves.

5. In addition to my volunteer responsibilities as an American Lung Association board member, I am a Pulmonologist and Director of Clinical Research with the Waterbury Pulmonary Associates, in Waterbury, Connecticut. I have been a medical doctor since 1991. Through this work I see patients who suffer from acute and chronic pulmonary conditions including chronic obstructive pulmonary disease ("COPD") and asthma. My patients come from among the populations served by the Lung Association.

6. COPD is a leading cause of death in the United States. COPD is a chronic inflammatory lung disease that causes difficulty breathing, coughing, and wheezing. Patients with COPD occasionally suffer from acute exacerbation episodes during which they may experience abruptly worsening symptoms including shortness of breath and increased coughing. In some cases, exacerbation

A023

episodes may be fatal. COPD has no known cure, but its symptoms can be managed in part by avoiding environmental triggers.

7. Asthma is a chronic lung disease that causes intermittent inflammation of the airways, leading to wheezing, chest tightness, shortness of breath, and coughing. Patients with asthma occasionally suffer asthma attacks, which cause an abrupt worsening of asthma symptoms and may be fatal. Asthma has no known cure, but its symptoms can be managed in part by avoiding environmental triggers.

8. As a scientist, I am aware of the scientific research indicating that human activities generate billions of tons of carbon dioxide emissions each year. That carbon dioxide accumulates in the atmosphere, staying there for long periods of time trapping heat and causing significant climate changes. These climate changes produce dangerous conditions, including increased surface heat, longer periods of heat and drought in some areas, and more intense storms and flooding in other areas. Increased heat translates to longer periods of summer-like weather conditions in certain areas of the country, including where I live and have my practice, than were the case just a few decades ago.

9. I am further aware that climate change and resulting longer, hotter summers already are resulting in higher concentrations of ground-level ozone, and over longer periods of time, than was previously the case. Ground-level ozone forms when certain air pollutants, called ozone precursors, interact with sunlight

3

A024

and heat. On warm days, ozone precursors react more with sunlight than on cool days leading to higher concentrations of ground-level ozone. Higher summertime temperatures and increased frequency and duration of heat waves due to climate change exacerbate ground-level ozone problems, particularly in cities and surrounding areas, like the area where I have my practice and where I live.

10. Additionally, climate change induces increased drought and resulting wildfires increasing the concentrations of particulate matter in those parts of the country that are subject to drought conditions. Breathing elevated levels of particulate matter also is linked to respiratory ailments, and even premature death among persons in vulnerable populations like the elderly and those with chronic lung diseases.

11. In my practice we have noticed an increase in the number of patients seeking treatment for respiratory and cardiovascular conditions on hot, humid days and on days when the air quality is bad. Patients often remark that they cannot breathe when it is hot and that they cannot breathe when it is humid. I know from my expertise that this is because ground-level ozone levels are higher on those days. I have read multiple studies exploring the direct link between hot days, higher ozone levels, and increased difficulty breathing.

12. I am concerned that, as climate change leads to hotter summers and increased frequency and severity of heat waves, my patients with COPD and

A025

asthma will have even more frequent exacerbation episodes and asthma attacks, leading to an increase in emergency room visits, hospitalizations, and deaths.

13. Through my work on the Lung Association Board of Directors, I am aware that on April 24, 2024, EPA finalized a rule titled "New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule."

14. I am aware that this rule will set carbon pollution performance standards for new gas-fired power plants and emission guidelines for existing coal-fired power plants. These rules will result in the reduction of climate change-causing carbon emissions.

15. In addition to my professional concerns, I also have a personal interest in EPA's rule. I suffer from exercise-induced asthma.

16. I live in Middlebury, Connecticut. In my spare time I enjoy playing tennis outdoors and I use such exercise for much-needed stress relief. When the air is bad, on humid and high ozone days, I often find it difficult to breathe and sometimes must use an inhaler. I fully intend to continue playing tennis outdoors for as long as I can, but if climate related temperature increases continue

5

A026

unchecked, hotter and poorer air quality days will increase in frequency and potentially force me to reconsider the outdoor activities that I enjoy.

17. I have two children (one born in 1996 and the other in 1999) who live in South Norwalk and Middlebury, Connecticut, respectively. Both of my children are active and enjoy running and other sports outdoors. My oldest daughter also suffers from exercise-induced asthma and must use an inhaler before running. She has noted increased symptoms on hot days and particularly when the air quality is poor. Having seen patients with asthma exacerbated by increased exposure to ground-level ozone, I am concerned about the effects of warmer days and worsening air quality due to climate change on my daughter's health.

18. Both my youngest child and I also experience adverse symptoms due to seasonal allergies, causing us to reduce our time outside. I understand that warmer weather in the northeast is already causing shifts in flowering times and pollen development that is expanding and intensifying the allergen season. I am concerned that as climate change continues to increase the length and severity of the allergen season, that my child's and my unpleasant seasonal allergy symptoms will worsen.

19. I understand that EPA's rule will reduce power plant carbon emissions. Reducing emissions of these greenhouse gases will have a positive effect on air quality and pulmonary health, including my patients' health, and my own health

6

A027

and the health of my children. I believe that climate change and its effects on public health are the most important public health issues of our generation, and we must do everything we can to reduce climate change.

20. I, my family, and my patients would benefit from the rule's pollution control measures. If a court were to strike the rule, I, my family, and my patients would not receive those health benefits.

21. I support the American Lung Association's efforts to defend the rule as directly relevant to the organization's mission and consistent with its work on air pollution, public health, and climate change.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of May, 2024.

David G. Hill, MD, FCCP
201 Central Road
Middlebury, CT 06762

A028

# DECLARATION OF PAUL JEFFREY

I, Paul Jeffrey, declare as follows:

1. I am a member of the Natural Resources Defense Council (NRDC) and have been for nearly twenty years. I joined NRDC for many reasons—the Superfund site near my home, for one—but the main reason is my love for the outdoors. I come from a family that has always enjoyed the outdoors—my father climbed the Matterhorn—and we have raised our children to be very active in outdoor activities and sports. I believe somebody, if not everybody, needs to do something to preserve our natural resources, which is why I support NRDC.

