No. 24-1120

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF WEST VIRGINIA, STATE OF INDIANA, *et al.*,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,

*Respondents*.

## PETITIONERS' MOTION TO STAY

THEODORE E. ROKITA
  ATTORNEY GENERAL

JAMES A. BARTA
 *Solicitor General*

OFFICE OF THE ATTORNEY
GENERAL OF INDIANA
302 W. Washington St.
Indianapolis, IN 46204
Phone: (317) 232-0709
james.barta@atg.in.gov

*Counsel for State of Indiana*

PATRICK MORRISEY
  ATTORNEY GENERAL

LINDSAY S. SEE
 *Solicitor General*
MICHAEL R. WILLIAMS
 *Principal Deputy Solicitor General*
 *Counsel of Record*
FRANK A. DAME
 *Assistant Solicitor General*

OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

[additional counsel listed after signature page]

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Under D.C. Circuit Rule 28(a)(1), Petitioners state the following:

Parties and Amici

1.　Petitioners in this Court are the States of West Virginia, Indiana, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Iowa, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Hampshire, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, and Wyoming.

2.　Respondents in this Court are the United States Environmental Protection Agency and Michael S. Regan, Administrator, United States Environmental Protection Agency.

3.　There are no amici appearing.

Rulings Under Review

4.　The ruling at issue is "New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule," 89 Fed. Reg. 39,798 (May 9, 2024).  It may be found at Doc. No. 2053599, at 13-279.

Related Cases

5.      This case relates to several actions currently consolidated with it, including *Ohio v. EPA*, No. 24-1121; *National Rural Electric Cooperative Association v. EPA*, No. 24-1122; *National Mining Association v. EPA*, No. 1124; and *Oklahoma Gas and Electric Company v. EPA*, No. 1126.

# TABLE OF CONTENTS

Introduction ........................................................................................................ 1

Statement .......................................................................................................... 2

Argument .......................................................................................................... 5

I.   The States Will Likely Prevail ................................................................ 6

     A.   The Rule violates Section 111's terms ........................................... 6

     B.   *West Virginia v. EPA* confirms the Rule is unlawful .................. 13

II.  The States Will Suffer Irreparable Harm Without A Stay .................... 16

III. Other Parties' And The Public's Interest Favor A Stay ...................... 20

Conclusion ...................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) ..........................................................15

*Env't Comm. of Fla. Elec. Power Coordinating Grp., Inc. v. EPA,*
94 F.4th 77 (D.C. Cir. 2024) ....................................................2

*Essex Chem. Corp. v. Ruckelshaus,*
486 F.2d 427 (D.C. Cir. 1973).............................................2, 6

*Kansas v. United States,*
249 F.3d 1213 (10th Cir. 2001)..............................................20

*Kentucky v. Biden,*
23 F.4th 585 (6th Cir. 2022) ..................................................20

*League of Women Voters of U.S. v. Newby,*
838 F.3d 1 (D.C. Cir. 2016) ....................................................21

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
523 U.S. 26 (1998)..................................................................13

*Lignite Energy Council v. EPA,*
198 F.3d 930 (D.C. Cir. 1999)..................................................9

*Michigan v. EPA,*
213 F.3d 663 (D.C. Cir. 2000)................................................12

*Michigan v. EPA,*
576 U.S. 743 (2015)................................................................18

*Myersville Citizens for a Rural Cmty., Inc. v. FERC,*
783 F.3d 1301 (D.C. Cir. 2015)................................................2

*Nat'l Lime Ass'n v. EPA,*
627 F.2d 416 (D.C. Cir. 1980)........................................6, 7, 10

*Nat'l-Southwire Aluminum Co. v. EPA,*
838 F.2d 835 (6th Cir. 1988)..................................................11

iv

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

*Nken v. Holder,*
556 U.S. 418 (2009)...........................................................5

*Pennsylvania v. Kleppe,*
533 F.2d 668 (D.C. Cir. 1976)...........................................21

*Portland Cement Ass'n v. Train,*
513 F.2d 506 (D.C. Cir. 1975)..................................2, 6, 10

*Sierra Club v. Costle,*
657 F.2d 298 (D.C. Cir. 1981)...........................................10

*Students for Fair Admissions, Inc. v. President & Fellows of
Harvard Coll.,*
600 U.S. 181 (2023)..........................................................16

*Texas v. EPA,*
829 F.3d 405 (5th Cir. 2016)........................................20, 21

*Thunder Basin Coal Co. v. Reich,*
510 U.S. 200 (1994).........................................................20

*Train v. Nat. Res. Def. Council, Inc.,*
421 U.S. 60 (1975)...........................................................12

*Tri-State Generation & Transmission Ass'n v. Shoshone River
Power, Inc.,*
805 F.2d 351 (10th Cir. 1986).........................................21

*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 ....................................................................13

*West Virginia v. EPA,*
577 U.S. 1126 (2016).......................................................21

*West Virginia v. EPA,*
597 U.S. 697 (2022)...................... 1, 2, 3, 4, 11, 12, 13, 14, 15, 19

*West Virginia v. EPA,*
90 F.4th 323 (4th Cir. 2024) ...........................................21

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Winter v. Nat. Res. Def. Council, Inc.,*
 555 U.S. 7 (2008)....................................................................5

*Withrow v. Williams,*
 507 U.S. 680 (1993)...............................................................21

*Wyoming v. U.S. Dep't of the Interior,*
 493 F. Supp. 3d 1046 (D. Wyo. 2020) ...............................12

## Statutes

42 U.S.C. § 7401 .........................................................2, 11, 13

42 U.S.C. § 7411 ............................................2, 3, 6, 8, 10, 11, 12

42 U.S.C. § 15962 ..................................................................8

## Other Authorities

89 Fed. Reg. 39,798 (May 9, 2024) ........... 1, 4, 5, 7, 8, 9, 11, 12, 13, 14, 15, 16, 20

FERC-NERC-Regional Entity Staff Report:
 The February 2021 Cold Weather Outages in Texas and
 the South Central United States (Nov. 16, 2021)........................................17

