ORAL ARGUMENT NOT YET SCHEDULED

Consolidated Nos. 24-1120, -1121, **-1122,** -1124, -1126

# In the United States Court of Appeals for the District of Columbia Circuit

NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION,

*Petitioner*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL REGAN, in his official capacity as Administrator of the United States Environmental Protection Agency,

*Respondents.*

On Petition for Review of a Final Action of the
United States Environmental Protection Agency

**MOTION FOR STAY OF EPA'S FINAL RULE**

Mithun Mansinghani
LEHOTSKY KELLER COHN LLP
619 W. Main St.
Oklahoma City, OK 73102

Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
408 W. 11th St., 5th Floor
Austin, TX 78701

Scott A. Keller
    *Counsel of Record*
Steven P. Lehotsky
Michael B. Schon
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com

*Counsel for the National Rural Electric Cooperative Association*

## TABLE OF CONTENTS

Table of Exhibits ................................................................. iii

Table of Authorities ............................................................. v

Glossary ......................................................................... viii

Introduction ..................................................................... 1

Background ....................................................................... 5

    A.    Statutory overview ........................................ 5

    B.    EPA's 90% carbon-capture-and-sequestration ("CCS") Rule .... 6

        1.    Existing coal-fired units ............................. 6

        2.    New gas-fired units .................................... 7

    C.    Procedural history ........................................ 8

Argument ......................................................................... 8

I.    Petitioner is likely to succeed on the merits ................. 8

    A.    The Rule exceeds EPA's Clean Air Act Section 111 authority. ............................................. 9

        1.    90% CCS is not an "adequately demonstrated" system. ................................................. 9

        2.    Emissions limits based on 90% CCS are not "achievable." ......................................... 13

        3.    The Rule's alternative compliance options unlawfully require generation-shifting. ............ 15

    B.    The major-questions doctrine confirms that the Rule is unlawful ............................................ 16

    C.    The Rule is arbitrary and capricious. .................. 18

II.    Petitioner's members will suffer immediate irreparable harm absent a stay. ............................................... 18

III.    The balance of harms and the public interest strongly favor a stay. . 21

Conclusion ....................................................................... 22

Certificates ..................................................................... 23

**TABLE OF EXHIBITS**

Exhibit A        Declaration of Jim Matheson, *Chief Executive Officer, National Rural Electric Cooperative Association*

Exhibit B        Declaration of Gavin McCollam, *Senior Vice President and Chief Operating Officer, Basin Electric Power Cooperative*

Exhibit C        Declaration of Jerry Purvis, *Vice President of Environmental Affairs, East Kentucky Power Cooperative*

Exhibit D        Declaration of Robert McLennan, President and Chief Executive Officer, *Minnkota Power Cooperative*

Exhibit E        Declaration of David J. Tudor, *Chief Executive Officer & General Manager, Associated Electric Cooperative Inc.*

Exhibit F        Declaration of Vernon Hasten, President and Chief Executive Officer, *Arkansas Electric Cooperative Corporation*

Exhibit G        Declaration of Craig Grooms, *Chief Operating Officer, Buckeye Power, Inc.*

Exhibit H        Declaration of Ben Porath, *Executive Vice President and Chief Operating Officer, Dairyland Power Cooperative*

Exhibit I        Declaration of Justin Soderberg, *Vice President of Generation, Western Farmers Electric Cooperative*

Exhibit J        Declaration of Robert C. Hochstetler, *President and Chief Executive Officer, Central Electric Power Cooperative, Inc.*

Exhibit K        Declaration of Kari Hollandsworth, President & Chief Executive Officer, *Golden Spread Electric Cooperative, Inc.*

Exhibit L        *New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for*

*Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule*, 89 Fed. Reg. 39,798 (May 9, 2024)

## TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ala. Ass'n of Realtors v. HHS*,
  594 U.S. 758 (2021) ............................................................ 18, 21

*Am. Clinical Lab'y Ass'n v. Becerra*,
  40 F.4th 616 (D.C. Cir. 2022) ........................................... 18

*\*Am. Lung Ass'n v. EPA*,
  985 F.3d 914 (D.C. Cir. 2021) ........................................... 9, 12

*\*Chamber of Com. v. EPA*,
  577 U.S. 1127 (2016) ........................................................ 4, 18

*Constellation Mystic Power, LLC v. FERC*,
  45 F.4th 1028 (D.C. Cir. 2022) ......................................... 18

*CSX Transp., Inc. v. Williams*,
  406 F.3d 667 (D.C. Cir. 2005) ........................................... 19

*Horsehead Res. Dev. Co., v. Browner*,
  16 F.3d 1246 (D.C. Cir. 1994) ........................................... 18

*King v. Burwell*,
  576 U.S. 473 (2015), .......................................................... 16

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ............................................... 21

*\*Lignite Energy Council v. EPA*,
  198 F.3d 930 (D.C. Cir. 1999) ........................................ 9, 10, 11, 12

*Mexichem Specialty Resins, Inc. v. EPA*,
  787 F.3d 544 (D.C. Cir. 2015) ........................................... 20

_____

*Authorities upon which we chiefly rely are marked with asterisks.

