**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| **State of West Virginia, et al.,** | |
| Petitioners, | |
| **v.** | Case No. 24-1020 (and consolidated cases) |
| **United States Environmental Protection Agency, et al.,** | |
| Respondents. | |

On Petition for Review of Final Action of the United States
Environmental Protection Agency

## UNOPPOSED MOTION FOR LEAVE TO INTERVENE AS RESPONDENTS

Pursuant to Federal Rule of Appellate Procedure 15(d) and Circuit Rule 15(b), the undersigned states, stage agency, and cities (Movant-Intervenor States) move to intervene in support of the respondents in litigation challenging an Environmental Protection Agency rule that limits carbon dioxide emissions from new gas-fired power plants and existing coal-fired power plants under the Clean Air Act. The rule would meaningfully limit greenhouse gas emissions from some of the largest sources in the nation, thereby

helping to address the significant harms our states, cities, and residents are facing from climate change.

## BACKGROUND

These cases involve challenges to a final rule the Environmental Protection Agency (EPA) issued under section 111 of the Clean Air Act that establishes performance standards for carbon dioxide ($CO_2$) emissions from new gas-fired power plants and requires states to develop plans to limit $CO_2$ from existing coal-fired power plants. 89 Fed. Reg. 39,798 (May 9, 2024) (Rule).

### *Section 111*

Section 111 requires EPA to limit pollution from a source category EPA determines "causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7411(b)(1)(A). For such source categories, EPA must set "standards of performance," defined as a "standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any non-air quality health and environmental impacts and energy requirements) the

Administrator determines has been adequately demonstrated." *Id.* § 7411(a)(1).

Under section 111(b), EPA establishes performance standards for new sources by determining the emissions levels that can be achieved using the most up-to-date control technology or method of limiting emissions of each type of pollutant that is both feasible and achievable at a reasonable cost, but it does not mandate any specific equipment, technology, or method to meet that standard. *Id.* § 7411(a)(1) & (b)(5). In establishing these standards, EPA "may distinguish among classes, types, and sizes" within a source category. *Id.* § 7411(b)(2).

Once EPA establishes a performance standard for new stationary sources, it must issue an emissions guideline to control certain types of air pollutants—those not regulated as criteria or hazardous air pollutants—from existing sources in the same category. *See id.* § 7411(d)(1). Although EPA promulgates standards of performance under section 111(b) that directly apply to new (as well as modified and reconstructed) sources, states establish standards of performance for existing sources under section 111(d). *Id.* The same definition of "standard of performance"

applies to the standards that states set; in other words, states use EPA's emissions guideline to develop standards for existing sources that also reflect the degree of pollution reduction achievable by application of the best system of emission reduction. *Id.* § 7411(a)(1), *see West Virginia v. EPA*, 597 U.S. 697, 709-11 (2022). Section 111(d) also directs EPA to allow states to take into account the source's remaining useful life and other factors in establishing a standard of performance for a source. 42 U.S.C. § 7411(d)(1).

EPA retains oversight to ensure that state plans are "satisfactory" in meeting section 111(d) requirements. 42 U.S.C § 7411(d)(2)(A). If a state fails to submit a plan or EPA determines that a state plan is not satisfactory, EPA must promulgate a federal plan to limit pollution from existing sources in that state. *Id.*

## *Climate Change and State Efforts to Reduce CO$_2$ Emissions from Fossil-Fueled Power Plants*

Movant-Intervenor States are experiencing direct and compounding harms from climate change. These harms are projected to worsen without deep reductions in anthropogenic emissions of greenhouse gases, such as those from power plants regulated by the Rule. As discussed in Movant-Intervenor States'

rulemaking comments, those harms range from searing temperatures in our cities, to severe droughts, damaging wildfires, poor air quality, and lethal flash floods.[1] Just to take two examples from this past summer, Phoenix, Arizona experienced the hottest month ever observed in a city in the United States, sweltering through a record 31 consecutive days at or above 110°F.[2] And wildfire smoke caused New York City to suffer one of its worst air quality days on record.[3]

Of particular relevance here, climate change is also threatening grid reliability in our states. As EPA noted in the preamble to the proposal, "many regions of the country have

---

[1] Comments of New York Attorney General et al. (Aug. 8, 2023), EPA-HQ-OAR-2023-0072-0748 ("Multistate Comments") at 10-11 & Appendix 1; Comments of the State of Colorado (Aug. 8, 2023), EPA HQ-OAR-2023-0072-0576 ("Colorado Comments") at 3-6.

[2] Matthew Cappucci, *Phoenix Just Posted the Hottest Month Ever Observed in a U.S. City*, Wash. Post (Aug. 1, 2023), https://www.washingtonpost.com/weather/2023/08/01/phoenix-record-hot-month-climate/.

