# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| **State of West Virginia, et al.,** | |
| Petitioners, | |
| **v.** | Case No. 24-1120 (and consolidated cases) |
| **United States Environmental Protection Agency, et al.,** | |
| Respondents. | |

On Petition for Review of Final Action of the United States
Environmental Protection Agency

## UNOPPOSED MOTION FOR LEAVE TO INTERVENE AS RESPONDENT

Pursuant to Federal Rule of Appellate Procedure 15(d) and
Circuit Rule 15(b), the State of New Jersey moves to intervene in
support of the Environmental Protection Agency in litigation
challenging a federal rule that limits carbon dioxide emissions from
new gas-fired power plants and existing coal-fired power plants
under the Clean Air Act. New Jersey seeks to intervene to defend
the rule, which would meaningfully limit greenhouse gas emissions
from some of the largest sources in the nation, thereby helping to
address harms our State and residents face from climate change.

1

## BACKGROUND

These cases involve challenges to a final rule the Environmental Protection Agency (EPA) issued under section 111 of the Clean Air Act that establishes performance standards for carbon dioxide ($CO_2$) emissions from new gas-fired power plants and requires States to develop plans to limit $CO_2$ from existing coal-fired power plants, 89 Fed. Reg. 39,798 (May 9, 2024) (Rule).

### *Section 111*

Section 111 requires EPA to limit pollution from any source category that EPA determines "causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7411(b)(1)(A). The statute refers to these emission limits as "standards of performance," defined as a "standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any non-air quality health and environmental impacts and energy requirements) the Administrator determines has been adequately demonstrated." *Id.* § 7411(a)(1).

Section 111(b) requires EPA to set standards of performance for new stationary sources. *Id.* § 7411(b)(1)(B). EPA sets performance standards for new sources by reference to emissions levels that can be achieved using the most up-to-date control technology or method of limiting emissions of each type of pollutant that is both feasible and achievable at a reasonable cost, but it does not mandate any specific equipment, technology, or method. *Id.* § 7411(a)(1) & (b)(5). Section 111(b) requires EPA to establish standards of performance governing the emission of air pollutants from new sources, and to review and, if appropriate, revise, those standards at least every eight years. *Id.* § 7411(b)(1)(B). In establishing standards, EPA "may distinguish among classes, types, and sizes" within a source category. *Id.* § 7411(b)(2).

Once EPA establishes a performance standard for new stationary sources, it must issue an emissions guideline to control certain types of air pollutants—those not regulated as criteria or hazardous air pollutants—from existing sources in the same category. *See id.* § 7411(d)(1). Although EPA promulgates standards of performance under section 111(b) that directly apply to new (as well as modified and reconstructed) sources, states

3

establish standards of performance for existing sources under section 111(d). *Id.* The same definition of "standard of performance" applies equally to the standards that states set, and states use EPA's emissions guideline in developing standards for existing sources that reflect the degree of pollution reduction achievable by application of the best system of emission reduction. *Id.* § 7411(a)(1), *see West Virginia v. EPA*, 597 U.S. 697, 709-11 (2022).

Section 111(d) also directs EPA to allow states—in establishing a standard of performance for a particular source—to take into account the source's remaining useful life and other factors. 42 U.S.C. § 7411(d)(1). EPA has an important oversight role under section 111(d) to ensure that state plans are "satisfactory" in meeting section 111(d) requirements. 42 U.S.C § 7411(d)(2)(A). If a state fails to submit a plan or EPA determines that a state plan is not satisfactory, EPA must promulgate a federal plan to limit pollution from those existing sources. *Id.*

*Climate Change and New Jersey's Efforts to Reduce $CO_2$ Emissions from Fossil-Fueled Power Plants*

New Jersey is experiencing direct and compounding harms from climate change that are projected to worsen without deep

4

reductions in anthropogenic emissions of greenhouse gases, such as those from power plants regulated by the Rule. These harms range from sweltering temperatures in our cities, to severe droughts, poor air quality, and lethal flash floods.[1] In 2021, flash flooding from Hurricane Ida killed twenty-five people in New Jersey, the most of any state.[2] And in 2023, wildfire smoke caused New Jersey to suffer its worst air quality day on record.[3]

Of particular relevance here, climate change is also threatening grid reliability in New Jersey. As EPA noted in the preamble to the proposal, "many regions of the country have experienced a significant increase in the frequency and severity of

---

[1] New Jersey Department of Environmental Protection, *2020 New Jersey Scientific Report on Climate Change* (June 30, 2020), https://dep.nj.gov/wp-content/uploads/climatechange/nj-scientific-report-2020.pdf.