2. While I've been concerned about climate change for some time, my concerns have increased based on the latest projections about sea level rise, such as those I've read in reports by the Intergovernmental Panel on Climate Change. I am concerned that sea level rise and associated flooding are going to render whole portions of the east coast unlivable. I am most deeply concerned about the impacts of climate change on the coast of New Jersey, where I live.

3. I live in Ortley Beach, New Jersey, a community on a coastal barrier island, which is part of Toms River Township. My wife and I have owned property here for nineteen years and lived here for twelve. We made Ortley Beach our permanent residence just months before October 29, 2012, when Superstorm Sandy destroyed our town.

A029

4. Superstorm Sandy damaged over 99 percent of the homes in Ortley Beach. The intensity and devastation from that storm, which climate change likely contributed to, made us recognize that the future survival of our town was likely to depend on our actions to incorporate future storm resilience into how we rebuilt. That is when I decided to get involved in the Ortley Beach Voters and Taxpayers Association. Soon after that, I was elected to serve as President. I'm now the Vice President of this Association, a nonprofit whose mission is to improve the quality of life in Ortley Beach. For example, we obtained a $1 million grant for pedestrian lighting in the business district. We have also done grassroots advocacy for a new dunes barrier system to protect residents and homeowners on the ocean side of the town from another storm like Superstorm Sandy. We were instrumental in negotiating the sale of 2.5 acres of private beachfront property to the state of New Jersey and Toms River Township to be preserved forever as dunes and beach instead of the planned 24 condominium development. Our association's number one priority now is pleading with the US Army Corps of Engineers to return to replenish our rapidly deteriorating dune system. The dune system came with a 50-year promise to revisit and replenish the dunes every 5 to 10 years. They are now two years late and 30% of the dune is now eroded away.

5. Ortley Beach was "ground zero" for Superstorm Sandy due to the level of damage the storm wrought here. The land elevation in Ortley Beach is low,

A030

only about two to four feet above sea level, so the ocean storm surge formed more like a tsunami than a hurricane and inundated our community. Ortley Beach sustained more damage than any other municipality in New Jersey. About 25 percent of the homes in Ortley Beach were considered "substantially damaged" under Federal Emergency Management Agency (FEMA) standards, which means that the cost to repair the home was equal to or greater than fifty percent of the home's market value before the flood. Very few people received full payments from their flood insurance carriers. Many community members who had full flood insurance coverage of $250,000, as required by their mortgage banks, received less than $100,000 from their insurance.

6.      Compared to others in our community, my wife and I were very lucky: we were some of the very few who did not get water inside our home. We live on the bay side of the island, which saw the least amount of flooding, and our house is elevated on pilings with breakaway walls. We did, however, lose everything in our garage, our two cars, our deck, pool, and landscaping. There was three feet of water in our garage, sand in the streets, and debris everywhere; for example, a mattress and someone's fireplace mantle crashed through our garage door. In addition, because the storm struck at the end of October, as winter was approaching, it made recovery difficult with no electricity, no natural gas, no water, and no sewer. All utility infrastructure was destroyed. We could not re-enter our

3

**A031**

community for over a month because roads were either washed away or covered with feet of sand. Downed power lines and natural gas leaks were everywhere. We could not live in our home for about three months until the conditions were safe and utilities were restored. Even then, recovery was slow as there were restrictions on entry, and contractors, plumbers, and electricians were all in very short supply.

7. I estimate the full cost of repairing our home after Superstorm Sandy was more than $150,000. Flood insurance covered part of this cost, and we received additional aid from FEMA. Nevertheless, we paid more than $75,000 out-of-pocket from our retirement funds to repair our home.

8. The financial impacts of Sandy go far beyond these initial repair costs and continue to this day. Our flood insurance premiums have increased 60% in the last 5 years, but only because our house is above the base flood elevation and this is our primary residence. Secondary homeowners in the area have a $250 surcharge on their annual flood insurance premiums and their premiums can rise 25 percent **per year** under current federal legislation. All new homes must be built elevated high on pilings which protects them from flooding, but comes with immense increased cost. In addition, following superstorm Sandy all New Jersey insurance companies added a new "hurricane deductible." The deductible, which is triggered if a hurricane makes landfall anywhere in the state of New Jersey, is five percent of the amount for which our home is insured. Our insurance company requires us to

4

A032

insure for full replacement cost, or just over $1,300,000, so our "hurricane deductible" is now over $65,000.

9. Hurricane Sandy also affected the makeup of my community. Unfortunately, some of our barrier island residents have still not returned after evacuating for Superstorm Sandy over eleven years ago. Many of the homes destroyed by Sandy were cottages that had been passed down from generation to generation. Sadly, many of those families are gone now. As an officer of the Voters and Taxpayers Association, I have received letters that said, "I love Ortley Beach, but my home was destroyed by Sandy, and I can never afford to return." Some properties damaged by the storm still sit with damaged, unrepaired homes. There are also empty lots in my neighborhood where the homes or businesses were demolished after being destroyed in Superstorm Sandy. These empty lots and abandoned houses remain a blight on the neighborhood.

10. Superstorm Sandy badly damaged many of the Township's streets and roadways. These effects occurred in many coastal towns near Ortley Beach, as reported by the New York Times.[1] Fortunately, a grant from FEMA enabled the Township to repave most of our badly damaged streets.

---

[1] Nick Corasaniti, *Jersey Shore Towns Scramble for Revenue as Sandy Aid Dries Up*, NYTimes (July 30, 2017), https://www.nytimes.com/2017/07/30/nyregion/hurricane-sandy-jersey-shore-towns.html.

A033

11. I believe that Hurricane Sandy was such a strong, devastating storm because of climate change. It is obvious that our environment is changing, and I believe that humans are accelerating the change. I was trained as an organic chemist at Carnegie Mellon University and MIT. Although mostly retired, I still read articles from scientific journals including Science, the New England Journal of Medicine, and the MIT Technology Review. I see a clear, negative impact from human-produced greenhouse gas emissions on the climate. I therefore support government efforts to reduce greenhouse gas emissions to slow and ultimately prevent these impacts.

12. Sandy was an extreme storm; it resulted in the lowest barometric pressure ever recorded in New Jersey. But such extremes are becoming more frequent as climate change progresses, as evidenced by multiple storms over the past decade that have continued to batter and damage our protective sand dune system. As I continue to see frequent storms roll up the New Jersey shore, I'm more convinced than ever that climate change is real and is progressing at an increasingly rapid rate.