Fed. R. App. 18......................................................................1

# GLOSSARY

CCS..................................................Carbon Capture and Sequestration/Storage

CAA ........................................................................................Clean Air Act

$CO_2$.............................................................................. Carbon Dioxide

EPA ..............................................................Environmental Protection Agency

## INTRODUCTION

Petitioners—half the country's States—move to stay EPA's final rule, "New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule," 89 Fed. Reg. 39,798 (May 9, 2024). The States also ask the Court to administratively stay the Rule while it decides this motion.[*]

If this case feels like a repeat performance, that's because it is. Except this time, EPA must get around a Supreme Court decision explaining how it cannot use the statute here to wipe out the part of the market the Rule will erase. New details aside, the Rule is just as unlawful as EPA's last try. It sets impossible-to-meet standards, removes the States' statutory discretion to patch up the damage, and ultimately leaves regulated sources no choice but to exit the market. But the Supreme Court was clear: Congress did not give EPA power to "direct existing sources to effectively cease to exist." *West Virginia v. EPA*, 597 U.S. 697, 728 n.3 (2022). Because the States and our residents are staring down economy-collapsing harms under this illegal and shortsighted Rule, the Court should stop it now.

---

[*] Respondents oppose this motion. West Virginia had asked EPA to stay the Rule pending review on May 8. Fed. R. App. 18(a)(2)(A)(ii). EPA never responded.

**STATEMENT**

1.   "The Clean Air Act is an exercise in cooperative federalism."
*Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1317
(D.C. Cir. 2015) (cleaned up).   In Section 111's part of that exercise, EPA's
"central determination," *West Virginia*, 597 U.S. at 720, is to identify a "best
system of emission reduction" for regulated stationary source categories, 42
U.S.C. § 7411(a)(1).   Congress gave EPA clear limits and direction in doing
that.   EPA must "determine[]" that the best system of emission reduction is
"adequately demonstrated," "taking into account" "cost," "any nonair quality
health and environmental impact," and "energy requirements."   *Id.*

Under the "seemingly universal view" of that command, Congress
intended the best system to "focus[] on improving the emissions performance
of individual sources."   *West Virginia*, 597 U.S. at 726-27 (cleaned up).   EPA
cannot pick a system that would cause expense "greater than the [regulated]
industry could bear and survive."   *Portland Cement Ass'n v. Train*, 513 F.2d
506, 508 (D.C. Cir. 1975).   Instead, Section 111 expressly requires that the
technology (and the emission limits flowing from it) "be achievable" in the real
world.   *Essex Chem. Corp. v. Ruckelshaus*, 486 F.2d 427, 433 (D.C. Cir. 1973).

When it comes to the States, Congress recognized that air pollution
control is *their* "primary responsibility."   42 U.S.C. § 7401(a)(3).   So it gave
each State "leeway to select means" for controlling pollution "consistent with
its particular circumstances and priorities."   *Env't Comm. of Fla. Elec. Power
Coordinating Grp., Inc. v. EPA*, 94 F.4th 77, 93 (D.C. Cir. 2024).   Under

Section 111, States develop "plan[s]" setting the "standards of performance" for the existing sources in their borders. 42 U.S.C. § 7411(d)(1). (EPA sets standards for new sources. *Id.* § 7411(b).) The States' plans must "reflect[]" the "degree of emission limitation achievable" through EPA's best system of emission reduction. *Id.* § 7411(a)(1). But Congress also said EPA "shall" respect the States' discretion to account for source-specific considerations, including (but not limited to) a facility's "remaining useful life." *Id.* § 7411(d)(1). EPA may directly regulate existing sources only if States fail to submit or enforce a "satisfactory plan." *Id.* § 7411(d)(2).

**2.** For decades, Section 111 was a "gap filler"—really, a "backwater"— EPA "rarely" used. *West Virginia*, 597 U.S. at 724, 730. In its 2015 Clean Power Plan rule, though, EPA purported to "improve the overall power system" by choosing a best system of emission reduction that "force[d] a shift throughout the power grid from one type of energy source to another." *Id.* at 727-28 (cleaned up). The Supreme Court granted a first-of-its-kind stay that kept the rule from going into effect. *Id.* at 715.

EPA later repealed the 2015 rule, and many of the same parties returned to this Court to litigate that choice. *West Virginia*, 597 U.S. at 715-17. But the Supreme Court confirmed that generation shifting was not on the table. The Clean Power Plan "assert[ed] highly consequential power beyond what Congress could reasonably be understood to have granted." *Id.* at 724. The plan sought to "restructur[e] the Nation's overall mix of electricity generation, to transition from 38% coal to 27% coal." *Id.* at 720. But a "decision of such

magnitude and consequence rests with Congress itself, or an agency acting pursuant to a clear delegation." *Id.* at 735. Every marker of a "major questions case" confirmed it: EPA's claimed authority was "unheralded," it would have "transformative[ly] expan[ded]" agency power into an area "Congress had conspicuously and repeatedly declined to enact itself," EPA lacked "comparative expertise" as an energy regulator, and the result would have been "unprecedented power over American industry." *Id.* at 724, 728 (cleaned up). For power like that, EPA's purported statutory authority was nowhere "close to the sort of clear authorization" precedent requires. *Id.* at 732.

**3.** This Rule is EPA's third try at regulating power plants' greenhouse gas emissions under Section 111. This time, EPA chose carbon capture and sequestration/storage, or CCS, as the best system of emission reduction for existing coal-fired steam generating units operating beyond 2038. 89 Fed. Reg. at 39,840. CCS reroutes a plant's exhaust, isolates and extracts the carbon (often offsite), then transports it for use or long-term storage. Plants must begin operating CCS systems at a 90% capture rate by 2032—the genesis of an aggressive "presumptive standard" of 88.4% reductions from current annual emissions. *Id.* at 39,840-41.