*Michigan v. EPA,*
    576 U.S. 743 (2015) ........................................................ 21

*Nat'l Fed'n of Indep. Bus. v. OSHA,*
    595 U.S. 109 (2022) ............................................... 17, 18, 20

*\*Nat'l Lime Ass'n v. EPA,*
    627 F.2d 416 (D.C. Cir. 1980) ....................................... 13, 14, 16, 18

*In re NTE Conn., LLC,*
    26 F.4th 980 (D.C. Cir. 2022) ........................................... 19, 21

*\*Portland Cement Ass'n v. Ruckelshaus,*
    486 F.2d 375 (D.C. Cir. 1973) ..................................... 13, 14, 16, 17

*Sierra Club v. Costle,*
    657 F.2d 298 (D.C. Cir. 1981) ................................................ 14

*Singh v. Berger,*
    56 F.4th 88 (D.C. Cir. 2022) ................................................ 20

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ........................................................ 20

*\*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ........................................................ 13

*\*West Virginia v. EPA,*
    597 U.S. 697 (2022) ..................................................1, 2, 4-8, 14-17

**Statutes**

5 U.S.C. § 705 ................................................................. 8

5 U.S.C. § 706 ................................................................ 18

42 U.S.C. § 7411(a)(1) ........................................ 1, 2, 5, 8, 10, 13, 15, 17

42 U.S.C. § 7411(b).................................................................. 5, 6

42 U.S.C. § 7411(d) ........................................................................ 5, 6

**Other Authorities**

Angela C. Jones & Ashley J. Lawson, Cong. Rsch. Serv., *Carbon Capture and Sequestration (CCS) in the United States* (Oct. 5, 2022), https://perma.cc/L73B-JXAW .......................................... 17

EPA, *In Perspective: the Supreme Court's Mercury and Air Toxics Rule Decision* (June 30, 2015), https://perma.cc/D9NK-CNBB ................. 21

National Rural Electric Cooperative Association, *Comment Letter on Proposed Rule* (Aug. 8, 2023), https://perma.cc/JH6G-H8F8 ....... 9, 11-16, 21

*New Source Performance Standards for Greenhouse Gas Emissions From New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions From Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule*, 88 Fed. Reg. 33,240 (proposed May 23, 2023) .......................................... 12

*New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule*, 89 Fed. Reg. 39,798 (May 9, 2024) ...........................................2, 6, 8-10, 12-15, 17, 20

H.R. 2519, 117th Cong. (2021) ............................................................ 18

H.R. 4535, 114th Cong. (2016) ............................................................ 18

S. 4280, 117th Cong. (2022) ................................................................ 18

# GLOSSARY

| | |
|---|---|
| Act | Clean Air Act, 42 U.S.C. §§ 7401 to 7671q |
| CCS | Carbon Capture and Sequestration (or Storage) |
| $CO_2$ | Carbon Dioxide |
| Comments | NRECA, *Comment Letter on Proposed Rule* (Aug. 8, 2023), https://perma.cc/JH6G-H8F8 |
| EPA | U.S. Environmental Protection Agency |
| NRECA | National Rural Electric Cooperative Association |
| Proposed Rule | *New Source Performance Standards for Greenhouse Gas Emissions From New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions From Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule*, 88 Fed. Reg. 33,240 (proposed May 23, 2023) |
| Rule | *New Source Performance Standards for Greenhouse Gas Emissions From New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule*, 89 Fed. Reg. 39,798 (May 9, 2024) |
| Unit | Electric Generating Unit |

INTRODUCTION

EPA is once again trying to transform the power sector by forcing a shift in electricity generation to its favored sources. The Supreme Court rejected this ploy in *West Virginia v. EPA*, because Congress has not authorized EPA to "decid[e] how Americans will get their energy." 597 U.S. 697, 729 (2022). EPA's new plan is just as bad. Covered power plants must either implement an emissions-reduction system that has not been demonstrated anywhere (90% carbon-capture-and-sequestration or "CCS"), or else they must shift electricity generation (by shuttering coal units and curtailing generation at new gas units).

No power plant in human history has ever implemented the 90% CCS system that the Rule mandates. And covered plants would have to spend *billions* trying to comply. *See, e.g.*, McCollam ¶ 11; Purvis ¶ 43; McLennan ¶ 82; Tudor ¶ 8; Hasten ¶ 31; Grooms ¶ 28.[1] The Rule poses immense and imminent harms to Petitioner's members, so this Court should stay the Rule.

This Rule violates Clean Air Act ("Act") Section 111's central limits. Section 111 carefully circumscribes EPA's authority to set emissions standards by (1) identifying the "best system of emissions reduction" that "has been adequately demonstrated," accounting for costs, energy requirements, and other factors, and (2) setting "achievable" emissions limits based on that system for new and existing electric generating units. 42 U.S.C. § 7411(a)(1).

---

[1] Citations using a "¶" refer to the declarations in the exhibits to this Motion.

The Rule's identified "system" has not been "adequately demonstrated" anywhere. *Id.* The "system" EPA identified is "90 percent CCS"—in other words, capturing, transporting, and storing 90% of the carbon dioxide ("$CO_2$") from a unit. 89 Fed. Reg. 39,917; *see id*. 39,845-46. But there have only ever been a few experimental efforts to use *any* type of CCS technology at power plants. None of these have achieved anything close to 90% capture for any sustained period of time, and they have suffered constant breakdowns. And these experimental efforts have captured $CO_2$ from just a *partial subset*—that is, a "slipstream"—of a unit's total emissions.

Compounding the problems, this Rule uses this undemonstrated 90% CCS system to set emissions limits that are not at all "achievable." 42 U.S.C. § 7411(a)(1). Even if the technology for achieving 90% CCS became feasible, pipelines (for transport) and sequestration sites (for storage) are still missing.