[3] Aatish Bhatia, Josh Katz, & Margot Sanger-Katz, Just How Bad was the Pollution in New York?, The New York Times (June 9, 2023), https://www.nytimes.com/interactive/2023/06/08/upshot/new-york-city-smoke.html.

experienced a significant increase in the frequency and severity of extreme weather events" and such events have affected "energy infrastructure and both the demand for and supply of electricity." 88 Fed. Reg. at 33,415; *see also* 88 Fed. Reg. 41,477, 41,478 (June 27, 2023) (Federal Energy Regulatory Commission report finding trend of increasing severe weather events "threatens livelihoods, electric system reliability, and the Commission's ability to ensure just and reasonable jurisdictional rates."). According to a recent report by the U.S. Global Change Research Program, "[w]ithout mitigation [of greenhouse gas emissions] and adaptation, projected increases in the frequency, intensity, duration, and variability of extreme events will amplify effects on energy systems."[4]

To combat climate change harms, Movant-Intervenor States have taken numerous actions to reduce $CO_2$ and other greenhouse gases from sources within our borders. With respect to the electricity sector, for example, the states that are part of the Regional Greenhouse Gas Initiative have reduced carbon pollution

---

[4] U.S. Global Change Research Program, *Fifth National Climate Assessment* (Nov. 2023), ch. 5 (Energy), https://nca2023.globalchange.gov/chapter/5/.

from power plants by more than 50 percent.[5] Other states—such as Colorado and North Carolina—have recently passed laws requiring investor-owned utilities to achieve 80 percent and 70 percent reductions, respectively, in $CO_2$ emissions by 2030.[6]

*Regulation of $CO_2$ from New Power Plants Under Section 111(b)*

In 2006, several states and nonprofit organizations challenged EPA's failure to establish standards of performance of carbon dioxide from new coal-fired power plants under section 111(b). *See New York v. EPA* (D.C. Cir. No. 06-1322). After the Supreme Court held in *Massachusetts v. EPA*, 549 U.S. 497 (2007), that greenhouse gases are air pollutants under the Clean Air Act, the case was remanded to EPA for further proceedings. *See* Per Curiam Order in Case No. 06-1322 (Sept. 24, 2007) at 1.

Nearly a decade later, EPA issued performance standards to limit emissions of carbon dioxide from new coal-fired and gas-fired power plants. *See* 80 Fed. Reg. 64,510 (Oct. 23, 2015) (setting performance standards for new coal-fired electricity generating

---

[5] Multistate Comments, Appendix 2 at 1-3.

[6] Multistate Comments at 12-13; Colorado Comments at 6-7.

7

units and new gas-fired combustion turbines).[7] After petitions for review challenging that rule were filed, many of Movant-Intervenor States intervened as respondents. *See* Doc. No. 1581832 (Nov. 4, 2015). The case was subsequently placed in abeyance, where it remains today. *See* Doc. No. 1688176 (Aug. 10, 2017).

*Regulation of $CO_2$ from Existing Power Plants Under Section 111(d)*

On the same day in 2015 that it established standards for new coal-fired and gas-fired power plants, EPA issued emission guidelines under section 111(d) for states to limit $CO_2$ from existing sources in those categories. *See* 80 Fed. Reg. (Oct. 23, 2015) (Clean Power Plan). Many of Movant-Intervenor States intervened to defend that rule. *See* ECF Doc. #1581816 (Nov. 4, 2015).

In 2019, EPA repealed and replaced the Clean Power Plan with the Affordable Clean Energy (ACE) rule. *See* 84 Fed. Reg. 32,520 (July 8, 2019). EPA projected the ACE rule would reduce $CO_2$ emissions by less than one percent, and cause emissions of $CO_2$,

---

[7] Under the Clean Air Act, an existing source that is modified or reconstructed after regulations are proposed for new sources is also considered a new source. 42 U.S.C. § 7411(a)(2); 40 C.F.R. § 60.15. The 2015 rule included standards for reconstructed and modified coal-fired and gas-fired units. *Id.*

nitrogen oxides, and/or sulfur dioxide to <u>increase</u> in a dozen or so states, including in Arizona, Michigan, Minnesota, New York, and Oregon.[8] The ACE rule also prohibited states from including cap-and-trade programs as a compliance mechanism for sources within their jurisdictions. 84 Fed. Reg. at 32,555-56. Many of Movant-Intervenor States challenged the ACE rule as inconsistent with the statute and unsupported by the record. *See* ECF Doc. #1802486 (Aug. 13, 2019). The D.C. Circuit held that the ACE rule's repeal of the Clean Power Plan was not compelled by the Clean Air Act, *American Lung Ass'n v. EPA*, 985 F.3d 914, 991 (D.C. Cir. 2021), and reserved ruling on other claims on the ACE rule's legality.