[2] Mike Catalini, Wayne Parry & Michael R. Sisak, Searches, Sorrow in Wake of Ida's Destructive, Deadly Floods, Associated Press (September 3, 2021), https://apnews.com/article/hurricane-ida-new-york-new-jersey-flooding-f50cc6c7f822be4428495427f30cbd16.

[3] Jeff Goldman, Katie Kausch & Steven Rodas, NJ Smashes Record for Worst Air Quality Day in 43 Years From Dense Smoke, NJ.com (Jun. 7, 2023), https://www.nj.com/weather/2023/06/nj-smashes-record-for-worst-air-quality-day-in-43-years-from-dense-smoke.html.

extreme weather events" and such events have affected "energy infrastructure and both the demand for and supply of electricity." 88 Fed. Reg. at 33,415; *see also* 88 Fed. Reg. 41,477, 41,478 (June 27, 2023) (Federal Energy Regulatory Commission report finding trend of increasing severe weather events "threatens livelihoods, electric system reliability, and the Commission's ability to ensure just and reasonable jurisdictional rates."). According to a recent report by the U.S. Global Change Research Program, "[w]ithout mitigation [of greenhouse gas emissions] and adaptation, projected increases in the frequency, intensity, duration, and variability of extreme events will amplify effects on energy systems."[4]

To combat climate change harms, New Jersey is committed to reducing GHG emissions from sources within our borders to 80% below their 2006 levels by 2050. N.J. Stat. Ann., 26:2C-39, 26:2C-40. With respect to the electricity sector, New Jersey sets $CO_2$ emissions limits and reporting requirements for power plants.

_____

[4] U.S. Global Change Research Program, *Fifth National Climate Assessment* (Nov. 2023), ch. 5 (Energy), https://nca2023.globalchange.gov/chapter/5/.

N.J.A.C. 7:27F-2.3 – 2.7. New Jersey also participates in the Regional Greenhouse Gas Initiative cap-and-trade program.[5]

*Regulation of $CO_2$ from New Power Plants Under Section 111(b)*

In 2006, several states and nonprofit organizations challenged EPA's failure to establish standards of performance of carbon dioxide from new coal-fired power plants under section 111(b), *New York v. EPA* (D.C. Cir. No. 06-1322). After the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007), the case was remanded to EPA for further proceedings in light of the Supreme Court's ruling that greenhouse gases are air pollutants under the Clean Air Act. *See* Per Curiam Order in Case No. 06-1322 (Sept. 24, 2007) at 1.

Nearly a decade later, EPA issued new source performance standards to limit emissions of carbon dioxide from new coal-fired power plants and new gas-fired power plants. *See* 80 Fed. Reg. 64,510 (Oct. 23, 2015) (setting performance standards for new coal-

---

[5] New Jersey Department of Environmental Protection, RGGI Factsheet (October 15, 2020), https://nj.gov/dep/aqes/docs/rggi_101_factsheet.pdf.

fired electricity generating units and new gas-fired combustion turbines).[6] The challenge to that rule was subsequently placed in abeyance, where it remains today. *See* ECF Doc. #1688176 (Aug. 10, 2017). In 2018, EPA proposed to weaken the standards for new coal-fired plants, but did not finalize those revisions. *See* 83 Fed. Reg. 65,424 (Dec. 20, 2018) & 86 Fed. Reg. 2542 (Jan. 13, 2021).

*Regulation of $CO_2$ from Existing Power Plants Under Section 111(d)*

On the same day in 2015 that it established standards for new coal-fired and gas-fired power plants, EPA issued emission guidelines under section 111(d) for states to limit $CO_2$ from existing sources in those categories. *See* 80 Fed. Reg. (Oct. 23, 2015) (Clean Power Plan).

In 2019, EPA repealed and replaced the Clean Power Plan with the Affordable Clean Energy (ACE) rule. *See* 84 Fed. Reg. 32,520 (July 8, 2019). EPA projected that the ACE rule would reduce $CO_2$ emissions by less than one percent, and cause emissions

---

[6] Under the Clean Air Act, an existing source that is modified or reconstructed after regulations are proposed for new sources is also considered a new source. 42 U.S.C. § 7411(a)(2); 40 C.F.R. § 60.15. The 2015 rule included standards for reconstructed and modified coal-fired and gas-fired units. *Id.*

of $CO_2$, nitrogen oxides, and/or sulfur dioxide to <u>increase</u> in a dozen or so states.[7] The ACE rule also prohibited states from including cap-and-trade programs as a compliance mechanism for sources within their jurisdictions. 84 Fed. Reg. at 32,555-56. New Jersey challenged the ACE rule as inconsistent with the statute and unsupported by the record. *See* ECF Doc. #1802486 (Aug. 13, 2019). The D.C. Circuit held that the ACE rule's repeal of the Clean Power Plan was not compelled by the Clean Air Act, *American Lung Ass'n v. EPA*, 985 F.3d 914, 991 (D.C. Cir. 2021), and reserved ruling on other claims that the ACE rule was unlawful.