13. I am very concerned about the future effects of climate change. I've said to my kids, partly in jest, "Enjoy our house here, but don't count on it being livable in the future when you are my age." I'm worried that, if the sea level keeps

6

A034

rising, flooding during storms and high tides will eventually make our community uninhabitable.

14.     Low-lying streets in Ortley Beach now flood more frequently during minimal storms or seasonal high tides. This increased flooding isn't associated with powerful storms; it's associated with seasonal high tides that are generating higher water levels than they have in the past. We are seeing more and more "sunny day" high tides. This spring we have already had a seasonal high tide at the same time as a modest northeaster storm and water levels in the street were the highest since superstorm Sandy. We could not leave our home because the water in the roadways was a foot deep, roads were impassable. The nearby state highway was closed in both directions due to high tide waters. The tide rose to within one foot of my garage doors, scary! More and more frequently I cannot walk my dog to the bay. People who live on the flooded streets have to drive through 3-6 inches of salt water to get to their homes, if they can get there at all. I've seen some projections that say that within the next decade, there will be twenty days per year when you cannot get down the street to your home in my town. We are reminded of the rising sea levels more and more frequently. Frankly it's very worrisome and stressful.

15.     I worry that this type of flooding will only get worse if the climate continues to warm and seas continue to rise. In fact, if sea levels rise another foot,

A035

many of the local roads will flood so much during high tides that some homes will become simply inaccessible. Our Township continues to obtain state grants that allow the elevation of other nearby roads that continue to frequently flood, but it is immensely expensive. It is unlikely that the funding necessary to fully address anticipated sea-level rise over the next 25 years will be available. And we can't elevate all the roads! If the state and Township did not have to spend so much money on these mitigation efforts, there are many things that the money could go toward that would improve the lives of residents, such as public transportation.

16. I'm familiar with the Environmental Protection Agency's (EPA's) recently-signed rule setting standards that will reduce greenhouse gas emissions from existing coal-fired power plants and future natural gas plants. I understand the rule is projected to significantly reduce greenhouse gas emissions, thereby helping to slow climate change. I believe EPA should protect our communities from the harmful effects of climate change, including by limiting greenhouse gas emissions. I therefore support NRDC's efforts to defend this rule, and would benefit from the reduced emissions that would result if EPA's rule is upheld.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 5th, 2024, in Ortley Beach, NJ.

_____
Paul Jeffrey

8

A036

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

## DECLARATION OF RYAN KELLY
### Submitted in Support of Clean Wisconsin

I, Ryan Kelly, declare as follows:

1. My name is Ryan Kelly, and this declaration is based on my personal and professional knowledge, information, and belief.

2. I submit this declaration in support of Clean Wisconsin's defense of the U.S. Environmental Protection Agency's ("EPA") rulemaking titled "New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule," signed on April 24, 2024.

3. I am the Development Director at Clean Wisconsin, a public interest membership organization organized and existing since 1970 under the laws of the State of Wisconsin and recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code.

4. My work at Clean Wisconsin includes responsibility for major gifts, outreach, and member engagement, including ensuring that members engage with Clean Wisconsin's mission in a manner they value. Specifically, my duties at

1

A037

Clean Wisconsin require me to communicate with Clean Wisconsin's membership, by, among other things, preparing materials for distribution to members and to prospective members concerning Clean Wisconsin's mission and history as well as discussing environmental issues of concern to Wisconsinites. Those issues include clean air and climate change and public health and environmental impacts in Wisconsin.

5. When an individual becomes a member of Clean Wisconsin, their name and address is entered into our membership database, which is updated each time a member renews membership or donates to Clean Wisconsin. I am responsible for tracking that information.

6. My work at Clean Wisconsin therefore requires me to be familiar with the organization's mission, which is to be a voice for Wisconsin's environment, working to preserve and protect Wisconsin's clean air, clean water, and natural heritage, including by engaging on a wide range of issues and in a number of venues, including state and federal courts, on matters that support and protect our natural resources and the health of all Wisconsinites.

7. Litigation and advocacy seeking cleaner air in Wisconsin, including through the abatement of air pollution that adversely affects our members and all Wisconsinites, falls squarely within Clean Wisconsin's mission.

8. Through my work at Clean Wisconsin, I understand that EPA has set

2

**A038**

performance standards for carbon emissions from new gas-fired power plants and emission guidelines for existing coal-fired power plants.

9. Clean Wisconsin submitted comments in support of these standards. The comments provided recommendations on ways EPA could improve the proposal to achieve even greater benefits for the climate and public health.

10. Through my work at Clean Wisconsin, I understand that electricity generation is the largest source of greenhouse gas emissions in Wisconsin, emitting 46.9 million metric tons of carbon dioxide-equivalent per year. Over three quarters of electricity in the state is produced by coal and gas power plants. In addition to carbon, fossil fuel power plants emit fine particulate matter as well as nitrogen oxides and sulfur dioxide, both of which form secondary particulate matter. Fine particulate matter has well established connections to respiratory and cardiovascular health impacts.

11. Through my work at Clean Wisconsin, I understand that these rules will have immediate and local health benefits in Wisconsin from reduced air pollution.

12. In August 2023, Clean Wisconsin prepared a report on near-term emissions reductions and health benefits from EPA's proposed regulations on

3

A039

Wisconsin-based power plants.[1] This report quantified the proposed rule's considerable health and social benefits from carbon dioxide, nitrogen oxide, and particulate matter emission reductions in Wisconsin.

13. Through my work at Clean Wisconsin, I can say that the organization has members who are impacted by the performance standards and emissions guidelines for fossil fuel-fired electric generation units, and who would not receive those benefits if these limits were delayed or not in effect.

14. Effective and timely implementation of these limits is also relevant to Clean Wisconsin's organizational purpose. If the standards and guidelines were delayed or kept from going into effect, Clean Wisconsin would not enjoy the rule's benefits to our mission.

I declare under the penalty of perjury that the foregoing is true and correct. Dated this 3rd day of May, 2024.