Considering the "significant capital expenditures involved in deploying CCS technology," EPA set a separate best system for coal plants set to retire before 2039. 89 Fed. Reg. at 39,800-01. They must convert to co-firing 40% natural gas by 2030. *Id.* at 39,801. Coal-fired plants retiring by 2032 have an

"applicability exemption" from the Rule. *Id.* at 39,805. Plants in either early retirement category cannot change course: To avoid the 90% CCS mandate, retirement commitments are binding. *Id.* at 39,805, 39,958.

The Rule also sets standards for natural gas- and oil-fired steam generating units tied to plant use, 89 Fed. Reg. at 39,896-99, and standards for new and modified fossil fuel-fired combustion turbines, *id.* at 39,902-52.

State plans setting source-specific standards of performance are due in two years. 89 Fed. Reg. at 39,997. EPA generally will not approve a state plan with standards below EPA's "presumptive" standards. *Id.* at 39,956-60. Instead, state plans "must achieve at least the level of emission reduction that would result if each affected [plant] was achieving its presumptive standard of performance." *Id.* at 39,956. And EPA warns that States must show "fundamental differences between the circumstances of a particular facility and the information" EPA considered before using their discretion to tailor standards to remaining useful life and other factors. *Id.* at 39,962.

## ARGUMENT

The Court should stay the Rule because the States will likely succeed on the merits, they face likely irreparable harm, a stay will not substantially injure other interested parties, and the public interest favors a stay. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The first two factors are "most critical"; three and four merge here. *Nken v. Holder*, 556 U.S. 418, 434-35 (2009). All of them push for the States. So like the Supreme Court did last

time it faced a rule poised to remake the electricity-generation sector, this Court should issue a stay.

## I.    The States Will Likely Prevail.

The Rule's 90% CCS, 40% co-firing, and onerous new-source requirements all fail as best systems of emission reduction. They don't line up with what the statute expressly requires. And they're really a backdoor avenue to forcing coal plants out of existence—a major question that no clear congressional authority permits. The Rule likely cannot stand.

### A.    The Rule violates Section 111's terms.

**1.** Standards flunk Section 111 when they are impossible to implement in the near term (at least with any degree of economic sense). A "best system" "has been adequately demonstrated"—note the past tense—and must produce "achievable" emission reductions. 42 U.S.C. § 7411(a)(1). Those terms expect proven technology, not aspiration. EPA's pick must be "reasonably reliable, reasonably efficient," and not "exorbitantly costly," *Essex*, 486 F.2d at 433, under the "most adverse conditions which can reasonably be expected to occur," *Nat'l Lime Ass'n v. EPA*, 627 F.2d 416, 431 n.46 (D.C. Cir. 1980). Though some "projection[s] based on existing technology" are allowed, *Portland Cement*, 486 F.2d at 391, "crystal ball inquir[ies]" and EPA's "subjective understanding of the problem" are not, *Essex*, 486 F.2d at 433 (cleaned up).

CCS is an important emerging technology—many of the States are invested in its success—but it's not feasible on the Rule's scale or timetable.

Real-world examples are crucial to proving a technology represents "the industry as a whole." *Nat'l Lime*, 627 F.2d at 431. Yet no large-scale power plants are achieving 90% capture. No wonder a host of entities called 90% CCS non-feasible. Comments of West Virginia, et al., Dkt. No. EPA-HQ-OAR-2023-0072, at 20-21 (Aug. 8, 2023) ("States Comment"). EPA found just two "electricity generation applications"—that is, power plants with operational CCS. 89 Fed. Reg. at 39,847. But both work with a fraction of the flue gas many coal plants produce: Texas's Petra Nova is a 240 megawatt-equivalent unit, and Canada's Boundary Dam Unit 3 is 110. *Id.* at 39,847-48. Neither captures at 90%. Petra Nova faced many "technical challenges" its first three years (a compliance buffer the Rule refuses) and shut down from 2020 to 2023. *Id.* at 39,849-50. Boundary Dam managed only 37% capture in 2021. States Comment 19. EPA champions its "more recent[]" success, but even that pinnacle makes it "capable of achieving capture rates of 83 percent" only. 89 Fed. Reg. at 39,848.

So unable to live up to the "full-scale deployments" the Rule promises, EPA had no valid basis to "determin[e] that 90 percent capture of $CO_2$ is adequately demonstrated" *now*. 89 Fed. Reg. at 39,813, 39,847.

Nor can EPA's optimism that CCS will come through soon make up the difference. Too many hurdles persist at each step. Cost, for one. Even EPA estimates that 90% capture systems for new units (read: built-to-order, not

retrofitted as existing plants must be) increase capital costs by 115% and operating costs by 35%. 89 Fed. Reg. at 39,932. That estimate is too rosy, *e.g.*, States Comment 22-24, meaning EPA likely failed its *separate* duty to consider "cost," 42 U.S.C. § 7411(a)(1). So too with "adequately demonstrated": The Rule relies heavily on federal credits to potentially make costs bearable. *E.g.*, 89 Fed. Reg. at 39,800, 39,934. But almost all its examples use Energy Policy Act of 2005 funding, and that statute says EPA cannot rely on funded facilities to prove any "technology, or level of emission reduction" is "adequately demonstrated." 42 U.S.C. § 15962(i).

The Rule also allows too little time to build and deploy CCS. The National Center for Carbon Capture estimates the first CCS demonstration projects won't go online until 2030 to 2032—after an eight-to-ten-year process. States Comment 17-18. Yet EPA demands all non-retiring coal plants hit 90% capture in 7.5 years. 89 Fed. Reg. at 39,840-41. That wishful thinking colors how the Rule discusses the few in-process, full-scale CCS plants, too. For example, it says Project Tundra initially "planned completion in April 2024." *Id.* at 39,850-51. But Project Tundra hasn't broken ground and now slates commercial operations for 2028—*thirteen years* after discussions began. *See* source cited *id.* at 39,851 n.315; *see also* Ex.17, McLennan.Decl. ¶¶21-52 (describing Project Tundra).