With no way to comply with the 90% CCS requirements, the Rule will force units to shift electricity generation—by either shuttering (for existing coal units) or curtailing operations (for new gas units). But the Supreme Court just held that EPA cannot "force a nationwide transition away from the use of [fossil fuels] to generate electricity." *West Virginia*, 597 U.S. at 735. The right mix of electricity generation is a major question of "economic and political significance" for Congress—not EPA—to decide. *Id.* at 730.

EPA's overreach poses immense, immediate, and irreparable harms for Petitioner's members, the electric grid, virtually all Americans, and the economy. Consider rural America: Of the 75+ coal-fired units owned or

operated by members of the National Rural Electric Cooperative Association ("NRECA"), NRECA knows of only 3 uniquely situated units that could plausibly *attempt to demonstrate* CCS at any notable level—yet even they would not come close to meeting the Rule's 90% rate. Matheson ¶ 33. Two are at the same plant (Project Tundra), which fortuitously sits atop ideal geology for storage, has been planning the project for a decade, has used government funding for two-thirds of the costs thus far, and still would not meet the 90% capture rate for both units. McLennan ¶¶ 21-74. The third (Dry Fork Station) is just in an exploratory planning process. McCollam ¶¶ 18-26.

The Rule will therefore force retirements, which will slash reliability across the country and impose other enormous compliance costs. NRECA has multiple members for whom compliance costs alone will exceed *$10 billion*. *E.g.*, McCollam ¶ 11; Purvis ¶ 38. Part of that is the replacement power needed to offset the electricity generation that the Rule eliminates. Buying new power from an already constrained market is enormously expensive. *E.g.*, Tudor ¶¶ 23-24. So is building new units, Hasten ¶ 31, or buying new equipment to retrofit existing units, McCollam ¶ 20 (estimating retrofits would cost "more than 150% of what it cost to bring the [unit] into operation in the first place barely a decade ago"). Prematurely retiring plants will strand hundreds of millions in assets. *E.g.*, Purvis ¶ 60; McLennan ¶ 82.

These harms start *immediately*. *Infra* p. 20. The Rule requires retirement commitments soon. Cooperatives will need replacement power for the units that the Rule shuts down or curtails. That new generation cannot be conjured

overnight. *See* Porath ¶ 24. Instead, "design, engineering, consulting, site studies, and numerous other pre-construction activities" can easily exceed tens of millions per unit. McLennan ¶ 24. Indeed, early-stage "[e]ngineering costs typically represent approximately five percent of project costs." McCollam ¶ 21. That means hundreds of millions in imminent spending.

The Rule imposes these unbearable costs on communities least able to shoulder them. NRECA's nearly 900 not-for-profit members provide electricity in rural areas, where low populations and incomes have not attracted for-profit power companies. Matheson ¶ 6. Given their focus on affordability and reliability, these cooperatives already have diverse renewable generation portfolios, and NRECA members are at the forefront of exploring CCS. *Id.* ¶ 14. But the Rule abandons this balanced approach in favor of a mandate forcing rural consumers to pay skyrocketing rates for diminished reliability.

There is no difference between substituting or prioritizing renewable units (invalidated by *West Virginia*) and shutting down or curtailing production from fossil-fuel units (required by the Rule). Both schemes require generation-shifting, which exceeds EPA's authority. *West Virginia*, 597 U.S. at 735. Petitioner respectfully requests an immediate stay of EPA's unlawful Rule preserving the status quo. *See Chamber of Com. v. EPA*, 577 U.S. 1127 (2016) (mem.).

BACKGROUND

A.    Statutory overview

Section 111 of the Act authorizes EPA to set "standards of performance" for new stationary sources of certain air pollutants, and to establish guidelines that States then use to set standards for existing sources. 42 U.S.C. §§ 7411(b), (d). Both aim to "reduce pollution by causing the regulated source to operate more cleanly." *West Virginia*, 597 U.S. at 725.

For new sources, EPA sets performance standards, and the States may implement those standards. *Id.* §§ 7411(b), (c). EPA does this by first determining the "best system of emission reduction" that "has been adequately demonstrated"—accounting for "cost," "energy requirements," and "nonair . . . impact." *Id.* § 7411(a)(1). EPA then quantifies the emissions limitations "achievable" using that system. *Id.*

For existing sources, EPA issues guidelines for States to set their own standards using State "plan[s]." 42 U.S.C. § 7411(d)(1). State standards must reflect the "best system of emission reduction" that EPA determined. *Id.* State plans can also consider other factors, including "the remaining useful life" of an existing unit. *Id. West Virginia* held that Section 111(d) gives EPA no authority to cap $CO_2$ "emissions at a level that will force a nationwide transition away from the use of coal to generate electricity" or "direct existing sources to effectively cease to exist." 597 U.S. at 735, 728 n.3.

5

### B.    EPA's 90% carbon-capture-and-sequestration ("CCS") Rule

The Rule sets CO₂ emissions limits that States must apply to *existing coal-fired* units, under Section 111(d). 89 Fed. Reg. 39,840. The Rule also sets CO₂ emissions limits for *new gas-fired* combustion-turbine units, under Section 111(b). *Id.* 39,902. Both types of units must either (1) meet emissions limits equal to what EPA says 90% CCS can achieve, or (2) else shift electricity generation—by shuttering (existing coal units) or drastically cutting electricity output (new gas units).

### 1.    Existing coal-fired units

The Rule divides existing coal-fired units into three subsets: two are "subcategories" and one is an "applicability exemption." *Id.* 39,805. These subsets are defined by whether a unit has committed to permanently retire, and by when. *Id.* Those commitments must be "federally enforceable" via inclusion in a State plan. *Id.* 40,000. State plans including these commitments are due to EPA in 24 months. *Id.* 39,997.