The Supreme Court then reversed, ruling that the ACE rule's repeal of the Clean Power Plan was warranted under the major questions doctrine. *West Virginia*, 597 U.S. at 734-35. After the case was remanded, the parties agreed to place the litigation in abeyance in light of EPA's representations that it would undertake

---

[8] EPA, Regulatory Impact Analysis for the Repeal of the Clean Power Plan, and the Emission Guidelines for Greenhouse Gas Emissions from Existing Electricity Generating Units (June 2019), ES-6; EPA, *Illustrative ACE Scenario, State Emissions Projections*, https://www.epa.gov/airmarkets/analysis-final-ace-rule.

a new rulemaking to repeal and replace the ACE rule. *See* ECF Doc. #1970895 (Order dated Oct. 27, 2022).

*The Inflation Reduction Act*

Shortly after the Supreme Court decided *West Virginia*, Congress passed the Inflation Reduction Act,[9] which laid the groundwork for the Rule in two important ways. First, Congress confirmed EPA's authority to regulate $CO_2$ from power plants under section 111 of the Clean Air Act and directed the agency "to ensure that reductions in greenhouse gas emissions are achieved through the use of the existing authorities of this Act." 42 U.S.C. § 7435(a)(6). Second, the Inflation Reduction Act's generous carbon capture and sequestration (CCS) tax credits significantly changed the economics for using that technology to control power plant carbon pollution. Because CCS is now less expensive, EPA can take that savings into account when assessing cost in selecting the best system of emission reduction for power plants.

---

[9] Pub. L. No. 117-167, 136 Stat. 1366 (2022)

*The Rule*

In May 2023, EPA proposed performance standards for new gas-fired combustion turbines and proposed emission guidelines for (i) existing coal-fired electricity generating units, and (ii) existing gas-fired combustion turbines. 88 Fed. Reg. 33,240 (May 23, 2023). The proposed standards and guidelines were based on best systems of emissions reduction that included CCS, co-firing with hydrogen and other less carbon-intensive fuels, and highly efficient design. *See id.* at 33,244-45. The agency also proposed to formally repeal the ACE rule on legal and policy grounds. *See id.* at 33,335-41. EPA subsequently issued a notice in which it sought additional comment on the potential impacts of the rule on small businesses and on grid reliability. *See* 88 Fed. Reg. 80,682 (Nov. 20, 2023).

After considering public comments, including two comment letters by Movant-Intervenor States, EPA finalized the Rule on April 25, 2024, and published it in the Federal Register a few weeks later. *See* 89 Fed. Reg. 39,798. The Rule includes performance standards for $CO_2$ from new gas-fired combustion turbines and emission guidelines for states to establish performance standards for existing coal-fired electricity generating units. In determining

the best system of emission reduction for certain types of new gas-fired units and existing coal-fired units to be CCS, EPA cited "lower costs and continued improvements in CCS technology, alongside federal tax incentives that allow companies to largely offset the cost of CCS." *Id.* at 39,800. EPA decided not to finalize its proposed $CO_2$ emission guidelines for existing gas-fired combustion turbines, but announced it would be addressing those sources by additional rulemaking in the near future. *Id.* at 39,806.

New Gas-Fired Power Plants: Regarding emission reduction requirements for new gas-fired power plants, EPA set performance standards for three subcategories—low load, intermediate load, and base load combustion turbines—based on electricity sales (utilization) relative to the turbine's potential electricity output. 89 Fed. Reg. at 39,908. For low load sources, EPA set performance standards based on the use of low-emitting fuels as the best system. *Id.* at 39,916. Base load and intermediate load sources must achieve a standard that reflects the degree of limitation achievable through use of a highly efficient turbine design, which EPA determined to be the best system of emission reduction. *Id.* at 39,917. Base load units, which supply electricity to the grid more or less constantly,

are subject to a second phase performance standard based on CCS as the best system of emission reduction. *Id.* at 39,917. In that second phase, beginning in 2032, base load units must comply with a standard based on applying CCS that achieves 90 percent capture of $CO_2$. 40 C.F.R. § 60.5580a, Table 1.

Existing Coal-Fired Power Plants: Regarding emission guidelines for existing coal-fired power plants, the Rule includes two subcategories. EPA designed these subcategories based in part on information received from power plant owners regarding their future plans for electricity generation. *See* 89 Fed. Reg. at 39,891.