The Supreme Court then reversed, ruling that the ACE rule's repeal of the Clean Power Plan was warranted under the major questions doctrine. *West Virginia v. EPA*, 597 U.S. at 734-35. After the case was remanded, the parties agreed to place the litigation in abeyance in light of EPA's representations that it would undertake a new rulemaking to repeal and replace the ACE rule. *See American*

---

[7] EPA, Regulatory Impact Analysis for the Repeal of the Clean Power Plan, and the Emission Guidelines for Greenhouse Gas Emissions from Existing Electricity Generating Units (June 2019), ES-6; EPA, *Illustrative ACE Scenario*, *State Emissions Projections*, https://www.epa.gov/airmarkets/analysis-final-ace-rule.

*Lung Ass'n v. EPA*, D.C. Cir. No. 19-1140 (Order dated Oct. 27, 2022).

<u>*The Inflation Reduction Act*</u>

Shortly after the Supreme Court decided *West Virginia*, Congress passed the Inflation Reduction Act,[8] which laid the groundwork for the Rule in two important ways. First, Congress confirmed EPA's authority to regulate $CO_2$ from power plants under section 111 of the Clean Air Act and directed the agency "to ensure that reductions in greenhouse gas emissions are achieved through the use of the existing authorities of this Act." 42 U.S.C. § 7435(a)(6). Second, the Inflation Reduction Act's generous carbon capture and sequestration (CCS) tax credits significantly changed the economics for using CCS to control power plant carbon pollution. Because CCS is now less expensive, EPA can take that savings into account when assessing cost, which is one of the statutory factors the agency must consider in selecting the best system of emission reduction for power plants.

---

[8] Pub. L. No. 117-167, 136 Stat. 1366 (2022)

*The Rule*

In May 2023, EPA proposed performance standards for new gas-fired combustion turbines and emission guidelines for (i) existing coal-fired electricity generating units, and (ii) existing gas-fired combustion turbines. *See* 88 Fed. Reg. 33,240 (May 23, 2023). The proposed standards and guidelines were based on best systems of emissions reduction that included CCS, co-firing with hydrogen and other less carbon-intensive fuels, and highly efficient design. *See id.* at 33,244-45. The agency also proposed to formally repeal the ACE rule on legal and policy grounds. *See id.* at 33,335-41. EPA subsequently issued a notice in which it sought additional comment on the potential impacts of the rule on small businesses and on grid reliability. *See* 88 Fed. Reg. 80,682 (Nov. 20, 2023).

After considering public comments, EPA finalized the Rule on April 25, 2024, and published it in the Federal Register a few weeks later. *See* 89 Fed. Reg. 39,798. The Rule includes performance standards for $CO_2$ from new gas-fired combustion turbines and emission guidelines for states to establish performance standards for existing coal-fired electricity generating units. In determining the best system of emission reduction for certain types of new gas-

fired units and existing coal-fired units to be CCS, EPA cited "lower costs and continued improvements in CCS technology, alongside federal tax incentives that allow companies to largely offset the cost of CCS." *Id.* at 39,800. EPA decided not to finalize its proposed $CO_2$ emission guidelines for existing gas-fired combustion turbines, but announced it would be addressing those sources by additional rulemaking in the near future. *Id.* at 39,806.

New Gas-Fired Power Plants: Regarding emission reduction requirements for new gas-fired power plants, EPA set performance standards using three subcategories—low load, intermediate load, and base load combustion turbines—based on electricity sales (utilization) relative to the turbine's potential electricity output. 89 Fed. Reg. at 39,908. For low load sources, EPA set performance standards based on the use of low-emitting fuels as the best system. *Id.* at 39,916. Base load and intermediate load sources must achieve a standard that reflects the degree of limitation achievable through use of a highly efficient turbine design, which EPA determined to be the best system of emission reduction. *Id.* at 39,917. Base load units, which supply electricity to the grid more or less constantly, are subject to a second phase performance standard based on CCS

as the best system of emission reduction. *Id.* at 39,917. In that second phase, beginning in 2032, base load units must comply with a standard based on applying CCS that achieves 90 percent capture of CO2. 40 C.F.R. § 60.5580a, Table 1.