_____
Ryan Kelly

---

[1] *Available at* https://www.cleanwisconsin.org/wp-content/uploads/2023/08/Benefits-of-EPAs-proposed-regulations-on-Wisconsin-based-power-plants-V3.1.pdf.

4

A040

# DECLARATION OF DONNA KREBS

I, Donna M. Krebs, hereby declare as follows:

1.     I am a current member of the Natural Resources Defense Council ("NRDC"). I have been a member for at least 3 years.

2.     I have lived in Jackson County, Mississippi since 1960 and Moss Point, MS since 1992. I live near the Victor J. Daniel Jr. coal-fired power plant.

3.     I work as a paralegal and have been employed at my current place of employment for 38 years. I recently switched to working 4 days a week.

4.     In 2017 I was diagnosed with lung cancer. I had a lobectomy and was treated with chemotherapy. I also have chronic obstructive pulmonary disease. Due to my history of respiratory related illness, air pollution is a big concern for me. I am concerned about air quality in my area because I live down the road from the Victor J. Daniel Jr. coal-fired power plant.

5.     I receive updates from the local news channel when the air quality is bad. Sometimes they will advise people in my area to stay indoors. There have recently been wildfires in the neighboring county, and I could see the smoke from my house. The most recent fire took the better part of a week to put out. I am strongly considering purchasing an indoor freestanding air filter due to my concerns about air pollution in my community.

**A041**

6.    I enjoy occasionally spending time in my yard where I do a little bit of gardening. I love to watch the birds and I have bird baths and feeders. I have always enjoyed spending time in the outdoors. When my children were young, we would frequently go on camping trips and spend time on our boats, kayaks, and jet skis.

7.    Since living in this area, I have noticed our summers are becoming hotter and longer. We have more extreme heat days now than ever. In the heat of the summer, I will avoid going outside until my backyard is in full shade. I think climate change is making it more difficult for me to enjoy my backyard on hot days.

8.    The house I live in now was damaged during hurricane Katrina. I purchased this property in its damaged state with the whole lower level completely washed out. I live in fear of future hurricanes because this property is surrounded by water. There is a bayou to one side of the house and a river on the other side. During a bad storm, portions of my road will go under water, so ingress and egress from my house is difficult. It is particularly difficult for me because my property is the lowest of the surrounding properties. I think the biggest threat in my area is rising water. Since Katrina, there have been around three storms that caused rising water enough to leave a waterline on my house

**A042**

and come into my garage. I am concerned that climate change is increasing the threat of flooding in my area that will cause future harm to my house.

9. I take many precautions to prepare for hurricanes. I keep all my precious items in boxes, ready to go in the trunk of my car, in case I would have to evacuate at a moment's notice. However, evacuating does not come without risk. After storms it can be really challenging to get back because the roads are blocked, there's traffic, and looters are known to take advantage of the situation. Starting early in the summer, I open the NOAA app on my phone and check daily for hurricanes from July 1st through November. I stay close to home after the July 4th holiday because the weather can change on a dime. I have prepared myself to evacuate for hurricanes classified as Category 4 and 5 and Category 3 if it looks like it is building. Though I haven't had to evacuate yet, I am scared I will soon because of climate change contributing to more frequent and intense hurricanes.

10. I have experienced extensive property damage in the past due to hurricane Katrina. I used to own 25 properties in Pascagoula, MS. All these properties incurred flooding damage. The recovery work was extensive. I had to redo walls, cut out sheetrock and insulation, replace AC units, and redo wiring, outlets, and floors. In the end, I sold about half of the properties as-is. I am

**A043**

concerned that extreme weather events brought on by climate change will cause future harm to my properties.

11.    I also have global concerns about air pollution and the threat of climate change to low-lying and waterfront areas like the place I live. I'm concerned about my grandchildren's future. I think we must do something about climate change, and that it's a threat to the entire planet. I am aware that EPA recently issued new regulations restricting carbon pollution from power plants. If those standards are successfully enforced, it would help prevent pollution that is contributing to climate change.

I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed on May __1__, 2024.

Signature: _Donna M. Krebs_

Name: Donna M. Krebs

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

# DECLARATION OF NANCY RETANA
## Submitted in Support of Clean Wisconsin

I, Nancy Retana, do hereby affirm and state:

1.      I am currently a member of Clean Wisconsin. I have been a member of Clean Wisconsin for over a year and have been involved in and tracking its advocacy ever since.

2.      I became a member of Clean Wisconsin because I am a strong supporter of its mission to protect Wisconsin's natural heritage, and because I am passionate about its work to center community voices.

3.      I live in Glendale, a suburb of Milwaukee. I live near the Oak Creek Power Plant, a base load coal- and natural gas-fired power plant.

4.      I am aware that We Energies, the utility that owns the Oak Creek Power Plant, has announced plans to retire the facility's coal units. I understand that the utility has given federal regulation of emissions as one reason to retire the coal units.

5.      I am aware that We Energies has announced plans to add new natural gas-fired power units at the Oak Creek Power Plant site.

1

A045

6. I understand that human activities, including emissions from power plants, contribute to climate change. I understand that climate change has already begun to impact areas including Milwaukee.

7. I understand that climate change's impacts include increasing the severity and duration of wildfires in the United States and Canada, increasing flooding, and increasing the number of extremely hot days in the Milwaukee area and elsewhere.

8. I suffer from asthma and have many close family members with asthma. Smoke from wildfires has increased the number of poor air quality days in my area. Milwaukee's air quality is also negatively impacted by localized emissions from the Oak Creek Power Plant. I have personally experienced negative health effects during poor air quality days.

9. My work involves outdoor projects with community members to install green infrastructure such as rain gardens.

10. In the course of my work, I have had to cancel or reschedule meetings with organizational partners due to poor air quality. On one occasion, poor air quality meant that I was unable to have a planned outdoor meeting with an elderly person.

11. Pollution from the Oak Creek Power Plant impacts the health of myself and my community. I have been on the plant's site. There is a playground

2

A046

located very close to the power plant, and the playground equipment is sometimes covered with soot from the power plant. I do not believe it is safe for children in my community to play there.

12. Particulate matter from the Oak Creek Power Plant travels far distances and harms my health and the health of others in the areas where I live and work. I find it daunting to think about the effects of this particulate matter pollution.