Transporting extracted carbon presents a similar problem. Although EPA knows little about laying pipelines, it ignores the experts and predicts industry will build enough new $CO_2$ pipelines by 2032. 89 Fed. Reg. at 39,855.

EPA's own modeling, though—which relies on best-case assumptions that all plants will be able to use the closest theoretically viable "saline sequestration site"—calls for 5,000 miles above the country's current 5,385. *Id.* at 39,855-56. With the last eleven years' "14 percent" increase in $CO_2$ pipeline capacity to go on, *id.* at 39,855, banking on almost 100% more and several years faster is hope, not adequate demonstration.

Storing carbon is a problem, too. New builds can "consider proximity and access to geologic sequestration sites." 89 Fed. Reg. at 39,863. Existing plants cannot. Even assuming site-specific testing proves all or even most of EPA's "potential" sites, *id.*, viable, someone must build facilities there before plants can use them. And EPA admits that "only sequestration facilities with Federal funding are currently operational." *Id.* at 39,864. *If* industry chooses to build, EPA (or one of a few approved States) must also permit storage sites for Class VI injection or storage. *Id.* at 39,870-71. Yet EPA has issued just eight Class VI permits so far, and even with the new resources it promises to this "multidisciplinary process," it only "aims" to issue new permits in two years "when appropriate." *Id.* at 39,870-71. Add lead time to analyze and secure funding for dozens of permits needed for the Rule's success—not to mention years more to build, connect (new) pipelines, and ramp up operations—and EPA's storage assumptions are more "speculation or conjecture" than demonstration. *Lignite Energy Council v. EPA*, 198 F.3d 930, 934 (D.C. Cir. 1999).

Thus, EPA isn't offering "fair[] … project[ions]." *Portland Cement*, 486 F.2d at 391. CCS has promise—but the "greater the imprint of the new technology," "the more demanding" Section 111 becomes when reviewing its "capabilities." *Sierra Club v. Costle*, 657 F.2d 298, 348 (D.C. Cir. 1981). Looking "cumulative[ly]" at all the question marks of 90% CCS by 2032, *Nat'l Lime*, 627 F.2d at 431, the States will likely show it is far from "adequately demonstrated."

The intermediate "best system" of 40% natural gas co-firing (for plants closing between 2032 and 2039) suffers from similar problems. Only about a third of plants co-fire at all, and those few plants average about 4%, not 40%. *See, e.g.*, Comments of Otter Tail, Dkt. No. EPA-HQ-OAR-2023-0072, at 30-32 (Aug. 8, 2023). Transitioning to 40% co-firing would require plants to replace or upgrade the boiler and supporting systems—all expensive and technically challenging options. *Id.* The plants would then need a large, reliable supply of natural gas—a commodity already in high demand. *Id.* More natural-gas co-firing also means more natural-gas pipelines, yet EPA ignores the problems and time impossibilities from permitting, siting, financing, and eminent domain. And finally, EPA has not shown that co-firing is an available option for "the industry as a whole." *Nat'l Lime*, 627 F.2d at 431. So this "intermediate" option is no option at all.

**2.** The Rule also bungles the States' statutory authority to set existing sources' "standards of performance" and account for source-specific factors like a plant's "remaining useful life." 42 U.S.C. § 7411(d)(1). Reflecting

Congress's directive that controlling air pollution "is the primary responsibility of States and local governments," *id.* § 7401(a)(3), "the States set the actual rules governing existing" sources, *West Virginia*, 597 U.S. at 710. State plans must "reflect[]" the emission limitations EPA's best system can achieve, 42 U.S.C. § 7411(a)(1), not mirror them. That, plus the promise EPA will permit source-specific tailoring, *id.* § 7411(d), means Section 111(d) "gives substantial latitude to the states in setting emission standards," *Nat'l-Southwire Aluminum Co. v. EPA*, 838 F.2d 835, 838 (6th Cir. 1988).

These provisions mark the daylight between EPA's primary responsibility for new-source regulation, 42 U.S.C. § 7411(b), and its secondary role for existing ones. But the Rule blurs it. States must rubber-stamp EPA's impossibilities and cannot meaningfully mitigate the harms that come with them. This flaw dooms *all* the Rule's existing-source regulations.

*First*, the Rule makes EPA's "presumptive standards" virtual requirements. 89 Fed. Reg. at 39,956. And these extra-statutory presumptions go beyond ostensibly helpful shortcuts: EPA will not declare plans "satisfactory" if they fail to "achieve at least the level of emission reduction" the "presumptive standards" do. *Id.* In fact, the Rule affirms States' "authority to deviate" from EPA's path only where they seek "to apply a more stringent standard of performance"—EPA will accept *those* standards without additional justification. *Id.* at 39,957. Otherwise, instances warranting a different methodology "will be limited to anticipated changes in [plant] operation." *Id.* at 39,958.

So the presumptive standards veer too close to unlawful direct regulation. While EPA may voice a "preferred approach" for state plans, it cannot erase the States' discretion by insisting on it. *See Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 69 (1975). Its role is to "guide States" in setting standards. *West Virginia*, 597 U.S. at 728 n.3; *accord Wyoming v. U.S. Dep't of the Interior*, 493 F. Supp. 3d 1046, 1071 n.23 (D. Wyo. 2020). Without the "real choice" the statute affords, *Michigan v. EPA*, 213 F.3d 663, 687 (D.C. Cir. 2000), the Rule makes the States agents instead of co-regulators.