The first (and default) subcategory is for "long-term" units, which EPA defines as units that "intend to operate past January 1, 2039." *Id.* 39,838. EPA says that the best system for this subcategory is CCS that captures 90% of the CO₂ from a unit. *Id.* 39,845. This system requires the design, engineering, and installation of bespoke CO₂ capture technology. *Id.* 39,846. The captured CO₂ must then be transported (usually via pipeline) to a site that can permanently sequester it (usually underground). *Id.* EPA "assumes" that "work" toward

6

"each component of CCS" will begin in "June 2024." *Id.* 39,874. And the Rule requires operators to complete that work before January 1, 2032. *Id.* 39,801.

The second subcategory is for "medium-term" units: those that commit "to permanently cease operation[s] prior to January 1, 2039." *Id.* 39,841; *see id.* 39,958. EPA says the best system for this subcategory is "[n]atural gas co-firing" at 40 percent. 39,801. That means transforming a coal unit into one that combusts both coal and natural gas. *See id.* Just "[a]s in the timeline for CCS," EPA "assumes" that "work" toward co-firing will begin in June 2024. *Id.* 39,893. Medium-term units must complete that work before January 1, 2030. *Id.* 39,845.

Third, the Rule establishes an "applicability exemption" for units that commit "to permanently cease operation before January 1, 2032." *Id.* 39,841. These units "are not regulated by" the Rule. *Id.* 39,843.

### 2.    New gas-fired units

For new and modified gas-fired combustion turbines, the Rule creates three subcategories. These subcategories are defined by a unit's "electric sales (*i.e.*, utilization) relative to the [unit's] potential electric output." *Id.* 39,908.

"Low load" units, those that commit to sell "20 percent or less of their potential electric output," must comply with a standard of performance based on "lower-emitting fuels." *Id.* 39,917. "Intermediate load" units, those that commit to sell 20-40%, must comply with a standard based on "high-efficiency simple cycle turbine technology." *Id.* 39,918. "Base load" units,

those that sell more than 40%, must comply with a "multi-phase standard of performance." *Id.* 39,923. Phase I is "based on the performance of a highly efficient combined cycle turbine" and has "an immediate compliance date." *Id.* 39,903. Phase II is based on 90% CCS and has "a compliance date of January 1, 2032." *Id.*

## C.    Procedural history

Petitioner filed its Petition for Review on May 9, 2024. That same day, Petitioner asked EPA to stay the Rule pending judicial review. EPA has not responded.

ARGUMENT

All four traditional factors warrant a stay. *See* D.C. Cir. R. 18. The Administrative Procedure Act also gives this Court authority to "postpone the effective date of an agency action." 5 U.S.C. § 705.

## I.    Petitioner is likely to succeed on the merits.

EPA's Rule exceeds its Section 111 authority. A 90% CCS "system" for power plants has never "been adequately demonstrated" anywhere. 42 U.S.C. § 7411(a)(1). Nor are emissions levels based on that technology "achievable." *Id.* EPA's alternatives and "compliance flexibilities," 89 Fed. Reg. 39,803, mandate generation-shifting invalid under *West Virginia*, 597 U.S. at 735. Were there any doubt, the major-questions doctrine confirms Congress did not provide "clear" language granting EPA any of this power. *Id.* To top it off, the Rule is arbitrary and capricious in multiple ways.

8

A.    **The Rule exceeds EPA's Clean Air Act Section 111 authority.**

1.    **90% CCS is not an "adequately demonstrated" system.**

To be "adequately demonstrated," a system must be "reasonably reliable, efficient, and expected to serve the interests of pollution control without becoming exorbitantly costly." *Am. Lung Ass'n v. EPA*, 985 F.3d 914, 962 (D.C. Cir. 2021) (cleaned up), *rev'd on other grounds*, 597 U.S. 697 (2022). It must be something that "can be successfully applied . . . under a wide range of operating conditions," *Lignite Energy Council v. EPA*, 198 F.3d 930, 934 (D.C. Cir. 1999) (cleaned up); that "sources themselves can implement," *Am. Lung*, 985 F.3d at 962 n.9; and that has "a proven track record," *West Virginia*, 597 U.S. at 759 (Kagan, J., dissenting). CCS at 90% fails all of these.

First, EPA has not shown that 90% CCS is "reasonably reliable." *Am. Lung*, 985 F.3d at 962 (cleaned up). Just a handful of power plants globally have attempted CCS—but only coal-fired plants, and only for a *subset* "slipstream" of emissions. NRECA, *Comment Letter on Proposed Rule* at 11 (Aug. 8, 2023), https://perma.cc/JH6G-H8F8 ("Comments"). Those limited attempts met consistent setbacks. *Id.*

For example, the Rule lauds the Boundary Dam CCS "slipstream" project in Canada. 89 Fed. Reg. 39,848. But that system captured *only 44%* of the $CO_2$ it targeted during all of 2021. Comments 11. EPA praises the system for "achieving capture rates of 83 percent *when the capture plant is online*." 89 Fed. Reg. 39,848 (emphasis added). But EPA's qualifying phrase obscures the project's persistent breakdowns. *See* Comments 11. From early 2021 to early

9

2023, Boundary Dam's CCS system was "online" *only about 65%* of the time. *Id.* 19. EPA concedes this system was continually "affected by technical issues." 89 Fed. Reg. 39,848. A system that breaks every third day is not reasonably reliable.