For coal-fired electricity generating units that will be operated on a long-term basis—beyond January 1, 2039—EPA determined the best system of emission reduction to be CCS. *Id.* at 39,801. Beginning in 2032, those units have to meet an emission limitation based on a 90 percent capture of $CO_2$ (an 88.4 percent reduction in emission rate). 40 C.F.R. § 60.5775b(c)(1). Units that will cease operations prior to January 1, 2039 ("medium-term" units) must meet an emission limitation by 2030 based on co-firing natural gas with at the level of 40 percent of annual heat input, which represents a 16 percent reduction in emission rate on a

pound of $CO_2$ per megawatt hour gross basis. *Id.* § 60.5775b(c)(2). Existing coal-fired generating units that retire before January 1, 2032, are not be subject to any new emission limitations, but must submit reports and related records to EPA documenting the retirement. *See* 40 C.F.R. § 60.5710b(b); § 60.5876b.

In the final Rule, EPA added provisions to specifically address comments concerning (i) potential compliance difficulties due to delays in construction and/or permitting, and (ii) the Rule's impact on grid reliability. On the first issue, states may include a mechanism in their plans to extend the compliance date by up to one year for sources installing control technology that experience (and subsequently document) a permitting- or construction-related delay outside of the owner's control that it makes it impossible to meet the compliance deadline. 40 C.F.R. § 60.5740b(a)(11). Second, the Rule adds provisions that states can use to address situations in which compliance could result in short-term or longer-term grid reliability problems. *Id.* § 60.5740b(a)(12), (13).

States have two years from the date of the Rule's publication to prepare their plans to establish performance standards for coal-fired electricity generating units subject to the Rule. 40 C.F.R.

14

§ 60.5785b(a). State plans need not include those units that will be ceasing operations before January 1, 2032. *See id.* § 60.5710b(b).

The Rule is expected to achieve substantial greenhouse gas emission reductions. EPA estimates that the Rule will result in 1.38 billion tons of $CO_2$-equivalent emissions reduced during the 2028-2047 period. *See* 89 Fed. Reg. at 40,004.

<u>*This Litigation*</u>

On May 9, 2024, four petitions for review challenging the Rule were filed by: (i) a group of states led by West Virginia (case no. 24-1120) (ECF Doc. #2053599); (ii) Kansas and Ohio (case no. 24-1121) (ECF Doc. #2053609); (iii) National Rural Electric Co-operative Association (NRECA) (case no. 24-1122) (ECF Doc. #2053624); and (iv) National Mining Association and America's Power (case no. 24-1124) (ECF Doc. #2053706). The Oklahoma Gas and Electric Company (case no. 24-1126) (ECF Doc. #2053908) and Electric Generators for a Sensible Transition (case 24-1128) (ECF Doc. #2054552) filed petitions on May 10. The petitions have been consolidated, with *West Virginia v. EPA* (No. 24-1120) as lead case.

Before filing this motion, counsel for the Movant-Intervenor States contacted counsel for the petitioners listed above and for

EPA. The petitioners in the six cases listed above take no position on this motion. Respondents also take no position on this motion.

## LEGAL STANDARD

Federal Rule of Appellate Procedure (FRAP) 15(d) authorizes intervention in circuit court proceedings to review agency actions on a motion containing "a concise statement of interest of the moving party and the grounds for intervention" that is filed within 30 days after the petition for review. In determining whether to grant intervention, this Court typically draws on the policies underlying Federal Rule of Civil Procedure (FRCP) 24. *See Mass. Sch. of Law at Andover, Inc. v. United States*, 118 F.3d 776, 779 (D.C. Cir. 1997). Under FRCP 24, a party seeking to intervene as of right must satisfy four factors: (1) timeliness of the application to intervene; (2) a legally protected interest; (3) that the action, as a practical matter, impairs or impedes that interest; and (4) that no party to the action can adequately represent the potential intervenor's interest. *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 320 (D.C. Cir. 2015); *see also Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1233 (D.C. Cir. 2018) (looking "to the timeliness of the motion to intervene and whether the

existing parties can be expected to vindicate the would-be intervenor's interests").

A court may also grant permissive intervention when a movant makes a timely application and the applicant's claim or defense and the main action have a question of law or fact in common. FRCP 24(b)(1); *see EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998).

## ARGUMENT

## I. MOVANT-INTERVENOR STATES ARE ENTITLED TO INTERVENE AS A MATTER OF RIGHT.

### A. The States Have Article III Standing and Legally Protected Interests that Would Be Impaired if the Court Were to Grant the Petitions for Review.

The standing inquiry for an intervenor-respondent is the same as for a petitioner: the intervenor must show injury in fact, causation, and redressability. *Crossroads Grassroots*, 788 F.3d at 316. Movant-Intervenor States satisfy these three factors here.