Existing Coal-Fired Power Plants: Regarding emission guidelines for existing coal-fired power plants, the Rule includes two subcategories. EPA designed these subcategories based in part on information received from power plant owners regarding their future plans for electricity generation. *See* 89 Fed. Reg. at 39,891.

For coal-fired electricity generating units that will be operated on a long-term basis—beyond January 1, 2039—EPA determined the best system of emission reduction to be CCS. 89 Fed. Reg. at 39,801. Beginning in 2032, those units would have to meet an emission limitation based on a 90 percent capture of $CO_2$ (an 88.4 percent reduction in emission rate). 40 C.F.R. § 60.5775b(c)(1). Units that will cease operations prior to January 1, 2039 ("medium-term" units) must meet an emission limitation by 2030 based on co-firing natural gas with coal at the level of 40 percent of annual heat input, which represents a 16 percent reduction in emission rate on a pound of CO2 per megawatt hour

gross basis. *Id.* § 60.5775b(c)(2). Existing coal-fired generating units that retire before January 1, 2032, are not be subject to any new emission limitations, but must submit reports and related records to EPA documenting the retirement. *See* 40 C.F.R. § 60.5710b(b); § 60.5876b.

In the final Rule, EPA added provisions to specifically address comments concerning (i) potential compliance difficulties due to delays in construction and/or permitting, and (ii) the Rule's impact on grid reliability. On the first issue, states may include a mechanism in their plans to extend the compliance date by up to one year for sources installing control technology that experience (and subsequently document) permitting- or construction-related delays outside of the owner's control that it makes it impossible to meet the compliance deadline. 40 C.F.R. § 60.5740b(a)(11). Second, the Rule adds provisions that states can use to address situations in which compliance could result in a short-term or longer-term problem regarding grid reliability. *Id.* § 60.5740b(a)(12), (13).

States have two years from the date of the Rule's publication to prepare their plans to establish performance standards for coal-fired electricity generating units subject to the Rule. 40 C.F.R. §

60.5785b(a). State plans need not include those units that will be ceasing operations before January 1, 2032. *See id.* § 60.5710b(b).

The Rule is expected to achieve substantial greenhouse gas emission reductions. EPA estimates that the Rule will result in 1.38 billion tons of $CO_2$-equivalent emissions reduced during the 2028-2047 period. 89 Fed. Reg. at 40,004.

## *This Litigation*

On May 9, 2024, four petitions for review challenging the Rule were filed by: (i) a group of states led by West Virginia (case no. 24-1120) (ECF Doc. #2053599); (ii) Kansas and Ohio (case no. 24-1121) (ECF Doc. #2053609); (iii) National Rural Electric Co-operative Association (NRECA) (case no. 24-1122) (ECF Doc. #2053624); and (iv) National Mining Association and America's Power (case no. 24-1124) (ECF Doc. #2053706). The Oklahoma Gas and Electric Company (case no. 24-1126) (ECF Doc. #2053908) and Electric Generators for a Sensible Transition (case 24-1128) (ECF Doc. #2054552) filed petitions on May 10. Additional petitions were later filed by the United Mine Workers of America (case 24-1142) (ECF Doc. #205521), International Brotherhood of Electrical Workers (case 24-1143) (ECF Doc. #2055265), International Brotherhood of

Boilermakers (case 24-1144) (ECF Doc. #2055279), Midwest Ozone Group (case 24-1146) (ECF Doc. #2055472), Edison Electric Institute (case 24-1152) (ECF Doc. #2055725), NACCO Natural Resources Corporation (case 24-1153) (ECF Doc. #2055798), and Idaho Power Company (case 24-1155) (ECF Doc. #2055798). The petitions have been consolidated, with *West Virginia v. EPA* (No. 24-1120) as lead case.

Before filing this motion, counsel for New Jersey contacted counsel for the petitioners listed above and for EPA and respondent-intervenors and requested they notify New Jersey of any objections to this motion. No party did so.