13. As an active member of my community and as an organizer, I regularly talk to individuals who are experiencing health issues because of poor air quality, or who have concerns about their health or the health of their children in the face of air pollution.

14. I have chosen on occasion to refrain from outdoor activities when local air pollution concerns are particularly acute.

15. I understand that Milwaukee has experienced an increase in flooding due to climate change. In 2008 and 2010, Milwaukee experienced "100-year" floods that damaged areas and led to at least one fatality. People in my community are still dealing with the aftermath of extreme flooding caused by climate change.

16. My parents' home has had basement back-ups and infrastructure damage due to flooding caused by climate change.

A047

17. My work involves organizing outreach events, many of which are held outdoors in public spaces and parks. Extreme flooding has made some of these areas inaccessible for myself or others and caused me to have to reschedule events.

18. Climate change has caused higher temperatures in my area, especially in inner city Milwaukee where high summer temperatures are exacerbated by the heat island effect. I know that some members of my community have struggled with high utility bills or been unable to afford access to air conditioning on extremely hot days.

19. My health has been affected by extreme temperatures caused by climate change. High temperatures exacerbate the effects of poor air quality and can worsen my asthma symptoms.

20. In addition to my own health, I am concerned about my family's health during extreme temperatures, as I have family members who work outside.

21. I am concerned about the impacts of climate change my area has already experienced and about what the effects of climate change will be in the future. I recently became pregnant and am worried about my health and my children's health as climate change continues to worsen.

22. Along with power plants' impacts on climate change and local air pollution, I am aware of and concerned about the energy cost burden on

4

A048

Milwaukee residents, particularly in Black and Latine neighborhoods that are disproportionately affected by rate increases.

23. I understand that, in April 2024, the U.S. Environmental Protection Agency ("EPA") finalized a rule establishing new carbon dioxide emissions limits for new gas-fired and existing coal-fired power plants.

24. I support EPA's rule. I understand that the power sector is the second-largest source of greenhouse gas emissions in the country, and believe it is essential to limit both greenhouse gas emissions and localized air pollution emissions from power plants.

25. EPA's rule will benefit my community and me by lessening the impacts of carbon emissions and air pollutants from power plants. I would not receive these benefits if the rule is delayed or overturned.

26. It is my understanding that Clean Wisconsin is seeking to join a lawsuit to defend EPA's rule establishing new emissions limits for new gas-fired and existing coal-fired power plants. I support Clean Wisconsin joining this lawsuit.

A049

talk to individuals who are experiencing health issues because of poor air quality, or who have concerns about their health or the health of their children in the face of air pollution.

14. I have chosen on occasion to refrain from outdoor activities when local air pollution concerns are particularly acute.

15. I understand that Milwaukee has experienced an increase in flooding due to climate change. In 2008 and 2010, Milwaukee experienced "100-year" floods that damaged areas and led to at least one fatality. People in my community are still dealing with the aftermath of extreme flooding caused by climate change.

16. My parents' home has had basement back-ups and infrastructure damage due to flooding caused by climate change.

17. My work involves organizing outreach events, many of which are held outdoors in public spaces and parks. Extreme flooding has made some of these areas inaccessible for myself or others and caused me to have to reschedule events.

18. Climate change has caused higher temperatures in my area, especially in inner city Milwaukee where high summer temperatures are exacerbated by the heat island effect. I know that some members of my community have struggled with high utility bills or been unable to afford access to air conditioning on extremely hot days.

19. My health has been affected by extreme temperatures caused by climate change. High temperatures exacerbate the effects of poor air quality and can worsen my asthma symptoms.

20. In addition to my own health, I am concerned about my family's health during extreme temperatures, as I have family members who work outside.

21. I am concerned about the impacts of climate change my area has already experienced and about what the effects of climate change will be in the future. I recently became pregnant and am worried about my health and my children's health as climate change continues to worsen.

22. Along with power plants' impacts on climate change and local air pollution, I am aware of and concerned about the energy cost burden on Milwaukee residents, particularly in Black and Latine neighborhoods that are disproportionately affected by rate increases.

23. I understand that, in April 2024, the U.S. Environmental Protection Agency ("EPA") finalized a rule establishing new carbon dioxide emissions limits for new gas-fired and existing coal-fired power plants.

24. I support EPA's rule. I understand that the power sector is the second-largest source of greenhouse gas emissions in the country, and believe it is essential to limit both greenhouse gas emissions and localized air pollution emissions from power plants.

25. EPA's rule will benefit my community and me by lessening the impacts of carbon emissions and air pollutants from power plants. I would not receive these benefits if the rule is delayed or overturned.

26. It is my understanding that Clean Wisconsin is seeking to join a lawsuit to defend EPA's rule establishing new emissions limits for new gas-fired and existing coal-fired power plants. I support Clean Wisconsin joining this lawsuit.

I declare under the penalty of perjury that the foregoing is true and correct. Dated this 13 day of May, 2024.

_Nancy Retana_ (signature)

Nancy Retana

A050

# DECLARATION OF LOUIS SMITH

I, Louis Smith, hereby declare as follows:

1.      I am a current member of the Natural Resources Defense Council ("NRDC"). I have been a member for over twenty years.

2.      I have lived in South Carolina for over twenty-two years. I currently live in Huger, SC with my sister. I have lived in Huger for almost one year. I have also lived in Mt. Pleasant, SC and Awendaw, SC.

3.      I work as a computer programmer for a restaurant equipment and supply store in North Charleston, SC. I drive to the office five or six days a week.

4.      In November 2023, I underwent surgery to have a stent put in an artery near my heart. I also have Type 2 diabetes. I am concerned that these conditions make me more vulnerable to air pollution from fossil fuel plants in my county.

5.      Around once a month, I read in the newspaper that ozone levels are high. I understand power plant emissions can contribute to high ozone.

6.      The poor air quality was visibly noticeable during the Canada wildfires last year. I am worried that climate change will cause more of these events and make the air quality around me worse.

**A051**

7. There are two coal-fired power plants located near me. The Cross plant is around thirty-five miles from where I live, and the Williams plant is around twenty miles away. I am concerned about the effects that the pollution from these coal-fired plants have on my community. There is mercury in the fish and in our lakes and rivers. The Williams plant is located near water where people fish and recreate. Additionally, it is troubling to me that there is a plan to build a natural gas plant along the Edisto.