*Second*, the Rule doubles down on EPA's wrongheaded approach to "remaining useful life" and "other factors." 42 U.S.C. § 7411(d)(1). EPA insists the Rule only repeats a new policy it promulgated elsewhere. 89 Fed. Reg. at 39,962. Many of the States are challenging that policy, too. *See West Virginia v. EPA*, No. 24-1009 (D.C. Cir. filed Jan. 16, 2024). But EPA can't justify misreading Section 111(d) in the Rule just because it made the same error elsewhere first.

And it is error. For one thing, the Rule treats "remaining useful life" as a potential way to mitigate the presumptive standards' rigidity—if EPA agrees with the State's assessment, it might approve a variance. *E.g.*, 89 Fed. Reg. at 39,956. EPA forgets States have authority to consider remaining useful life "in applying a standard of performance to any particular source," not just in setting it. 42 U.S.C. § 7411(d)(1). Tailoring is a back-end failsafe to the standards' front-end regulation. Regardless, the Rule leaves little room for source-specific discretion anywhere in the analysis. Only "fundamental

differences" satisfy EPA when a State tries to deploy discretion. 89 Fed. Reg. at 39,962. The Rule permits deviation only to the extent "necessary to address the fundamental difference." *Id.* And despite making its presumptive standards near-binding, the Rule refuses to "provid[e] presumptively approvable circumstances or analyses" for source-specific considerations—suggesting few, if any, exist. *Id.* at 39,964.

Inflexibility might be ok were EPA right that Congress meant to let States account for "exceptional circumstances" only. *Id.* at 39,890 n.674. But in a statute expressly protecting the States' pollution-management role, 42 U.S.C. § 7401(a)(3), Congress said EPA "shall permit" their source-specific judgments, *id.* § 7411(d). *See also Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("shall" "normally creates an obligation impervious to judicial discretion"). The Rule turns "shall" into a virtual "shall *not*," at least absent non-statutory, EPA-approved exceptional circumstances.

Rules that "overthrow" the CAA's "structure and design" are illegal. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014). This Rule's cavalier approach to Section 111's text shows it's one of them.

### B. *West Virginia v. EPA* confirms the Rule is unlawful.

Leaving aside infidelity to what Section 111 says, the Rule also fails because of what it doesn't. In considering EPA's 2015 rule, the Supreme Court said that sometimes even "a colorable textual basis" cannot justify regulation. *West Virginia*, 597 U.S. at 722. The Rule lacks even that—see above. But

EPA's venture back into major-questions territory is another reason the States will likely win.

The Rule remains in *West Virginia*'s crosshairs. *Contra* 89 Fed. Reg. at 39,899-90. Addressing the same statute and same segment of power generation, the Supreme Court saw EPA's task as regulating the industry as it finds it—not remaking it by "direct[ing] existing sources to effectively cease to exist." *West Virginia*, 597 U.S. at 728 n.3. It meant fossil fuel power plants. Whether "it would be 'best' if coal made up a much smaller share of national electricity generation" is a "very different kind of policy judgment" than Section 111 allows. *Id.* at 728. Congress kept the question of "how much coal-based generation" should exist for itself. *Id.* at 729.

Nothing's changed to suggest the Court would view the Rule with a different eye. The Rule still involves issues of nationwide "economic and political significance," "compliance costs" are still prohibitive, EPA still lacks energy "expertise," Congress still hasn't legislated despite the "well known" issues at stake, and EPA still lacks "clear authorization" to act in its stead. *West Virginia*, 597 U.S. at 701, 714, 731. Even so, the Rule would functionally eliminate coal and other fossil fuel-fired source categories from the market.

As explained above, most coal plants could not reach 90% capture by 2032 even if money were no object. No commercial-scale facilities have reached that benchmark. And despite CCS's promise, too much still needs to be done—funded, permitted, built, tested, and deployed for the capture, transport, and storage phases—to meet the Rule's mandates. EPA knows it.

The Rule says often that coal plants are already retiring. *E.g.*, 89 Fed. Reg. at 39,875-76. But EPA's own estimates show a large percentage slated to stay open. *Id.* at 39,812. And the Rule admits that modeling shows "*most sources that install CCS retire due to the costs of meeting*" the Rule's standards by 2045. *Id.* at 39,900 (emphasis added). At bottom, the Rule will drive retirements across the country—and much sooner. Ex.29, Preservati.Decl. ¶¶7, 13 (Rule puts "in jeopardy" *all* West Virginia coal plants not slated for pre-2039 retirement); *see also* Ex.2, Hasten.Decl. ¶¶18-24; Ex.4, Webb.Decl. ¶6; Ex.7, Zieman, *et al.*Decl. ¶7; Ex.10, Prettyman.Decl. ¶4.a.; Ex.11, Huston.Decl. ¶¶11, 17, 26; Ex.14, McCollam.Decl. ¶9; Ex.27, Dowd.Decl. ¶¶11, 21; Ex.30, Lane.Decl. ¶¶5, 13; Ex.31, Parfitt.Decl. ¶7.

EPA would sidestep *West Virginia* because CCS is a "traditional, add-on emissions control" instead of "generation shifting." 89 Fed. Reg. at 39,899-900. Put aside for now that CCS's transport and storage phases distinguish it from true *source*-based measures. Although *West Virginia* didn't resolve if EPA may ever regulate beyond the source, 597 U.S. at 734, it also didn't hold that "traditional" measures never involve major questions. It's the "basic and consequential tradeoffs" at stake, rather, that make something "major." *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023) (cleaned up). And *West Virginia* considered the 2015 rule's effects, not its nomenclature: The "emissions ceilings [were] so strict that no existing coal plant" could achieve them without shifting generation or stopping operations. 597 U.S. at 714.

That's why it doesn't matter that EPA took care not to say the quiet part too loudly this time. It knows the Rule will mean "less electricity" from "coal-fired power plants" and more from "other sources" instead. 89 Fed. Reg. at 38,899. "[W]hat cannot be done directly cannot be done indirectly." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (cleaned up). So while the Court could reject the Rule on the more prosaic statutory grounds above, the States will also likely prevail in showing EPA cannot set impossible-to-meet standards that drive regulated sources to close.