Nevertheless, EPA insists that it can "extrapolate[]" from Boundary Dam to project that CCS at the 90% capture rate mandated by this Rule will be constantly attainable at *all* existing coal and new gas units. 89 Fed. Reg. 39,889. But forward-looking extrapolations are fundamentally incompatible with the Act's clear statutory text focusing on what "has been adequately demonstrated"—in the past. 42 U.S.C. § 7411(a)(1).

Contrary to that clear statutory text, this Court's caselaw has occasionally allowed EPA to craft standards for future sources through "reasonable extrapolation" to "compensate for a shortage of data." *Lignite,* 198 F.3d at 934. But even under this caselaw, the Rule's predictions are still prohibited "speculation," not incremental "extrapolation." *Id.* EPA does not identify a single unit that has *ever* achieved 90% CCS. And EPA identifies no "demonstrated" application of CCS to *new natural-gas* units, instead extrapolating from projects "in development." 89 Fed. Reg. 39,926. Indeed, the Rule repeatedly cites things like "vendor statements," *id.* 39,851, and "planned," "designed," or "slipstream" (*i.e.*, partial) projects. *E.g.*, *id.* 39,848-50. EPA also constantly equivocates between CCS at *any* rate versus the 90% rate the Rule requires. *E.g.*, *id.* 39,846-55.

10

EPA's reliance on future experimental CCS projects besides Boundary Dam are even further afield. The state-of-the-art CCS projects by NRECA members Minnkota (Project Tundra) and Basin Electric (Dry Fork Station) have taken a decade simply to *plan*. *See* Comments 7. NRECA knows of no other member that could even plausibly attempt CCS for an existing unit, leaving shutdown as the only option. *See* Matheson ¶ 39. Possible operation is still years away at Project Tundra, Dry Fork is still in engineering and planning stages, and operation achieving what the Rule requires—90% CCS—is not even on the horizon. McLennan ¶¶ 6, 22; McCollam ¶ 19.

Consider Minnkota. That cooperative has been pursuing the "Project Tundra" CCS demonstration project *for nearly a decade*. Comments 7. Yet even with substantial state and federal funding and a storage site just a quarter-mile away, the project's future is uncertain because of this Rule. McLennan ¶¶ 6, 39, 51. If construction does occur, it will take five years and cost over $1.6 billion, but as designed still would not meet 90% CCS for the whole plant. *Id.* ¶ 6. Similarly, Basin Electric is exploring whether some level of CCS *may* be achievable at Dry Fork Station based on the plant's favorable geography and long history of state and federal funding for CCS studies. *See* McCollam ¶ 18. Yet the technology alone would cost more than 150% of the whole power plant's build cost—even ignoring transport and storage costs. *Id.* ¶ 20.

Second, CCS has not been "successfully applied . . . under a wide range of operating conditions." *Lignite,* 198 F.3d at 934. Instead, CCS works

only at units that have access to a sufficient pipeline, which is the necessary link between $CO_2$ "capture" and "storage." Comments 15-16. That link is missing almost everywhere. *Id.* EPA speculates that a vast network of $CO_2$ pipelines "may develop" "in the coming years." 89 Fed. Reg. 39,855. But despite $CO_2$ transport occurring "for nearly 60 years," $CO_2$ pipelines exist in limited areas. *Id.* While the Proposed Rule touted nearly 4,000 miles of newly "announced" $CO_2$ pipelines, 88 Fed. Reg. 33,294, the lion's share has since been "delayed or canceled," 89 Fed. Reg. 39,861. This is unsurprising. Surveying, permitting, right-of-way, and protracted litigation remain obstacles to pipelines—and thus to CCS—in almost all "operating conditions." *Lignite,* 198 F.3d at 934. So too for $CO_2$ storage. *Infra* p. 14.

Third, EPA has not shown that CCS is a system that units "themselves can implement." *Am. Lung*, 985 F.3d at 962 n.9. For example, NRECA has 63 not-for-profit members that "generate and transmit power." Comments 3. They do not operate pipelines or storage sites. *Id.* 16. To achieve CCS, they must rely on third parties to transport and store $CO_2$. *See id.* 16-17. Unlike technology-based emission controls installed at a unit, transport and storage requires third-party permitting, construction, and operation—almost always "over significant distance." *Id.* Because most power plants have access to neither $CO_2$ transport nor storage, they cannot "themselves" achieve CCS. *Am. Lung*, 985 F.3d at 962 n.9.

Fourth, CCS is "exorbitantly costly." *Id.* As NRECA's declarations show, cooperatives would have to spend *billions* trying to comply. *See*

McCollam ¶ 11; Purvis ¶ 43; McLennan ¶ 82; Tudor ¶ 8; Hasten ¶ 31; Grooms ¶ 28.

Fifth, EPA has not accounted for the impact of its rule on electric reliability "energy requirements." 42 U.S.C. § 7411(a)(1). Commenters alerted EPA to the "direct threats to electric grid reliability" that EPA failed to assess and inaccurately modeled. *E.g.*, Comments 2, 5-6, 26-32. Given this failure, the Rule offers what EPA tellingly refers to as "compliance flexibilities." 89 Fed. Reg. 39,803. These discretionary possibilities include, among others, a "compliance date extension mechanism," *id.* 39,960; a "short-term reliability mechanism," *id.* 40,014; and a "reliability assurance mechanism," *id.* 40,017. But EPA cannot sidestep its duty to set "demonstrated" and "achievable" standards, 42 U.S.C. § 7411(a)(1), by directing regulated parties to seek discretionary dispensation. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("The power of executing the laws . . . does not include a power to revise clear statutory terms that turn out not to work in practice."). EPA cannot "embark[] on [a] multiyear voyage of discovery" leaving the electric sector and consumers guessing about how EPA will grant certain limited dispensations from this Rule. *Id.* at 328.