With respect to injury-in-fact, "cases have generally found a sufficient injury in fact where a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit." *Crossroads Grassroots*, 788 F.3d

at 317. Here, a successful challenge to the Rule's emission standards for new gas-fired power plants and/or emission limitations on existing coal-fired power plants would impair Movant-Intervenor States' interests in two fundamental ways.

First, the Rule will result in significant reductions in $CO_2$ emissions from gas-fired and coal-fired power plants and thus prevent or mitigate climate change harms in our states. Fossil-fueled power plants emit 25 percent of the country's greenhouse gas emissions, representing the second largest source of carbon pollution (the transportation sector is the largest source). 89 Fed. Reg. at 39,799. As noted above, EPA projects that the Rule will reduce emissions by 1.38 billion tons of $CO_2$-equivalent during the 2028-2047 period, a reduction equivalent to preventing the annual emissions of 328 million gasoline cars, or to nearly the emissions from the entire U.S. electric power sector during one year.[10] Moreover, a federal rule is necessary to achieve these reductions,

_____

[10] EPA, "Biden-Harris Administration Finalizes Suite of Standards to Reduce Pollution from Fossil-Fueled Power Plants (Apr. 24, 2024)," https://www.epa.gov/newsreleases/biden-harris-administration-finalizes-suite-standards-reduce-pollution-fossil-fuel.

because many plants subject to the Rule are located in state or local jurisdictions that do not have emission standards for fossil-fueled power plants. *See* 89 Fed. Reg. at 39,813 (noting the essential role federal regulation plays because "progress in emissions reduction is not uniform across all states"). Movant-Intervenor States thus have a demonstrated, legally protected sovereign and quasi-sovereign interest in protecting their territory, infrastructure, and residents from pollution that contributes to climate change and resulting harms. *See Massachusetts v. EPA*, 549 U.S. 497, 521-26 (2007); *NRDC v. Wheeler*, 955 F.3d 68, 77 (D.C. Cir. 2020). If the Rule is vacated, Movant-Intervenor States and our residents would lose the benefit of the Rule's significant greenhouse gas reductions and resulting relief from climate harms.

Second, to comply with the Rule, power plants likely will implement approaches that also cut smog-causing pollutants such as nitrogen oxide that contribute to ozone nonattainment.[11] Thus,

---

[11] *See* EPA, Regulatory Impact Analysis for New Source Performance Standards for Greenhouse Gas Emissions from Fossil Fuel-Fired Electricity Generating Units (April 2024), at ES-6, tbl.

(continued…)

the Rule will reduce regulatory and financial burdens on state health and environmental programs and improve the health of our residents and natural resources. For example, EPA projects that, in 2035, the Rule will result in reductions of 49,000 tons of nitrogen oxide emissions, including 19,000 tons during the ozone season. 89 Fed. Reg. at 40,005, tbl. 4.

In addition, the Rule benefits Movant-Intervenor States by repealing the ACE rule. As noted above, EPA projected that the ACE rule would <u>increase</u> emissions of $CO_2$, nitrogen oxides, and/or sulfur dioxide in several of our states. 89 Fed. Reg. at 39,837. And the ACE rule prohibited states from including cap-and-trade programs in state plans, which many of Movant-Intervenor States (including California, Washington, and the states participating in the Regional Greenhouse Gas Initiative) use to reduce power plant carbon pollution. Vacatur of the Rule's repeal of the ACE rule would therefore make it more difficult for Movant-Intervenor States to meet our obligations to attain and maintain clean air in compliance

ES-1, https://www.epa.gov/system/files/documents/2024-04/utilities_ria_final_111_2024-04.pdf.

with section 110 of the Act. *Cf. West Virginia v. EPA*, 362 F.3d 861, 868 (D.C. Cir. 2004) (EPA action that makes it more onerous for a state to address pollution causes cognizable injury to the state).

Finally, these climate and pollution reduction benefits to Movant-Intervenor States are "directly traceable" to the Rule, and Movant-Intervenor States "can prevent the[se] injur[ies] by defeating" Petitioners' challenge. *Crossroads Grassroots*, 788 F.3d at 316. Movant-Intervenor States thus meet all three standing requirements.

For the same reasons, Movant-Intervenor States also satisfy the FRCP 24(a) requirements for legally protected interests that may be impaired or impeded by this litigation. As this Court has observed, "any person who satisfies Rule 24(a) will also meet Article III's standing requirement." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003). As discussed above, if Petitioners are successful in challenging the Rule, Movant-Intervenor States' interests in greenhouse gas and other pollution reductions and flexibility in designing compliance tools in state plans will be impaired. Movants thus satisfy the interest requirements for

intervention as of right under FRCP 24(a), as well as the requirements for Article III standing.