## LEGAL STANDARD

Federal Rule of Appellate Procedure (FRAP) 15(d) authorizes intervention in circuit court proceedings to review agency actions on a motion containing "a concise statement of interest of the moving party and the grounds for intervention" that is filed within 30 days after the petition for review. In determining whether to grant intervention, this Court typically draws on the policies underlying Federal Rule of Civil Procedure (FRCP) 24. *See Mass. Sch. of Law at Andover, Inc. v. United States*, 118 F.3d 776, 779

(D.C. Cir. 1997). Under FRCP 24, the court may "permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact" so long as the motion is timely and intervention would not "unduly delay or prejudice the rights of the original parties." FRCP 24(b)(1)(B), (3); *see EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998).

## ARGUMENT

## I. NEW JERSEY IS ENTITLED TO PERMISSIVE INTERVENTION

### A. New Jersey Has Article III Standing

The standing inquiry for an intervenor-respondent is the same as for a petitioner: the intervenor must show injury in fact, causation, and redressability. *Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312, 316 (D.C.Cir. 2015). New Jersey has Article III standing here.

With respect to injury-in-fact, "cases have generally found a sufficient injury in fact where a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit." *Crossroads Grassroots*, 788 F.3d at 317. Here, a successful challenge to the Rule's emission

17

standards for new gas-fired power plants and/or emission limitations on existing coal-fired power plants could impair New Jersey's interest in two fundamental ways.

First, the Rule will result in significant reductions in $CO_2$ emissions from gas-fired and coal-fired power plants and thus prevent or mitigate climate change harms to New Jersey. Fossil-fueled power plants emit 25 percent of the country's greenhouse gas emissions, representing the second largest source of carbon pollution (the transportation sector is the largest source). 89 Fed. Reg. at 39,799. As noted above, EPA projects that the Rule will reduce emissions by 1.38 billion tons of $CO_2$-equivalent, which is the equivalent to preventing the annual emissions of 328 million gasoline cars, or to nearly the emissions from the entire U.S. electric power sector during one year.[9] Moreover, a federal rule is necessary to achieve these reductions, because many of the plants subject to the Rule are located in state or local jurisdictions that do

---

[9] EPA, "Biden-Harris Administration Finalizes Suite of Standards to Reduce Pollution from Fossil-Fueled Power Plants (Apr. 24, 2024)," https://www.epa.gov/newsreleases/biden-harris-administration-finalizes-suite-standards-reduce-pollution-fossil-fuel.

not have emission standards for fossil-fueled power plants. *See* 89 Fed. Reg. at 39,813 (noting the essential role federal regulation plays because "progress in emissions reduction is not uniform across all states"). New Jersey thus has a demonstrated, legally protected sovereign and quasi-sovereign interest in protecting our territory, infrastructure, and residents from harmful pollution that contributes to climate change and resulting harms. *See Massachusetts v. EPA*, 549 U.S. 497, 521-26 (2007); *NRDC v. Wheeler*, 955 F.3d 68, 77 (D.C. Cir. 2020). If the Rule is vacated, New Jersey and its residents would lose the benefit of the Rule's significant greenhouse gas reductions.

Second, to comply with the Rule, power plants likely will implement approaches that also cut smog-causing pollutants such as nitrogen oxide that contribute to ozone nonattainment.[10] Thus, the Rule will reduce regulatory and financial burdens on New

---

[10] *See* EPA, Regulatory Impact Analysis for New Source Performance Standards for Greenhouse Gas Emissions from Fossil Fuel-Fired Electricity Generating Units (April 2024), at ES-6, tbl. ES-1, https://www.epa.gov/system/files/documents/2024-04/utilities_ria_final_111_2024-04.pdf.

Jersey's health and environmental programs and improve the health of our residents and natural resources. For example, EPA projects that in 2035, the Rule will result in reductions of 49,000 tons of nitrogen oxide emissions, including 19,000 tons during the ozone season. 89 Fed. Reg. at 40,005, tbl. 4.

In addition, the Rule benefits New Jersey by repealing the ACE rule. As noted above, EPA projected that the ACE rule would <u>increase</u> emissions of $CO_2$, nitrogen oxides, and/or sulfur dioxide. And the ACE rule prohibited states from including cap-and-trade such as the Regional Greenhouse Gas Initiative in state plans, which New Jersey relies on to reduce power plant carbon pollution. Vacatur of the Rule, which repeals the ACE rule, would therefore make it more difficult for New Jersey to meet our obligation to attain and maintain clean air in compliance with section 110 of the Act. *Cf. West Virginia v. EPA*, 362 F.3d 861, 868 (D.C. Cir. 2004) (EPA action that makes it more onerous for a state to address pollution causes cognizable injury to the state).