8. I am concerned that greenhouse gas emissions from coal-fired plants like the two near me will cause more intense and frequent extreme weather events. I have been in South Carolina during times of major flooding, high winds, and high heat. I live ten miles from the coast and am worried about what would happen if I experienced any of these events worse than I have before. For example, if a Category 5 hurricane hits the coast, it could be weeks and even months before the power comes back on.

9. I am also concerned about heat waves. When the heat and humidity get too high, I feel physically stressed, and I have no energy to walk around and enjoy the outdoors the way I normally do. During my over twenty years of living in South Carolina, I have noticed that the high heat in the summer starts earlier than it used to and lasts longer. I have to go out of my way to deal with the heat by taking multiple showers a day and avoiding the outdoors when

possible. I am aware that climate change would continue this trend and that greenhouse gas emissions from the Williams and Cross plants contribute to the problem.

10. I am aware that EPA recently issued new rules limiting greenhouse gas emissions from power plants. If those rules are successfully enforced, it would ensure that coal plants like the two in my community would have to reduce their emissions or retire, and that any new gas plants that are built are subject to emission standards. I am hopeful that this will happen and that my community and I will be better protected from the effects of climate change and air pollution.

I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed on May __3rd__, 2024.

Signature: *Louis M. Smith*

Name: Louis Smith

# DECLARATION OF RITA TOWER

I, Rita Tower, declare as follows:

1.     I am a member of the Natural Resources Defense Council (NRDC). I became a member of NRDC over a decade ago because I want to do everything I can to support NRDC's mission to fight climate change. I am watching our planet change with my own eyes and am deeply troubled by the changes I see.

2.     I live in Houston, Texas and have lived there for more than twenty-five years. I've lived in my current home for over twenty years.

3.     In the last few decades, Houston has seen increasingly frequent heavy rainfall and flooding, and I've seen firsthand how repeated flooding has affected my community. For example, for about 10 years starting in about 1996, I was a full-time soccer coach in Bear Creek Park in Houston. Since 2019, I have coached soccer one day a week. Repeated flooding in the area has damaged the landscape of the park and made it harder for me to use and enjoy.

4.     Years ago, the grass used to grow back nicely in the park after a flood. In recent years, frequent and harsh rainfall leave standing water in the park for months at a time. The flooding and standing water often make the park unusable. When there is standing water in the park, we can't use the fields to train our soccer team. For example, after Hurricane Harvey in 2017 and again after Tropical Storm Imelda in 2019, the entire soccer club was forced to find alternate places to play

**A054**

for about 6 months. When we couldn't find other fields, we had to periodically stop training. This was frustrating and disruptive to our team.

5. I've also noticed a decline in the amount of wildlife I see in the park. Years ago, when the grass and trees were healthy, I remember seeing lots of deer, armadillos, and other wildlife. I enjoyed observing those animals roam about in the park. But now that the vegetation in the park has been so devastated by repeated flooding, I don't see as many deer or armadillos. The park has become a less beautiful place to spend time in.

6. In recent years, major storms in Houston have also damaged my home and resulted in increasing costs of my flood insurance. For example, Hurricane Ike in 2008 damaged our roof, and we had to replace it. While insurance covered most of the costs of the new roof, my partner and I had to contribute $2,500 to meet our deductible.

7. Hurricane Harvey in 2017 was a frightening and incredibly stressful experience for me and my family. We were stuck inside for days listening to the water pouring down and knowing that the house might flood or that the storm could take the roof off our home. I watched the pine trees in my front yard blowing like wheat.

8. For two days, I watched from inside my house as water crept up my street. My home was thankfully spared, because I live at the far end of my

A055

neighborhood that is higher in elevation than other parts of the area. About three-quarters of the homes my neighborhood flooded during Harvey, and there was standing water in the street. I watched as our neighbors took boats out of the neighborhood. Just four houses down the street from me, the standing water was knee height. Watching the damage Harvey wreaked on my community was horribly stressful and, frankly, disturbing.

9. Fortunately, the damage to my home from Harvey was limited to the fence around our house, which needed to be replaced. Although my insurance paid for some of these repairs, I had to contribute out-of-pocket to meet my deductible. Following Hurricane Harvey and the damage to my home, my insurance premiums increased by approximately $500 per year, to a total of about $1900 per year. This is a significant expense for me.

10. My business has also been financially impacted by flooding in the area. For the last dozen or so years, I have owned and run a company that flips houses and manages rental properties in the Houston region.

11. Three of my properties have flooded due to hurricanes and extreme rainfall in recent years, including one from Hurricane Harvey. Two of the properties flooded with more than 24 inches of water. I had to do complete gut jobs to repair these three homes, including ripping out and replacing the cabinets and sheet rock, completing mold remediation, and replacing all the appliances in the

A056

kitchens. At the time, I didn't have flood insurance for these properties, and the repairs cost about $40,000 per home. In addition, because the homes were unusable until we completed repairs, I did not have any rental income from tenants in those properties for several months.

12. Following Hurricane Harvey, the Federal Emergency Management Agency (FEMA) redistricted the flood zones in the area and I was required to get flood insurance. My total insurance premiums for the homes I have insurance for as part of my business have increased significantly in the past few years, from about $6500 per year right after Harvey in 2017 to nearly $10,000 per year now.

13. In the twenty-five years I've lived in in Houston, I have experienced flooding more frequently over time. In the first twenty years I lived here, I experienced significant flood events about three times. But in the last six years, I've gone through it six times. I worry that these events will only become more frequent in the future. I fear that a major flood or hurricane in the near future will cause more damage to my home and the other properties I own as part of my business. Because of how much these changing and worsening flooding patterns have harmed my family and business, I have been resolved to understand why it's happening. Based on what I've read, I believe this pattern is caused by human-induced climate change. I fear these increasing extreme storms and flooding will only get worse if we don't take action to address this climate crisis.