## II.    The States Will Suffer Irreparable Harm Without A Stay.

The Rule will damage the energy grids, threatening dangerous, irreparable harm. *All* of it—its retirement-inducing CCS and co-firing mandates and its construction-stifling rules for new plants—injures the States.

Energy regulators and grid experts say reliability margins are painfully thin. *E.g.*, Ex.11, Huston.Decl. ¶¶14, 22, 30 (Midcontinent Independent System Operator); Ex.25, Parker.Decl. ¶¶14-17 (North American Electric Reliability Corporation); Ex.24, Rickerson.Decl. ¶¶18-20 (Electric Reliability Council of Texas). Last week, the PJM regional transmission organization warned that the Rule may "drive premature retirement of coal units that provide essential reliability services and dissuade new gas resources from coming online" "in the very years" demand increases will leave no capacity to spare. Ex.30, Lane.Decl. Ex.A; *see* Ex.12, Purvis.Decl. ¶6 (forecasting

upcoming Kentucky demand increase at "average of 1.5 percent per year"). Combined with other regulatory burdens adding to the supply-side crush, the grids cannot handle that loss. Ex.2, Hasten.Decl. ¶31 (Rule will cost Arkansas utility 335 megawatts on top of 1,168-megawatt loss from prior regulations); Ex.25, Parker.Decl. ¶21 (Rule-based retirements "are amplified by … other rules EPA has proposed or issued"). Especially not when "losing even one or two" plants can be devastating. Ex.25, Parker.Decl. ¶12; *see* Ex.27, Dowd.Decl. ¶24 ("significant, adverse" consequences when Rule forces Virginia's two coal-fired plants offline). Yet the Rule will seriously and directly undermine grid reliability. Ex.21, Vigesaa.Decl. ¶¶10-12 (describing models showing capacity shortfalls from the Rule).

The consequences are severe. Forced reliance on "less reliable sources" destabilizes the grids and pushes "major" rate hikes. Ex.11, Huston.Decl. ¶¶16, 19, 23; *see also* Ex.22, Stegmann.Decl. ¶20 (noting how the Rule will undermine Oklahoma's ability to construct a "nimble and robust fleet"); Ex.25, Parker.Decl. ¶39 (detailing categories of costs Rule will foist onto ratepayers). The Rule makes our residents "unnecessarily vulnerable to brownouts and blackouts," Ex.4, Webb.Decl. ¶12—which can be deadly. *E.g.*, FERC-NERC-Regional Entity Staff Report: The February 2021 Cold Weather Outages in Texas and the South Central United States 9 (Nov. 16, 2021), https://bit.ly/3QEwO1w (reporting over 200 fatalities during winter storm, most "connected to the power outages"); *see also* Ex.14, McCollam.Decl. ¶27 (CCS renders sources less reliable). Skyrocketing electricity rates threaten

"businesses, jobs and even human health." Ex.29, Preservati.Decl. ¶4; *see also id.* ¶11 (West Virginia fossil power generation sector represents "$93,000,000 in annual wages"); Ex.18, Friez.Decl. ¶14 (lignite industry generated "over $1 billion"). And the hundreds of millions of dollars in "stranded investments" when plants retire prematurely means residents' rates will have to pay for deadweight plants *and* "billions of dollars in new investment" to try to keep the lights on. Ex.30, Lane.Decl. ¶9; *see* Ex.18, Friez.Decl. ¶11 (recovering costs of lost power and abandoned investments will get passed onto ratepayers); Ex.13, Nowalslki.Decl. ¶¶8-9 (Rule imposes billions in costs in Montana); Preservati.Decl. ¶¶13-15 (replacing coal-fired power in West Virginia would cost $39 to $129 billion); Ex.10, Prettyman.Decl. ¶4.d. ("replacing lost capacity" costs "orders of magnitude greater than previous options").

Although plants may not go offline tomorrow, the decisions leading there have begun and will not be unwindable. Given financing, permitting, and interconnection challenges, "[u]tility planning horizons extend" out "to a decade." Ex.10, Prettyman.Decl. ¶4.e. So "[d]ecisions about whether plants can continue to operate" under the Rule "cannot be delayed." Ex.4, Webb.Decl. ¶7; *see also* Ex.11, Huston.Decl. ¶19 (no "luxury of waiting for future developments before making decisions"); Ex.30, Lane.Decl. ¶21 (possible "favorable future court ruling" doesn't change "need to begin planning" "immediately"); *cf.* Ex.20, Tschider.Decl. ¶¶62-75 (explaining "immediate, irreparable harms" for operator). We've seen this dynamic

before: By the time the Supreme Court rejected another illegal rule in *Michigan v. EPA*, 576 U.S. 743 (2015), industry had made critical business decisions consistent with the rule. Pet. for Writ of Certiorari, *West Virginia v. EPA*, No. 20-1530, at 23 (filed Apr. 29, 2021). Agencies and utilities say the same is happening now. *E.g.*, Ex.9, Pinegar.Decl. ¶8.

The Rule brings other irreparable harms, too. As "the object of" the Rule's requirements, *West Virginia*, 597 U.S. at 719 (cleaned up), the States must take steps now even while seeing its bad ends ahead. Ex.22, Stegmann.Decl. ¶14 (Oklahoma regulator must "begin working … immediately"). The Rule is complex and state plans require many-faceted, multi-agency phases. *E.g.*, Ex.8, Stuckey.Decl. ¶¶6-8; Ex.31, Parfitt.Decl. ¶¶5-7. They take "hundreds of thousands of dollars" and thousands of personnel hours. Ex.25, Parker.Decl. ¶40; *see* Ex.5, Boylan.Decl. ¶4 (Georgia's "near-term costs would be at least $683,484"); Ex.16, Helms.Decl. ¶14 (North Dakota regulator will "dedicate at least 28,000 hours of staff time"). Given agencies' limited budgets, that time and money comes at the expense of other duties— including under the CAA. Ex.5, Boylan.Decl. ¶4; Ex.31, Parfitt.Decl. ¶¶4, 11. And with a two-year deadline, States can't wait on litigation before getting to work on "the most complex, byzantine regulations" the agencies have seen. Ex.28, Crowder.Decl. ¶19; *see also* Ex.3, Osborne.Decl. ¶¶11-13; Ex.8 Stuckey.Decl. ¶9; Ex.15, Semerad.Decl. ¶14.