## 2.    Emissions limits based on 90% CCS are not "achievable."

The Rule's emissions limits are also unlawful because they are not "achievable." 42 U.S.C. § 7411(a)(1). A standard is "achievable" only if the system is "available for installation," *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 391 (1973), to "the industry as a whole," *Nat'l Lime Ass'n v. EPA*,

627 F.2d 416, 431 (D.C. Cir. 1980). EPA must (1) "identify variable conditions that might contribute to" the standard's nationwide achievability, and (2) "establish that" it used data that is "representative of potential industry-wide performance." *Sierra Club v. Costle*, 657 F.2d 298, 377 (D.C. Cir. 1981).

EPA has failed to address the "variable conditions" that make emissions levels based on 90% CCS impossible for almost all operators. *Nat'l Lime*, 627 F.2d at 433. The technology for even attempting 90% CCS is not "available for installation" anywhere. *Portland Cement*, 486 F.2d at 391. Instead, the few CCS projects identified by EPA use customized setups and are working to someday demonstrate 90% CCS in an experimental context. Comments 7. Nor has EPA identified any alternative that could achieve the required "88.4 percent reduction in annual [$CO_2$] emission rate[s]." 89 Fed. Reg. 39,801.

Even if 90% CCS became available, conditions for $CO_2$ transport and storage are mostly lacking and highly variable. Federal land-use policy impedes new pipelines in much of the West—not to mention underground storage. Comments 23. In other parts of the country, underground storage locations are scarce or absent. *See id.* 16. And no $CO_2$ transport network exists to link units to storage. *Id.* 15-16. EPA has thus failed to show that 90% CCS is "capable of being met under most adverse conditions which can reasonably be expected to recur." *Nat'l Lime*, 627 F.2d at 431 n.46.

EPA also did not use "representative[]" data. *Nat'l Lime*, 627 F.2d at 433. Boundary Dam is a Canadian "slipstream" project that by design

captures only *part* of the unit's emissions and "less than 90 percent of the total amount of $CO_2$ in the flue gas of the steam generating unit." 89 Fed. Reg. 39,848. Capturing some of a slipstream's $CO_2$ is categorically different from capturing 90% of an entire unit's $CO_2$. McLennan ¶¶ 27-34; *see* Comments 11 & n.39. For new gas units, EPA's best comparator is another partial "slipstream" project in Bellingham, Massachusetts. 89 Fed. Reg. 39,925. But that project shut down in 2005 and never captured more than about 10% of the unit's $CO_2$. *Id.*

### 3. The Rule's alternative compliance options unlawfully require generation-shifting.

Under this Rule, if covered units cannot achieve 90% CCS, then they are forced to shift electricity generation—through forced retirement, limiting output, or conversion (such as requiring coal plants to become partial gas plants). *E.g.*, 89 Fed. Reg. 39,801. To make up the energy shortfall, operators across the country will need to buy power from others or build new plants. But the Supreme Court just held that EPA lacks this power: The Clean Power Plan similarly required that "facilities reduce their own production of electricity," but the EPA has no authority "'shift' away virtually all of their generation" or "require[e] coal plants to become natural gas plants." *West Virginia*, 597 U.S. at 728 & n.3. That EPA styles its subcategories as "flexibilities" for an unachievable standard is no cure. 89 Fed. Reg. 39,803.

Nor are all the Rule's subcategories themselves "achievable." 42 U.S.C. § 7411(a)(1). Some units simply cannot support the retrofits necessary for co-

firing. Comments 18; *see* Purvis ¶ 44. And even where co-firing might be technologically possible, the natural gas pipelines needed to supply the large amount of fuel for co-firing have the same regional variability and obstacles as $CO_2$ pipelines. *E.g.,* McLennan ¶ 62. The technology is not "available for installation," *Portland Cement*, 486 F.2d at 391, to "the industry as a whole," *Nat'l Lime*, 627 F.2d at 431. And it is exorbitantly expensive. *E.g.*, Soderberg ¶ 15 (estimating "$490 million" for retrofits necessary for co-firing).

### B. The major-questions doctrine confirms that the Rule is unlawful.

EPA lacks power to issue the Rule under Section 111's plain text. Nor did Congress use "clear" statutory text to delegate EPA power to impose a 90% CCS system or force generation-shifting. *West Virginia*, 597 U.S. at 732. Congress was required to use clear language, because the major-questions doctrine applies: Multiple factors confirm that "this is a major questions case" of "vast economic and political significance." *Id.* at 716, 724.

First, as NRECA's declarations make clear, covered units would have to spend *billions* trying to comply. *See* McCollam ¶ 11; Purvis ¶ 43; McLennan ¶ 82; Tudor ¶ 8; Hasten ¶ 31; Grooms ¶ 28. Had Congress wished to assign EPA a question involving "billions of dollars in spending each year" affecting the price of electricity for millions of Americans, it "surely would have done so expressly." *King v. Burwell*, 576 U.S. 473, 485-86 (2015).

Second, EPA claims "newfound" and "transformative" authority. *West Virginia*, 597 U.S. at 724. EPA has long set standards based on what has

16

"been . . . demonstrated," 42 U.S.C. § 7411(a)(1), and is *currently* "achievable," *see id.* By contrast, the Rule relies on projects with indeterminate capture rates that "ha[ve] been announced," 89 Fed. Reg. 39,928; pipelines that EPA "anticipates . . . may develop," *id.* 39,855; and potential storage projects that "are in the process of completing . . . studies," *id.* 39,862. The move from established technology to predicting the future is an extravagant power grab. *Portland Cement*, 486 F.3d at 391 (section 111 determination "cannot be based on 'crystal ball' inquiry").