### B. Movant-Intervenor States Also Satisfy the Other Elements for Intervention as a Matter of Right.

Movant-Intervenor States meet the additional elements of timeliness and inadequate representation of interests to be able to intervene as of right. First, this motion is timely. FRAP 15(d) provides that a party seeking intervention must do so "within 30 days after the petition for review is filed." As noted above, the first petitions in this case were filed on May 9, 2024. This motion is thus within the 30-day period provided by FRAP 15(d).

Second, no existing party can vindicate or adequately address Movant-Intervenor States' interests. This element turns on "whether the existing parties can be expected to vindicate the would-be intervenor's interests." *Old Dominion*, 892 F.3d at 1233; *see also* FRCP 24(a) (considering whether "existing parties adequately represent" the would-be intervenor's interests). The requirement is "not onerous," and a "movant ordinarily should be allowed to intervene unless it is clear that" existing parties "will provide adequate representation." *Crossroads Grassroots*, 788 F.3d

at 321. General alignment of interests between would-be intervenors and existing parties is not dispositive. *Id.*

Movant-Intervenor States satisfy this minimal burden because their interests are not adequately represented by the other parties. Although Movants would be joining EPA in defending the Rule in the litigation, our interests are distinct because the Rule's emission guidelines directly regulate states, imposing obligations on states that it does not impose on EPA itself. *See West Virginia*, 597 U.S. at 710 (EPA has "the primary regulatory role in Section 111(d)," but in applying those EPA regulations "the States set the actual rules governing existing power plants.").

We also have sovereign and quasi-sovereign interests—in protecting state lands, infrastructure, and resources from climate change and attaining or maintaining national ambient air quality standards—that are distinct from EPA's interests. As a result, EPA and Movant-Intervenor States may choose to advance different arguments or make different strategic choices in this litigation. Movants therefore satisfy this final requirement for intervention as of right.

## II. ALTERNATIVELY, MOVANT-INTERVENOR STATES ARE ENTITLED TO PERMISSIVE INTERVENTION.

Movant-Intervenor States also satisfy the requirements for permissive intervention. Under FRCP 24(b)(1), courts may "permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact" so long as the motion is timely and intervention would not "unduly delay or prejudice the rights of the original parties." FRCP 24(b)(1)(B), (3). As noted above, there are common questions of law and fact, the motion is timely, and intervention at this early stage will not cause any delay or prejudice.

For the foregoing reasons, we respectfully request that this Court grant this motion to intervene.

Dated: May 16, 2024                    Respectfully submitted,

FOR THE STATE OF
NEW YORK

LETITIA JAMES
Attorney General

/s/ *Michael J. Myers*

By: _____

BARBARA D. UNDERWOOD
Solicitor General
JUDITH N. VALE
Deputy Solicitor General
MATTHEW W. GRIECO
Senior Assistant Solicitor General
MICHAEL J. MYERS
Senior Counsel
MORGAN A. COSTELLO
Chief, Affirmative Litigation Sect.
ANDREW G. FRANK
Assistant Attorney General
Environmental Protection Bureau
The Capitol
Albany, NY 12224
(518) 776-2382
michael.myers@ag.ny.gov

FOR THE STATE OF
ARIZONA

KRISTIN K. MAYES
Attorney General

*/s/ Paul Phelps\**

By: _____
PAUL PHELPS
Assistant Attorney General
CURTIS COX
Section Chief Counsel
Environmental Enf. Section
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-8543
Environmental@azag.gov
*application for admission to
D.C. Circuit pending

FOR THE STATE OF
CONNECTICUT

WILLIAM TONG
Attorney General

*/s/ Scott N. Koschwitz*

By: _____
MATTHEW I. LEVINE
Deputy Assoc. Atty. General
SCOTT N. KOSCHWITZ
Assistant Attorney General
Office of the Attorney General
165 Capitol Ave.
Hartford, CT 06106
(860) 808-5250
Scott.koschwitz@ct.gov

FOR THE STATE OF
COLORADO

PHILIP J. WEISER
Attorney General

*/s/ Carrie Noteboom*

By: _____
CARRIE NOTEBOOM
Assistant Deputy Attorney
  General
GABBY FALCON
SARAH QUIGLEY
Assistant Attorneys General
Natural Resources and
  Environment Section
Ralph C. Carr Colorado
  Judicial Center
1300 Broadway, 7th Floor
Denver, CO 80203
(720) 508-6285
carrie.noteboom@coag.gov

FOR THE DISTRICT OF
COLUMBIA

BRIAN L. SCHWALB
Attorney General

/s/ *Caroline S. Van Zile*

By: _____
CAROLINE S. VAN ZILE
Solicitor General
Office of the Attorney General for
  District of Columbia
400 6th St. NW
Washington, DC 20001
(202) 727-6609
caroline.vanzile@dc.gov