Finally, these climate and pollution reduction benefits to New Jersey are "directly traceable" to the Rule and New Jersey "can prevent the[se] injur[ies] by defeating" Petitioners' challenge.

*Crossroads Grassroots*, 788 F.3d at 316. New Jersey thus meets all three standing requirements.

### B. New Jersey Satisfies the Elements for Permissive Intervention

New Jersey meets the additional requirements to be entitled to permissive intervention. First, this motion is timely. FRAP 15(d) provides that a party seeking intervention must do so "within 30 days after the petition for review is filed." As noted above, the petition in this case was filed on May 9, 2024. This motion is thus within the 30-day period provided by FRAP 15(d).

New Jersey's claims share with the main action common questions of law or fact, and intervention at this early stage will not cause any delay or prejudice. New Jersey seeks to intervene to defend the Rule, as New York and several other States, cities and the California Air Resources Board have already done. *See* ECF Doc. #2054952. This court granted that motion on June 6, 2024. ECF Doc. #2058199. New Jersey shares these other government respondent-intervenors' arguments in support of the Rule and intends to file a joint brief.

For the foregoing reasons, we respectfully request that this Court grant this motion to intervene.

Dated: June 10, 2024                    Respectfully submitted,

FOR THE STATE OF NEW JERSEY

MATTHEW J. PLATKIN
Attorney General

By:   */s/Lisa Morelli*
      _____
      LISA MORELLI
      Deputy Attorney General
      NELL HRYSHKO
      Deputy Attorney General
      Division of Law
      25 Market St., P.O. Box 093
      Trenton, NJ 08625
      (609) 376-2735
      lisa.morelli@law.njoag.gov

**CERTIFICATE AS TO PARTIES AND AMICI**

Pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(1)(A), I hereby certify the parties and amici are as follows:

Pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(1)(A), I hereby certify the parties and amici are as follows:

In case 24-1120, petitioners are West Virginia, Indiana, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Iowa, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Hampshire, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, and Wyoming.

In case 24-1121, petitioners are Ohio and Kansas.

In case 24-1122, the petitioner is the National Rural Electric Co-operative Association

In case 24-1124, the petitioners are National Mining Association and America's Power.

In case 24-1126, the petitioner is the Oklahoma Gas and Electric Company.

In case 24-1128, the petitioner is Electric Generators for a Sensible Transition.

In case 24-1142, the petitioner is United Mine Workers of America.

In case 24-1143, the petitioner is International Brotherhood of Electrical Workers.

In case 24-1144, the petitioner is International Brotherhood of Boilermakers.

In case 24-1146, the petitioner is Midwest Ozone Group.

In case 24-1152, the petitioner is Edison Electric Institute.

In case 24-1153, the petitioner is NACCO Natural Resources Corporation.

In case 24-1155, the petitioner is Idaho Power Company.

In these consolidated cases, respondents are United States Environmental Protection Agency and Michael S. Regan, Administrator of the Environmental Protection Agency.

Intervenors for respondents are American Lung Association; Clean Air Council; the American Public Health Association; Clean Wisconsin; Natural Resources Defense Council; Edison Electric Institute (except in case 24-1152); California Air Resources Board; City and County of Denver; City of Boulder; City of Chicago; City of New York; Commonwealth of Massachusetts; Commonwealth of

Pennsylvania; District of Columbia; State of Arizona; State of Colorado; State of Connecticut; State of Delaware; State of Hawaii; State of Illinois; State of Maine; State of Maryland; State of Michigan; State of Minnesota; State of New Mexico; State of New York; State of North Carolina; State of Oregon; State of Rhode Island; State of Vermont; State of Washington; and State of Wisconsin;

Tennessee Valley Public Power Association, Inc. and Louisiana Public Service Commission moved to intervene on behalf of petitions in all consolidated cases.

The Chamber of Commerce of the United States of America moved to participate as amicus in all consolidated cases.

*/s/ Lisa Morelli*
_____
LISA MORELLI

## CERTIFICATE OF COMPLIANCE

I hereby certify that this filing complies with the requirements of Fed. R. App. P. 27(d)(1)(E) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font. I further certify that the motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 4,014 words, excluding the parts of the motion exempted under Fed. R. App. P. 32(f), according to the count of Microsoft Word.

*/s/ Lisa Morelli*

_____

LISA MORELLI

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Unopposed Motion for Leave to Intervene as Respondents have been served through the Court's CM/ECF system on all registered counsel this 10th day of June, 2024.

/s/ Lisa Morelli

_____

LISA MORELLI