A057

14.     I am aware that the U.S. Environmental Protection Agency (EPA) recently signed a new rule, setting standards to reduce greenhouse gas emissions from existing coal-fired power plants and future natural gas plants. I understand that EPA expects these standards will significantly reduce greenhouse gas emissions. In my view, EPA should be doing all it can to reduce greenhouse gas emissions as much as possible. I support NRDC helping to defend EPA's new rule, and I would benefit from the emission reductions that would result if EPA's rule is upheld. We are stewards of this planet, and we need to take better care of it.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May __3__, 2024

_Rita Tower_
Rita Tower

A058

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

## DECLARATION OF CATHERINE TROISI
### Submitted in Support of American Public Health Association

I, Catherine Troisi, do hereby affirm and state:

1. I am currently a member of the American Public Health Association (APHA). I have been a member of APHA for approximately twenty years.

2. I joined APHA because of my professional work in public health. I am an epidemiologist specializing in infectious diseases. I have held several leadership roles within APHA.

3. I am also a member of the National Association of County and City Health Officials and the Texas Public Health Association, which is a state APHA affiliate. I am a board member of the International Network of Epidemiologists in Policy.

4. I have lived in West University Place in the Houston, Texas metro area since 1981.

5. I understand that carbon emissions from power plants contribute to climate change.

6. In the decades since I moved to Houston, I have experienced more extreme temperatures and increasingly severe storms due to climate change.

1

A059

7. I understand that climate change has caused warmer water in the Gulf of Mexico that in recent years has meant that hurricanes are more likely to rapidly escalate to category 5. These severe storms have directly impacted my life.

8. When storms rapidly escalate in intensity, there is less time to take necessary precautions. That limited amount of time to prepare can affect people's ability to get supplies and, depending on how bad a storm is, to evacuate.

9. I have previously had to evacuate due to high intensity hurricanes. During Hurricane Rita in 2005, my family evacuated from Houston to Austin. Traffic from the evacuation meant that it took eighteen and a half hours to drive 180 miles. We were unable to use the car's air conditioning because we were worried about not having enough gas, which was a miserable experience in the heat. I was incident commander for public health at a site in Houston where Hurricane Katrina evacuees had gone to earlier in the year, and I saw firsthand how much a storm of that intensity could affect people.

10. I have also seen the effects of flooding from major hurricanes. Many houses near mine flooded during Hurricane Harvey in 2017. Although my family's house did not flood at that time, I am worried that we will have flooding in a future storm, as climate change is causing more frequent and more severe storms that lead to flooding.

2

A060

11. I also understand that climate change causes extreme temperatures. I have experienced extreme temperatures in Houston and their effects.

12. Houston has experienced record-breaking heat in the past few years, particularly in the summers. Even with air conditioning, the heat is oppressive, making it unpleasant even to leave the house for work or to run errands. I ordinarily enjoy walking and biking outside but am often unable to do so because of the extreme heat.

13. When I first moved to Houston, I was excited about living close to the coast and going to the beach, but the water is way too warm along the Texas coast and you literally burn your feet on the sand there. As a result, I instead have to travel farther to the East Coast to vacation at the beach.

14. The Houston area has generally poor air quality, which is exacerbated by high temperatures. Areas near the port refineries and industrial areas have particularly poor air quality.

15. I also understand that the grid in Houston is frequently at risk of failure due to storms and extreme temperatures. I have had to get solar panels and batteries for backup power because of the grid's unreliability.

16. I am also aware that climate change and power plant emissions cause other air quality issues.

3

A061

17. I have asthma, and can experience negative health effects during bad air quality days. I often avoid outdoor activities because of the combination of poor air quality and extreme heat.

18. I work with a coalition for unhoused Houston residents, and have seen how dangerous extreme temperatures—especially extreme heat—can be for people who do not have access to shelter. I am concerned about climate change's impact on these individuals.

19. As an expert in infectious diseases, I understand that as temperatures have increased globally, mosquitoes that carry disease have spread into areas where they have never lived before. As a result, outbreaks of diseases like dengue fever have occurred further north than ever before, including here in Texas.

20. I have six grandchildren, ranging in age from five to nine years. I am worried about the air and climate that they will inherit, and the extreme temperatures and storms that their generation will face.

21. I understand that, in April 2024, the U.S. Environmental Protection Agency ("EPA") finalized a rule establishing new carbon dioxide emissions limits for new gas-fired and existing coal-fired power plants.

22. I support EPA's rule. I understand that the power sector is the second-largest source of greenhouse gas emissions in the country, and believe it is

4

A062

essential to limit both greenhouse gas emissions and localized air pollution emissions from power plants.

23. EPA's rule will benefit my community and me by lessening the impacts of carbon emissions and air pollutants from power plants. I would not receive these benefits if the rule were delayed or overturned.

24. It is my understanding that APHA intends to defend EPA's rule establishing new emissions limits for new gas-fired and existing coal-fired power plants against legal challenges. I support APHA joining a lawsuit to defend this rule.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated this 11 day of May, 2024

_Catherine Troisi_
Catherine Troisi

5

A063

# DECLARATION OF GINA TRUJILLO

I, Gina Trujillo, declare as follows:

1. I am the Director of Membership at the Natural Resources Defense Council, Inc. (NRDC). I have been in that position since January 1, 2015, and have worked at NRDC in the membership department for more than 30 years.

2. My duties include supervising the preparation of materials that NRDC distributes to members and prospective members. Those materials describe NRDC and identify its mission.

3. NRDC is a membership organization incorporated under the laws of the State of New York. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code. NRDC's headquarters are located at 40 West 20th Street, New York, NY 10011.

4. NRDC's mission statement declares that "The Natural Resources Defense Council's purpose is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends." The mission statement goes on to declare that NRDC works "to restore the integrity of the elements that sustain life – air, land, and water – and to defend endangered natural places." NRDC's mission includes the prevention and mitigation of climate change, to

**A064**

protect NRDC's members' use and enjoyment of natural resources and their own health and safety.

5. Through its Climate and Energy Program, NRDC pursues federal and state policies to curb air pollution, particularly the pollutants that are causing climate change.

6. As a part of these efforts to protect our climate, communities, wildlife and ecosystems, NRDC submitted comments on the Environmental Protection Agency's (EPA's) proposal entitled, "New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule." 88 Fed. Reg. 33240 (May 23, 2023). Comments of CATF and NRDC, EPA Docket ID EPA-HQ-OAR-2023-0072-0893 (filed Aug. 8, 2023). NRDC has also intervened to defend in court EPA's prior attempt to regulate greenhouse gas emissions from the power sector, and challenged EPA's unlawful attempt to weaken those earlier standards. *See* Motion to Intervene, *West Virginia v. EPA*, No. 15-1363 (D.C. Cir. Oct. 27, 2015), ECF No. 1580219; Petition for Review, *Amer. Lung. Ass'n v. EPA*, No. 19-1166 (lead case No. 19-1140) (D.C. Cir. Aug. 14, 2019), ECF No. 1802136.