State agencies have spent "[t]housands of hours of staff time and extensive monetary resources" "backtracking and undoing" other EPA rules

where judicial relief came too late. Ex.1, Gore.Decl. ¶¶9-10. So given "the irreparable harm of nonrecoverable compliance costs," success without a stay threatens an empty victory. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 221 (1994) (Scalia, J., concurring in part and in the judgment).

Lastly, the Rule invades the States' sovereignty—"intangible harm" that cannot be redressed. *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (6th Cir. 2022). States have "sovereign interests" in regulating emissions and crafting "public polic[y]." *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001). And here specifically, "inver[ting]" the CAA's "federalism principles" is irreparable injury. *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016). All these harms urge a stay.

## III. Other Parties' And The Public's Interest Favor A Stay.

The remaining factors do, too. Keeping the status quo would not harm other parties. EPA's actions belie any emergency: it issued the Rule almost two years after *West Virginia*. Considering EPA stopped defending the prior administration's rule well before then, Br. for the Fed. Resps., *West Virginia v. EPA*, No. 20-1530 (filed Jan. 18, 2022), that delay is inexplicable. And any climate-based claims don't undercut relief. EPA believes coal-based generation will halve before 2039 without the Rule. 89 Fed. Reg. at 39,812. It also flaunts that the "power sector achieved a deeper level of reductions" than the Clean Power Plan forecast while that rule was stayed. *Id.* at 39,813; *see also* Ex.22, Stegmann.Decl. ¶24. Beyond that, "EPA's asserted injury" was "unconvincing" where a rule "would not reduce emissions for at least three

years." *Texas*, 829 F.3d at 434. Even more with compliance deadlines 7.5 years out.

On the last factor, this Court finds "no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). The public is "particular[ly]" interested in preserving federalism's "constitutional balance." *Withrow v. Williams*, 507 U.S. 680, 687 (1993) (cleaned up). A stay would also safeguard affordable and reliable electricity—the "efficient production of electricity" is an important public interest. *West Virginia v. EPA*, 90 F.4th 323, 332 (4th Cir. 2024); *see also Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 357 (10th Cir. 1986) (public interest in residents not "los[ing] their source of electric power").

\* \* \*

The Rule's "clear and direct effects would" "substantial[ly] disrupt[]" our "internal econom[ies] and" "impair[]" our residents' "well-being." *Pennsylvania v. Kleppe*, 533 F.2d 668, 674 (D.C. Cir. 1976). The Fifth Circuit stayed a rule likely to destabilize the grid from coal plant closures. *Texas*, 829 F.3d at 434. The Supreme Court stayed *this* Rule's precursor the same year. *West Virginia v. EPA*, 577 U.S. 1126 (2016). This Court should do the same now.

## CONCLUSION

The Court should stay the Rule.

Respectfully submitted,

THEODORE E. ROKITA
   ATTORNEY GENERAL

/s/ James A. Barta
James A. Barta
  *Solicitor General*

Office of the Attorney General
of Indiana
302 W. Washington St.
Indianapolis, IN 46204
Phone: (317) 232-0709
james.barta@atg.in.gov

*Counsel for State of Indiana*

PATRICK MORRISEY
   ATTORNEY GENERAL

/s/ Michael R. Williams
Lindsay S. See
  *Solicitor General*
Michael R. Williams
  *Principal Deputy Solicitor General*
  *Counsel of Record*
Frank A. Dame
  *Assistant Solicitor General*

Office of the Attorney General of
West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

STEVE MARSHALL
   ATTORNEY GENERAL

/s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
 *Solicitor General*

Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
 (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for State of Alabama*

TIM GRIFFIN
   ATTORNEY GENERAL

/s/ Nicholas J. Bronni
Nicholas J. Bronni
 *Solicitor General*
Dylan Jacobs
 *Deputy Solicitor General*

Office of the Arkansas Attorney
General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007 (main)
Nicholas.Bronni@ArkansasAG.gov
Dylan.Jacobs@ArkansasAG.gov

*Counsel for State of Arkansas*

TREG TAYLOR
   ATTORNEY GENERAL

/s/ Garrison Todd
Garrison Todd
 *Assistant Attorney General*

Alaska Department of Law
1031 W. 4th Ave., Ste. 200
Anchorage, AK 99501
(907) 269-5100
garrison.todd@alaska.gov

*Counsel for State of Alaska*

ASHLEY MOODY
   ATTORNEY GENERAL

/s Henry C. Whitaker
Henry C. Whitaker
 *Solicitor General*
James H. Percival
 *Chief of Staff*

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
henry.whitaker@myfloridalegal.com
james.percival@myfloridalegal.com

*Counsel for State of Florida*

CHRISTOPHER M. CARR
  ATTORNEY GENERAL

/s/ Stephen J. Petrany
Stephen J. Petrany
  *Solicitor General*

Office of the Attorney General of
Georgia
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*


BRENNA BIRD
  ATTORNEY GENERAL

/s/ Eric H. Wessan
Eric H. Wessan
  *Solicitor General*

Office of the Attorney General of
Iowa
1305 E. Walnut Street
Des Moines, IA 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