Third, EPA claims "unprecedented power over American industry." *West Virginia*, 597 U.S. at 728. By using undemonstrated "systems" to set unachievable standards for fossil-fuel plants, the Rule forces generation to shift elsewhere. This is a monumental change that involves "balancing . . . many vital considerations of national policy" in an arena where EPA has "no comparative expertise." *Id.* at 729.

Fourth, mandatory CCS and generation-shifting are approaches that "Congress [has] considered and rejected multiple times." *West Virginia*, 597 U.S. at 731. Congress has supported development of CCS and other new generation through *voluntary funding incentives*—not stringent mandates. *See, e.g.*, Angela C. Jones & Ashley J. Lawson, Cong. Rsch. Serv., *Carbon Capture and Sequestration (CCS) in the United States* (Oct. 5, 2022), https://perma.cc/L73B-JXAW (discussing tax credits for CCS). Congressional *funding incentive* programs lend no support for an agency's prescriptive *mandates*. *E.g.*, *NFIB v. OSHA*, 595 U.S. 109, 119 (2022) (per curiam). Congress

has rejected legislation that would require fossil-fuel cessation or CCS. *See, e.g.*, H.R. 2519, 117th Cong. (2021); H.R. 4535, 114th Cong. (2016); S. 4280, 117th Cong. (2022).

### C.    The Rule is arbitrary and capricious.

The Rule is also unlawfully "arbitrary" and "capricious." 5 U.S.C. § 706. This Court's precedents "have established a rigorous standard of review under section 111." *Nat'l Lime*, 627 F.2d at 429. EPA's soothsaying about CCS is "pure speculation." *Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994). EPA's disregard for regional variability for pipelines and storage is a "fail[ure] to consider an important aspect of the problem[s]" inherent in CCS. *Am. Clinical Lab'y Ass'n v. Becerra*, 40 F.4th 616, 624 (D.C. Cir. 2022). And EPA's quixotic views of CCS, co-firing, and reliability "run[] counter to" the evidence. *Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1050 (D.C. Cir. 2022).

## II.    Petitioner's members will suffer immediate irreparable harm absent a stay.

An immediate stay is necessary to protect Petitioner's members from the "risk of irreparable harm" that the Rule causes through unrecoverable compliance costs, skyrocketing energy rates, and an unreliable energy grid. *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (per curiam); *see NFIB*, 595 U.S. at 120 (citing "billions of dollars in unrecoverable compliance costs" to support stay of agency's rule); *Chamber of Com.*, 577 U.S. at 1127.

18

Petitioner's members face astronomical compliance costs. Multiple NRECA declarations make clear that covered units will need to spend *billions* trying to comply with EPA's undemonstrated and unachievable 90% CCS mandates. *See* McCollam ¶ 11; Purvis ¶ 43; McLennan ¶ 82.

For example, Basin Electric's costs alone will exceed *$14 billion*. McCollam ¶ 11. Both CCS and co-firing require massive capital investments. *E.g.,* Purvis ¶ 34 ("$10.7 billion" for CCS); *id.* ¶ 45 ("$500 million" just for a new pipeline for co-firing). Where those investments cannot even be attempted—which is almost everywhere—shutting down is the only choice left. *E.g.,* Grooms ¶ 26 ("Imminent retirement is the only option."). Shutdowns have their own steep costs, including lost "revenue stream[s]," *In re NTE Connecticut, LLC*, 26 F.4th 980, 991 (D.C. Cir. 2022), and "decrease[d] . . . efficiency." *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 673 (D.C. Cir. 2005). Shutdowns also threaten reliability, which hurts consumers, local businesses, and the national economy. *E.g.,* Hochstetler ¶ 33.

Each megawatt of power lost to shutdowns or retrofits must be replaced. *E.g.,* Grooms ¶ 54. Otherwise the electric grid would collapse. Purvis ¶ 66; McLennan ¶ 66-67. But all forms of replacement power are extremely expensive. *E.g.,* McLennan ¶¶ 80, 82; McCollam ¶ 66. These prices will only soar as operators simultaneously rush to secure replacement power and to meet the demands from electric vehicles, artificial-intelligence data centers, and countless other consumers. *See* Hochstetler ¶¶ 12-14. Existing electricity markets cannot meet these needs. Matheson ¶ 40. But new

19

construction cannot even begin until operators spend vast amounts of time and money on design, siting, permitting, procurement, and the like. *E.g.*, Soderberg ¶ 23.

These immense harms are imminent, because as EPA itself "assumes," the "work" toward achieving compliance will begin in "June 2024." 89 Fed. Reg. 39,874. That is long before the courts "can resolve th[is] case on the merits." *Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022). Litigating the Clean Power Plan took seven years. NRECA's members cannot wait that long for certainty. On the contrary, design, siting, engineering, and permitting for replacement power must begin now. Hasten ¶ 31. Contracts for new equipment must be inked now. Soderberg ¶ 29 (lead times "are *already* 2-3 years long"). Workforce impacts must be addressed now. *Id.* ¶ 25. Steps to secure financing must begin now. Tudor ¶ 37. And where new pipelines are required—*e.g.*, for CCS or co-firing—operators are already far behind schedule, because all this takes years to implement. McCollam ¶ 64.