FOR THE STATE OF
DELAWARE

KATHLEEN JENNINGS
Attorney General

By: /s/ Vanessa L. Kassab
_____
CHRISTIAN D. WRIGHT
Director of Impact Litigation
RALPH K. DURSTEIN III
VANESSA L. KASSAB
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

FOR THE STATE OF HAWAIʻI

ANNE E. LOPEZ
Attorney General

By: /s/ Lyle T. Leonard
_____
LYLE T. LEONARD
Deputy Attorney General
465 S. King Street, #200
Honolulu, HI 96813
(808) 587-3050
lyle.t.leonard@hawaii.gov

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General

By: /s/ Jason E. James
_____
MATTHEW DUNN
Chief, Environmental
 Enforcement/Asbestos
 Litigation Division
JASON E. JAMES
Assistant Attorney General
201 West Pointe Drive, Suite 7
Belleville, IL 62226
(872) 276-3583
jason.james@ilag.gov

FOR THE STATE OF
MARYLAND

ANTHONY G. BROWN
Attorney General

By: /s/ Michael F. Strande
_____
MICHAEL F. STRANDE
Assistant Attorney General
STEVEN J. GOLDSTEIN
Special Assistant Attorney
 General
Office of the Attorney General
1800 Washington Blvd.
Baltimore, MD 21230
(410) 537-3421
Michael.strande@oag.state.md.us
sgoldstein@oag.state.md.us

FOR THE STATE OF MAINE

AARON M. FREY
Attorney General

/s/ *Emma Akrawi*

By: _____
EMMA AKRAWI
Assistant Attorney General
Natural Resources Division
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
emma.akrawi@maine.gov

FOR THE COMMONWEALTH
OF MASSACHUSETTS

ANDREA JOY CAMPBELL
Attorney General

/s/ *Turner Smith*

By: _____
TURNER SMITH
Assistant Attorney General &
    Deputy Bureau Chief
JULIA JONAS-DAY
Assistant Attorney General for
    Climate Change
BENJAMIN MESHOULAM
Senior Advisor
SETH SCHOFIELD
Senior Appellate Counsel
Energy and Env. Bureau
Office of the Attorney General
One Ashburton Place, 18th Flr.
Boston, MA 02108
(617) 727-2200
turner.smith@mass.gov

FOR THE PEOPLE OF THE
STATE OF MICHIGAN

DANA NESSEL
Attorney General

/s/ *Elizabeth Morrisseau*

By: _____
ELIZABETH MORRISSEAU
Assistant Attorney General
Environment, Natural
    Resources, and Agriculture
    Division
6th Floor G. Mennen Williams
    Building
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
MorrisseauE@michigan.gov

FOR THE STATE OF
MINNESOTA

KEITH ELLISON
Attorney General

/s/ *Peter N. Surdo*

By: _____
PETER N. SURDO
Assistant Attorney General
Minnesota Attorney General's
    Office
445 Minnesota Street, S.1400
St. Paul, MN 55101
(651) 583-6667
peter.surdo@ag.state.mn.us

FOR THE STATE OF NEW
MEXICO

RAUL TORREZ
Attorney General

*/s/ William Grantham*

By: _____
WILLIAM GRANTHAM
Assistant Attorney General
408 Galisteo Street
Santa Fe, NM 87501
(505) 717-3520
wgrantham@nmag.gov

FOR THE STATE OF
OREGON

ELLEN F. ROSENBLUM
Attorney General

*/s/ Paul Garrahan*

By: _____
PAUL GARRAHAN
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney
   General
Natural Resources Section
General Counsel Division
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4540
Paul.Garrahan@doj.state.or.us
Steve.Novick@doj.state.or.us

FOR THE STATE OF NORTH
CAROLINA

JOSHUA H. STEIN
Attorney General

*/s/ Daniel S. Hirschman*

By: _____
DANIEL S. HIRSCHMAN
Sr. Deputy Attorney General
ASHER P. SPILLER
Special Deputy Attorney
   General
TAYLOR H. CRABTREE
Assistant Attorney General
North Carolina Dept. of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6400
dhirschman@ncdoj.gov
aspiller@ncdoj.gov
tcrabtree@ncdoj.gov

FOR THE COMMONWEALTH
OF PENNSYLVANIA

MICHELLE A. HENRY
Attorney General

*/s/Ann Johnston*

By: _____
ANN JOHNSTON
Asst. Chief Dep. Atty. General
Civil Environmental Enf. Unit
Office of the Attorney General
Strawberry Sq., 17th Floor
Harrisburg, PA 17120
(717) 417-3698
ajohnston@attorneygeneral.gov