7.    When an individual becomes a member of NRDC, his or her current residential address is recorded in NRDC's membership database. When a member renews his or her membership or otherwise makes a contribution to NRDC, the database entry reflecting the member's residential address is verified or updated.

8.    NRDC currently has approximately 477,130 members. There are NRDC members residing in each of the fifty United States and in the District of Columbia and Puerto Rico.

9.    When an individual becomes a member of NRDC, he or she authorizes NRDC to take legal action on his or her behalf to protect the environment and public health.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Signed on May 7, 2024

_Gina Trujillo_
Gina Trujillo

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**DECLARATION OF HAROLD WIMMER**
**Submitted in Support of American Lung Association**

I, Harold Wimmer, declare and state as follows:

1.      I am the President and Chief Executive Officer for the American Lung Association.

2.      I am responsible for the overall management and operation of the organization. In that capacity, I am required to be familiar with the organization's structure, function, purpose, and membership.

3.      The American Lung Association is incorporated in Maine with headquarters in Chicago, Illinois. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code.

4.      The American Lung Association has supporters in all fifty states and the District of Columbia. The American Lung Association's members and supporters include healthcare professionals, researchers, and educators who share a commitment to reducing the burden of lung disease on patients and their families.

5.      The American Lung Association has a vision of a world free of lung disease. Its mission statement is "to save lives by improving lung health and preventing lung disease."

1

**A067**

6. American Lung Association supporters and volunteers are actively involved in and influence the organization's work. Our volunteers advocate for policies to clean up air pollution and curb climate change, provide professional expertise to the organization, and serve on committees, such as the public policy committee and scientific advisory committee, that develop policy positions and make recommendations to the board of the directors.

7. Recognizing that climate change creates multiple, profound risks that endanger the lung health and lives of millions of Americans, the American Lung Association has supported strong steps to reduce climate change for years. The American Lung Association is committed to improving lung health and preventing lung disease through research, advocacy, and education, including informing the public about health threats from climate change.

8. I understand that on April 24, 2024, the U.S. Environmental Protection Agency ("EPA") finalized a rule titled "New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule." This rule would set performance standards for carbon emissions from new gas-fired power plants and establish emission guidelines for carbon pollution from existing coal-fired power plants.

2

A068

9. The American Lung Association submitted comments with a coalition of other national, state, and local public health, medical and nursing organizations on this rulemaking. Our comments urged EPA to strengthen the proposal to maximize the reduction of greenhouse gases from power plants and to protect the health of communities from air pollution from the power sector.

10. The American Lung Association has also been involved in previous EPA rulemakings regarding power plant carbon emissions and related litigation, including in as both a petitioner and respondent-intervenor before the U.S. Court of Appeals for the D.C. Circuit.

11. The American Lung Association's comments on this rulemaking detailed the health harms of climate change and power plant pollution.

12. As a result of my work with the American Lung Association, I am familiar with health harms from climate change. Carbon dioxide emissions from power plants accumulate in the atmosphere, trapping heat and changing the climate. Research shows that this creates conditions that increase the risk of harm to human health, especially for people with lung disease. For example, higher temperatures in the summer cause higher concentrations of ground-level ozone, and climate change also makes the ozone season longer as well as more intense. Additionally, high levels of widespread particulate matter occur due to wildfires, which are more intense and happening more often due to hotter, dryer conditions in

3

A069

certain areas of the country. Exposure to higher ozone levels and/or higher levels of particulate matter increases the risk of developing respiratory illnesses, increases the likelihood that existing respiratory conditions will worsen, and can increase the risk of premature death, among other serious harms. These changes are affecting American Lung Association members and supporters, and their family members, across the country.

13. The American Lung Association issued its 25th Annual "State of the Air" report on April 24, 2024. That report documents the impacts climate change is having on air quality and the continued need to address air pollution. The report found that over a third of Americans, roughly 131.2 million people, live in areas with failing grades for unhealthy levels of ozone or particulate pollution. Wildfires, which have been exacerbated by climate change, are a major contributor to the increasing number of days and places with these unhealthy levels of pollution.

14. The American Lung Association is particularly well situated to intervene in support of EPA because we serve people who are more vulnerable to the effects of climate change and related air pollution increases. For instance, people who suffer from respiratory conditions, including asthma, face increased risk of asthma attacks, hospitalizations, and missed work because of elevated concentrations of ozone and particulate matter resulting from climate change, and also because of the additional air pollution produced by the power sector.

4

A070

15. The American Lung Association has members and supporters throughout the country who suffer from or treat patients with asthma, chronic obstructive pulmonary disease (COPD), and other lung diseases. Approximately 26.8 million Americans have asthma, including 4.5 million children under age 18, as of 2018. Approximately 11.7 million people in the United States have been diagnosed with COPD. Research warns that climate change is expected to have significant adverse health effects on people with asthma and COPD, especially from increased particulate matter and higher ozone levels. These effects include increased risk of asthma attacks, increased risk of hospitalization, and even premature death.

16. The American Lung Association has members and supporters throughout the country who are over age 65, who have children under age 18, or who exercise or work outdoors. Research warns that climate change is expected to increase the risk of harm to these individuals who are at ages or are regularly engaged in activities where increased particulate matter, ozone or other pollutants have been documented as threats to their health.

17. The American Lung Association members and supporters across the country have a strong interest in supporting EPA's rule and its positive effect on air quality and respiratory health.

5

A071

18.    I support the American Lung Association's efforts to defend EPA's rule and to intervene on EPA's behalf against a legal challenge to the rule. The American Lung Association's efforts to defend the rule are directly relevant to the organization's mission and consistent with its work on air pollution, public health, and climate change.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 7th day of May, 2024.

Harold Wimmer

_____

Harold Wimmer
55 W. Wacker Dr., Suite 1150
Chicago, IL 60601

A072