RAÚL R. LABRADOR
  ATTORNEY GENERAL

/s/ Joshua N. Turner
Joshua N. Turner
  *Chief of Constitutional Litigation
  and Policy*
Alan M. Hurst
  *Solicitor General*

Office of the Idaho Attorney
General
P.O. Box 83720
Boise, ID 83720-0010
Tel:   (208) 334-2400
Josh.Turner@ag.idaho.gov
Alan.Hurst@ag.idaho.gov

*Counsel for State of Idaho*

RUSSELL COLEMAN
  ATTORNEY GENERAL

/s/ Matthew F. Kuhn
Matthew F. Kuhn
  *Solicitor General*
Jacob M. Abrahamson
  *Counsel for Special Litigation*

Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, KY 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jacob.Abrahamson@ky.gov

*Counsel for the Commonwealth of
Kentucky*

LIZ MURRILL
  ATTORNEY GENERAL

/s/ J. Benjamin Aguiñaga
J. Benjamin Aguiñaga
  *Solicitor General*
Tracy Short
  *Assistant Attorney General*

Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
(225) 326-6766
aguinagaj@ag.louisiana.gov
shortt@ag.louisiana.gov

*Counsel for State of Louisiana*

ANDREW BAILEY
  ATTORNEY GENERAL

/s/ Joshua M. Divine
Joshua M. Divine
  *Solicitor General*

Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel. (573) 751-1800
Fax. (573) 751-0774
josh.divine@ago.mo.gov

*Counsel for State of Missouri*

LYNN FITCH
  ATTORNEY GENERAL

/s/ Justin L. Matheny
Justin L. Matheny
  *Deputy Solicitor General*

Office of the Mississippi Attorney
General
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

AUSTIN KNUDSEN
  ATTORNEY GENERAL

/s/ Christian B. Corrigan
Christian B. Corrigan
  *Solicitor General*
Peter M. Torstensen, Jr.
  *Deputy Solicitor General*

Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Counsel for State of Montana*

MICHAEL T. HILGERS
  ATTORNEY GENERAL

/s/ Zachary A. Viglianco
Zachary A. Viglianco
  *Deputy Solicitor General*

Office of the Attorney General of Nebraska
2115 State Capitol
Lincoln, NE 68509
(531) 739-7645
zachary.viglianco@nebraska.gov

*Counsel for State of Nebraska*

DREW H. WRIGLEY
  ATTORNEY GENERAL

/s/ Philip Axt
Philip Axt
  *Solicitor General*

Office of Attorney General of North Dakota
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for State of North Dakota*

JOHN FORMELLA
  ATTORNEY GENERAL

/s/ Mark W. Dell'Orfano
Mark W. Dell'Orfano
  *Assistant Attorney General*

New Hampshire Department of Justice
1 Granite Place South
Concord, New Hampshire 03301-3271
(603) 271-1236
Mark.W.DellOrfano@doj.nh.gov

*Counsel for State of New Hampshire*

GENTNER DRUMMOND
  ATTORNEY GENERAL

/s/ Garry M. Gaskins, II
Garry M. Gaskins, II
  *Solicitor General*
Jennifer L. Lewis
  *Deputy Attorney General*

Office of the Attorney General of Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for State of Oklahoma*

ALAN WILSON
  ATTORNEY GENERAL

Robert D. Cook
  *Solicitor General*

/s/ J. Emory Smith, Jr.
J. Emory Smith, Jr.
  *Deputy Solicitor General*
Thomas T. Hydrick
  *Assistant Deputy Solicitor*
  *General*
Joseph D. Spate
  *Assistant Deputy Solicitor*
  *General*

Office of the Attorney General of
South Carolina
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for State of South Carolina*

MARTY J. JACKLEY
  ATTORNEY GENERAL

/s/ Steven Blair
Steven Blair
  *Deputy Attorney General*

South Dakota Attorney General's
Office
1302 E. Highway 14, Suite 1
Pierre, SD 57501
(605) 773-3215
atgservice@state.sd.us

*Counsel for State of South Dakota*

JONATHAN SKRMETTI
  ATTORNEY GENERAL AND
REPORTER

/s/ J. Matthew Rice
J. Matthew Rice
  *Solicitor General*
Whitney Hermandorfer
  *Director of Strategic Litigation*

Office of the Attorney General and
Reporter of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-7403
Matt.Rice@ag.tn.gov
Whitney.Hermandorfer@ag.tn.gov

*Counsel for State of Tennessee*

KEN PAXTON
  ATTORNEY GENERAL

Brent Webster
  *First Assistant Attorney General*

James Lloyd
  *Deputy Attorney General for Civil
  Litigation*

Kellie E. Billings-Ray
  *Chief, Environmental Protection
  Division*

/s/ Wesley S. Williams
Wesley S. Williams
  *Assistant Attorney General*

Office of the Attorney General of
Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | Fax: (512) 320-0911
Wesley.Williams@oag.texas.gov

*Counsel for State of Texas*

SEAN REYES
   ATTORNEY GENERAL

/s/ Stanford E. Purser
Stanford E. Purser
  *Solicitor General*

Office of the Utah Attorney General
160 E. 300 S., 5th Floor
Salt Lake City, Utah 84111
385-382-4334
spurser@agutah.gov

*Counsel for State of Utah*

JASON MIYARES
   ATTORNEY GENERAL

/s/ Erika L. Maley
Erika L. Maley
  *Solicitor General*
Kevin M. Gallagher
  *Principal Deputy Solicitor General*
Brendan T. Chestnut
  *Deputy Solicitor General*

Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
emaley@oag.state.va.us
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us

*Counsel for Commonwealth of Virginia*

BRIDGET HILL
   ATTORNEY GENERAL

/s/ D. David DeWald
D. David DeWald
  *Deputy Attorney General*

Office of the Attorney General of Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov

*Counsel for State of Wyoming*

Dated: May 13, 2024

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 5,193 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

/s/ Michael R. Williams
Michael R. Williams