These harms are "irreparable," because "no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (citation omitted). Bespoke equipment cannot be returned. Hasten ¶ 34. Dollars spent on design, permitting, engineering, and other studies cannot be refunded. Porath ¶ 26. Retirement commitments cannot be easily (or cheaply) revoked. Purvis ¶ 59. And sovereign immunity precludes recovery from the government. *See NFIB*, 595 U.S. at 120; *Thunder Basin Coal*

*Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring). Instead, entities like not-for-profit cooperatives and their members must shoulder them—as they already have begun doing in massive amounts.

### III.   The balance of harms and the public interest strongly favor a stay.

A stay will not "substantially injure" other parties. *In re NTE*, 26 F.4th at 991. As for EPA, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors*, 594 U.S. at 766.

Yet without a stay, Petitioner's members must undertake irreversible steps and commitments. EPA's Rube Goldberg machine of discretionary "compliance flexibilities" is of no use to those who have an obligation to keep America's lights on. EPA has a history of exploiting that very dynamic. *E.g.*, EPA, *In Perspective: the Supreme Court's Mercury and Air Toxics Rule Decision* (June 30, 2015), https://perma.cc/D9NK-CNBB (celebrating that "the majority of power plants are already in compliance or well on their way to compliance" with rule that had just been held unlawful in *Michigan v. EPA*, 576 U.S. 743 (2015)).

There is "no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Electric costs will skyrocket. Comments 32; *see* Purvis ¶ 40. As existing units are shuttered and plans for new units are abandoned, communities around the country will see jobs and tax revenue dwindle. *E.g.*, McLennan ¶ 72. And by targeting always-available generation (compared to intermittent forms like wind and solar), the Rule also threatens the reliable

supply of electricity. *E.g.*, McCollam ¶ 27; Hollandsworth ¶ 10. When that happens, investment dwindles, productivity declines, competition freezes, and innovation stagnates. *See* Hochstetler ¶ 33; Purvis ¶ 66.

To prevent the unlawful Rule from inflicting staggering, irreparable harms to NRECA's members—and from jeopardizing the electricity grid's reliability—this Court should stay the Rule pending judicial review.

## CONCLUSION

Petitioner respectfully requests that the Motion be granted.

Dated: May 13, 2024                    */s/ Scott A. Keller*

Mithun Mansinghani                     Scott A. Keller
LEHOTSKY KELLER COHN LLP                   *Counsel of Record*
619 W. Main St.                        Steven P. Lehotsky
Oklahoma City, OK 73102                Michael B. Schon
                                       LEHOTSKY KELLER COHN LLP
Joshua P. Morrow                       200 Massachusetts Ave. NW, Suite 700
LEHOTSKY KELLER COHN LLP               Washington, DC 20001
408 W. 11th St., 5th Floor             (512) 693-8350
Austin, TX 78701                       scott@lkcfirm.com

*Counsel for the National Rural Electric Cooperative Association*

CERTIFICATES

1. I certify that this document complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because—excluding the parts of the document exempted by Fed. R. App. P. 27(a)(2)(B), Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1)— this document contains 5,181 words.

2. I certify that this document complies with D.C. Cir. R. 27(d)(1)(E), the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word 2021.

3. I certify that on May 9, 2024, Petitioner requested relief from EPA in a Petition for Stay of EPA's Final Rule. EPA has not acted on that request. Thus, Petitioner now seeks a stay from this Court. *See* D.C. Cir. R. 18(a)(1).

4. I certify that the parties in this case (No. 24-1122) are the National Rural Electric Cooperative Association, the U.S. Environmental Protection Agency, and Michael Regan, in his official capacity as Administrator of the U.S. Environmental Protection Agency ("Respondents"). *See* D.C. Cir. R. 18(a)(4), 28(a)(1)(A). On May 13, 2024, the following entities moved to intervene in this case: American Lung Association, Clean Air Council, the American Public Health Association, Clean Wisconsin, and Natural Resources Defense Council ("Proposed Intervenors"). As of the time of this filing, the Court has not acted on that motion.

5. On May 9 and 10, 2024, this Court entered orders consolidating this case with Nos. 24-1120 (lead case), 24-1121, 24-1124, and 24-1126. The Respondents and the Proposed Intervenors in the consolidated cases are the same as in this case (No. 24-1122). In addition, the following entities are petitioners in the consolidated cases: State of West Virginia, State of Alabama, State of Alaska, State of Arkansas, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of New Hampshire, State of North Dakota, State of Ohio, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, State of Utah, Commonwealth of Virginia, State of Wyoming, National Mining Association, America's Power, and Oklahoma Gas and Electric Company.

/s/ Scott A. Keller
Scott A. Keller

## RULE 26.1 DISCLOSURE STATEMENT

The National Rural Electric Cooperative Association ("NRECA") represents nearly 900 consumer-owned, not-for-profit electric cooperatives, public power districts, and public utility districts in the United States. NRECA's mission is to promote, support, and protect the community and business interests of electric cooperatives, to power communities, and to empower members to improve the quality of life in their communities.

NRECA has no parent companies, and no publicly held company has a 10 percent or greater ownership interest in NRECA. NRECA does not issue stock. *See* Fed. R. App. P. 26.1; D.C. Cir. R. 18(a)(4), 26.1, 27(a)(4).

*/s/ Scott A. Keller*

Scott A. Keller
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com

*Attorney for the National Rural Electric Cooperative Association*
Dated: May 13, 2024

**CERTIFICATE OF SERVICE**

I certify that on this 13th day of May, 2024, I filed the foregoing motion and accompanying exhibits with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

*/s/ Scott A. Keller*

Scott A. Keller