FOR THE STATE OF RHODE
ISLAND

PETER F. NERONHA
Attorney General

/s/ *Alison Hoffman Carney*

By: _____
ALISON HOFFMAN CARNEY
Assistant Attorney General
Chief, Environmental and
  Energy Unit
150 South Main Street
Providence, RI 02903
(401) 274-4400 ext. 2116
acarney@riag.ri.gov

FOR THE STATE OF
WASHINGTON

ROBERT W. FERGUSON
Attorney General

/s/ *Christopher H. Reitz*

By: _____
CHRISTOPHER H. REITZ
CAROLINE E. CRESS
ZACHARY S. PACKER
Assistant Attorneys General
Office of the Attorney General
P.O. Box 40117
Olympia, WA 98504-0117
(360) 586-4614
chris.reitz@atg.wa.gov

FOR THE STATE OF
VERMONT

CHARITY R. CLARK
Attorney General

/s/ *Hannah Yindra*

By: _____
HANNAH YINDRA
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
hannah.yindra@vermont.gov

FOR THE STATE OF
WISCONSIN

JOSHUA L. KAUL
Attorney General

/s/ *Gabe Johnson-Karp*

By: _____
GABE JOHNSON-KARP
Assistant Attorney General
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI  53707-7857
(608) 267-8904
johnsonkarpg@doj.state.wi.us

FOR THE CITY OF BOULDER

TERESA TAYLOR TATE
City Attorney

/s/Luis A. Toro

By: _____
LUIS A. TORO
Senior Counsel
City of Boulder
1777 Broadway, 2d Floor
Boulder, CO 80302
(303) 441-3020
ToroL@bouldercolorado.gov


FOR THE CITY AND COUNTY
OF DENVER

KERRY TIPPER
City Attorney

/s/ Edward J. Gorman

By: _____
EDWARD J. GORMAN
Senior Assistant City Attorney
201 W. Colfax Avenue
Dept. 1207
Denver, Colorado 80202
Tel: (720) 913-3275
Edward.gorman@denvergov.org

FOR THE CITY OF CHICAGO

MARY B. RICHARDSON-
LOWRY
Corporation Counsel

/s/Myriam Zreczny Kasper

By: _____
MYRIAM ZRECZNY KASPER
Deputy Corporation Counsel
Appeals Division
City of Chicago Dept. of Law
2 N. LaSalle St., S. 580
Chicago, IL 60602
(312) 744-3564
Myriam.kasker@cityofchicago.org


FOR THE CITY OF NEW YORK

SYLVIA O. HINDS-RADIX
Corporation Counsel

/s/Christopher G. King

By: _____
CHRISTOPHER G. KING
ALICE R. BAKER
Senior Counsel
New York City Law Dept.
100 Church Street
New York, NY 10007
(212) 356-2074
cking@law.nyc.gov

FOR THE CALIFORNIA AIR
RESOURCES BOARD

ROB BONTA
Attorney General

*/s/ Jonathan A. Wiener*
By: _____
TRACY L. WINSOR
Senior Assistant Attorney
 General
MYUNG J. PARK
Supervising Deputy Attorney
 General
KATHERINE GAUMOND
THEODORE A.B. MCCOMBS
JONATHAN A. WIENER
Deputy Attorneys General
455 Golden Gate Ave., S.
11000
San Francisco, CA 94114
(415) 510-3549
jonathan.wiener@doj.ca.gov

# CERTIFICATE AS TO PARTIES AND AMICI

Pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(1)(A), I hereby certify the parties and amici are as follows:

In case 24-1120, petitioners are West Virginia, Indiana, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Iowa, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Hampshire, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, and Wyoming.

In case 24-1121, petitioners are Ohio and Kansas.

In case 24-1122, the petitioner is the National Rural Electric Co-operative Association

In case 24-1124, the petitioners are National Mining Association and America's Power.

In case 24-1126, the petitioner is the Oklahoma Gas and Electric Company.

In case 24-1128, the petitioner is Electric Generators for a Sensible Transition.

In these consolidated cases, respondents are United States Environmental Protection Agency and Michael S. Regan, Administrator of the Environmental Protection Agency.

There are no amici that have appeared in the litigation.

*/s/ Michael J. Myers*
_____
MICHAEL J. MYERS

## CERTIFICATE OF COMPLIANCE

I hereby certify that this filing complies with the requirements of Fed. R. App. P. 27(d)(1)(E) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font. I further certify that the motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 4,248 words, excluding the parts of the motion exempted under Fed. R. App. P. 32(f), according to the count of Microsoft Word.

*/s/ Michael J. Myers*

_____

MICHAEL J. MYERS

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Unopposed Motion for Leave to Intervene as Respondents have been served through the Court's CM/ECF system on all registered counsel this 16th day of May, 2024.

*/s/ Michael J. Myers*

_____

MICHAEL J. MYERS