ORAL ARGUMENT NOT YET SCHEDULED

No. 24-1120 (and consolidated cases)

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

Midwest Ozone Group,

Petitioner,

v.

United States Environmental Protection Agency and Michael S. Regan, Administrator, United States Environmental Protection Agency,

Respondents.

————————

**On Petition For Judicial Review Of Final Agency Action Of The United States Environmental Protection Agency, 89 Fed. Reg. 39,798 (May 9, 2024)**

————————

**REPLY TO RESPONSES IN OPPOSITION TO THE MIDWEST OZONE GROUP MOTION FOR STAY**

————————

Kathy G. Beckett
David M. Flannery
Keeleigh S. Huffman
Steptoe & Johnson PLLC
Post Office Box 1588
Charleston, WV 25326
(304) 353-8000
Kathy.Beckett@steptoe-johnson.com
Dave.Flannery@steptoe-johnson.com
Keeleigh.Huffman@steptoe-johnson.com

Edward L. Kropp
Steptoe & Johnson PLLC
Post Office Box 36425
Indianapolis, Indiana 46236
(317) 946-9882
Skipp.Kropp@steptoe-johnson.com

*Counsel for Midwest Ozone Group*

Dated: June 18, 2024

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Midwest Ozone Group provides the following:

## A. Parties, Intervenors, and Amici Curiae

Petitioners:

- No. 24-1120 (lead case): State of West Virginia; State of Indiana; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Georgia; State of Idaho; State of Iowa; Commonwealth of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of New Hampshire; State of North Dakota; State of Oklahoma; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; Commonwealth of Virginia; State of Wyoming

- No. 24-1121: State of Ohio; State of Kansas

- No. 24-1122: National Rural Electric Cooperative Association

- No. 24-1124: National Mining Association; America's Power

- No. 24-1126: Oklahoma Gas and Electric Company

- No. 24-1128: Electric Generators for a Sensible Transition

- No. 24-1142: United Mine Workers of America, AFL-CIO

- No. 24-1143: International Brotherhood of Electrical Workers, AFL-CIO

- No. 24-1144: International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL-CIO

- No. 24-1146: Midwest Ozone Group

- No. 24-1152: Edison Electric Institute

- No. 24-1153: NACCO Natural Resources Corporation

- No. 24-1155: Idaho Power Company

Respondents:

    Respondents are the United States Environmental Protection Agency and Michael S. Regan, Administrator, United States Environmental Protection Agency.

Intervenors for the Respondents:

    American Lung Association; American Public Health Association; California Air Resources Board; City and County of Denver; City of Boulder; City of Chicago; City of New York; Clean Air Council; Clean Wisconsin; Commonwealth of Massachusetts; Commonwealth of Pennsylvania; District of Columbia; Edison Electric Institute; Natural Resources Defense Council; State of Arizona; State of Colorado; State of Connecticut; State of Delaware; State of Hawaii; State of Illinois; State of Maine; State of Maryland; State of Michigan; State of Minnesota; State of New Mexico; State of New York; State of North Carolina; State of Oregon; State of Rhode Island; State of Vermont; State of Washington; State of Wisconsin; State of New Jersey

Movant Intervenors for Petitioner:

    Tennessee Valley Public Power Association, Inc.; Louisiana Public Service Commission

Movant Amicus for the Petitioners:

    The Chamber of Commerce of the United States of America

## B. Rulings Under Review

    Petitioners challenge a final action taken by the United States Environmental Protection Agency on May 9, 2024, published in the Federal Register 89 Fed. Reg. 39,798, entitled "*New Source Performance Standards for Greenhouse Gas Emissions From New,*

*Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emissions Guidelines for Greenhouse Gas Emissions From Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule."*

## C. Related Cases

There are no additional cases pending in other U.S. Courts of Appeals challenging the same final action.

## RULE 26.1 DISCLOSURE STATEMENT

The Petitioner makes the following statement pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26:

***The Midwest Ozone Group*** is a 'trade association,' within the meaning of Circuit Rule 26.1(b), as it is a continuing association of organizations and individual entities operated to promote the general interests of its membership on matters related to air emissions and air quality. Midwest Ozone Group has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public, although specific individuals in the membership of Midwest Ozone Group have done so. Midwest Ozone Group has no outstanding shares or debt securities in the hands of the public and has no parent company. No publicly held company has a 10% or greater ownership interest in Midwest Ozone Group.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........ ii

RULE 26.1 DISCLOSURE STATEMENT ................................................. v

TABLE OF AUTHORITIES ................................................................. vii

GLOSSARY OF ABBREVIATIONS, ACRONYMS, AND TERMS ............... viii

INTRODUCTION ............................................................................... 1

ARGUMENT

    I.    While EPA Finds Comfort In Having Discussed Grid Reliability With Grid Operators, Mere Discussion Is Not Enough; Grid Operators Find That The Rule Presents A Significant Near-Term Threat To The Reliability Of The Electric Power Grid ......................................................................... 1

    II.    EPA's Scheduling And Administrative "Fixes" Are Not Substantive And Therefore Do Not Resolve Concerns About Grid Reliability. ....................... 2

    III.    The Nation's Regional Transport Organization Are Alarmed About Electricity Demand Growth And Reliability As Impacted By This Rule ...... 4

    IV.    Power Companies' Concerns About Grid Reliability Have Not Been Addressed By The Rule. ......................................................................... 7

    V.    The Final Rule Also Fails To Address The Concerns About Grid Reliability Expressed By Members Of Congress ............................................................. 9

CONCLUSION ..................................................................................... 11

CERTIFICATE OF COMPLIANCE ........................................................ 12

CERTIFICATE OF SERVICE ............................................................... 13

# <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

<u>Statues</u>

CAA § 111, 42 U.S. Code § 7411 ...........................................................................1

<u>Federal Register Notices</u>

89 Fed. Reg. 39,798 (May 9, 2024) .........................................................2, 4, 10

## GLOSSARY OF ABBREVIATIONS, ACRONYMS, AND TERMS

| | |
|---|---|
| BSER | best system of emissions reduction |
| CAA | Clean Air Act |
| CCS | carbon capture and sequestration/storage |
| EPA | United States Environmental Protection Agency |
| MISO | Midcontinent Independent System Operator, Inc. |
| PJM | PJM Interconnection, L.L.C. |
| RTO | Regional Transport Organization |
| Rule | *New Source Performance Standards for Greenhouse Gas Emissions From New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emissions Guidelines for Greenhouse Gas Emissions From Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule*, 89 Fed. Reg. 39,798 (May 9, 2024) |
| SPP | Southwest Power Pool, Inc. |

## INTRODUCTION

Grid reliability is an overarching concern raised by all stakeholders about the agency's efforts to redefine electric power generation in this Rule. This concern has largely been ignored by EPA, as evidenced by the Rule's robust regulatory requirements and abbreviated compliance timelines that impose harmful threats to energy access for all users of domestic energy. Yet, EPA has the statutory obligation to "tak[e] into account," among other things, "energy requirements." Clean Air Act, Section 111.

Midwest Ozone Group supports the Stay Motions filed by State of West Virginia et. al., the National Rural Electric Cooperative Association, and Electric Generators for a Sensible Transition and incorporates those arguments, as well as their corresponding Replies by reference into this Reply.

## ARGUMENT

I.  **While EPA Finds Comfort In Having Discussed Grid Reliability With Grid Operators, Mere Discussion Is Not Enough; Grid Operators Find That The Rule Presents A Significant Near-Term Threat To The Reliability Of The Electric Power Grid.**

EPA has dismissed concerns that the Rule presents harm to the electric power grid by noting that it has met with representatives of power companies and grid operators to discuss grid reliability and found no threat. 89 Fed. Reg. 39,803; Goffman Decl., ¶113. Meeting with representatives is not indicative of having resolved the substantial reservations of stakeholders who have stated their objective and factual grid reliability observations.

1

EPA attempts to shore up its argument that the Rule does not impact grid reliability by asserting that it "considered the impacts on the power sector, on a nationwide and long-term basis, of determining CCS to be the BSER for long-term coal-fired steam generating units." 89 Fed. Reg. 39,886. EPA concludes it observes only "limited non-adverse impacts on the long-term structure of the power sector or on the reliability of the power sector." *Id.* Carbon capture and sequestration/storage ("CCS") is not commonly available in a manner that suggests obtaining such technology is a given either by planning to purchase or to develop it to meet a compliance deadline. In addition, the option offered by EPA to switch to natural gas is not an option for power generators using coal-refuse as a fuel. Gibbons Decl., ¶19. Electricity demand is increasing at a rate that requires immediate action to manage the harmful impact of this Rule. Gibbons Decl., ¶27.

## II.    EPA's Scheduling And Administrative "Fixes" Are Not Substantive And Therefore Do Not Resolve Concerns About Grid Reliability.

The declaration of Joseph Goffman references many particulars he claims are designed address impacts raised by stakeholders in comments filed. States and industry have raised issues of impossibility of implementation, but EPA asserts that because of "flexibilities" available, "near term impacts on the power sector in the policy case will generally tend to be overstated." Goffman Decl., ¶27. The generalizations of trends upon which EPA relies are not tolerable in the face of requirements of immediate

investments in planning, expenditures for services, pursuit of approvals by regulatory agencies, and construction.

As noted in the joint comments of the Indiana Department of Environmental Management, Indiana Utility Regulatory Commission, and Indiana Office of Utility Consumer Counselor, significant concerns remain about the capability of CCS to operate at a 90% removal efficiency, right-of-way authorizations, Class VI well permits (and other required permits), pipelines, and troubleshooting the capture system. EPA-HQ-OAR-2023-0072-0549 at 3. Goffman's Declaration attempts to resolve all stated concerns citing market changes, tax incentives, renewable electricity production, etc. Goffman Decl., ¶33-38. His assumptions are incorrect that the Rule has no near-term harm on source operations with the exception of planning. Goffman Decl., ¶105. Planning is not simply a thoughtful mind mapping exercise. The declaration of Christian T. Beam, Vice President of Energy Services for American Electric Power notes harm from electricity demand growth is predicted across the country citing to PJM Interconnection, L.L.C. ("PJM") long-term forecasts and Electric Reliability Council of Texas. Beam Decl., ¶77-78. "For AEP's Ohio, Indiana and Michigan utilities, the demand is over three times AEP's current peak load . . ." Beam Decl., ¶81. Planning for a company is far more than the tunnel into which EPA would have utilities look. The simple "fix" of delaying compliance timelines and offering administrative exceptions does nothing to address the real time electricity demands with which the nation is confronted as this Rule prompts harmful shifts in power generation.

3

### III.   The Nation's Regional Transport Organizations Are Alarmed About Electricity Demand Growth And Reliability As Impacted By This Rule.

EPA states that it is "…finalizing multiple adjustments to the proposed rules that ensure the requirements in these final actions can be implemented without compromising the ability of power companies, grid operators, and state and Federal energy regulators to maintain resource adequacy and grid reliability." 89 Fed. Reg. at 39,803. In response to comments, EPA states it had "engaged with the balancing authorities that submitted comments to the docket, the staff and Commissioners of the Federal Energy Regulatory Commission, the Department of Energy, the North American Electric Reliability Corporation, and other expert entities during the course of this rulemaking." *Id.* EPA's engagement with these stakeholders has not led to any significant changes in approach to address the harmful reliability concerns recognized by all of these agencies. EPA's final rule remains consistent with its initial proposal of forcing electric power to eliminate coal-fired generation. Longer compliance timelines for CCS, use of Remaining Useful Life and Other Factors to address reliability, short-term emergency procedures are all mere acknowledgements of others' concerns with no real relief. Acknowledgment is not engagement. Southwest Power Pool provided in its May 20, 2024 media statement that although the final rule offers concessions, harm remains as "concerns about future production capacity remain among those in the power providing sector." Bridson Decl., Exhibit A.

In commenting on the proposed BSER, balancing authorities, including Electric Reliability Council of Texas, Inc., Midcontinent Independent System Operator, Inc. ("MISO"), PJM Interconnection, L.L.C., and Southwest Power Pool, Inc., urged that EPA address grid reliability by making four requests: allowing compliance deadline "tapering" in regions with projected resource shortfalls over the following six years, providing a process to confirm the shortfall determinations to its satisfaction, annually reviewing or amending its guidance on enforcement discretion based on revised projected shortfall conclusions, and implementing the "tapering" on a fact-specific basis depending on how far away the region is in its forward analysis from meeting its target reserve margins.  EPA-HA-OAR-2023-0072-8207 at 11. EPA failed to respond to these four requests in the final Rule.

The May 8, 2024 statement of PJM expressed appreciation that portions of the final Rule related to grid reliability, but found it failed to address PJM concerns about harm that "in the very years when we are projecting significant increases in the demand for electricity, the Final Rule may work to drive premature retirement of coal units that provide essential reliability services and dissuade new gas resources from coming online." Brown Decl., Attachment III. PJM also noted "EPA has not sufficiently reconciled its compliance dates with the need for generation to meet dramatically increasing load demands on the system." *Id.*

Similar grid reliability concern has been expressed by the Southwest Power Pool ("SPP").

> SPP remains concerned, however, about the impact the Final Rule may have on the region's ability to maintain resource adequacy and ensure reliability in the SPP region. SPP is concerned that limited technological and infrastructure availability and the compliance time frame will have deleterious impacts including the retirement of, or the decision not to build, thousands of MWs of baseload thermal generation. . .. SPP continues to be concerned that CCS has not yet been adequately demonstrated at the required capture rate, has not been commercially produced at scale, and will not be widely available and practicable at the level needed for the Final Rule's 2032 compliance time frame.

Beam Decl., Exhibit B. The immediate impacts of this Rule are evident to SPP,

> SPP is not expressing these concerns about a hypothetical resource adequacy scenario in the future. SPP and other grid operators are currently working to develop planning and operations policies and practices to deal with resource adequacy issues that have already manifested. SPP's recent Loss of Load Expectation (LOLE) study indicated that, by 2029, as much as a 50% winter season Planning Reserve Margin (PRM) could be necessary to maintain a one-day-in-ten-years LOLE. A PRM of that magnitude would require a significant amount of new capacity to be added in a short time frame. It is important to note that this study considered SPP's existing and projected future resource mix without considering the potential impacts of the Final Rule's 2032 deadline for certain emissions limits. In other words, the study and its projected increase in PRM did not consider the additional at-risk generation that may retire and not be adequately replaced in a relatively short time frame resulting from the compliance time frames contained in the Final Rule. This outcome would further intensify the need for generating capacity and associated transmission upgrades in the SPP region, likely at a pace and cost unprecedented for the industry.

*Id.*

MISO has taken the position that "it is time 'to face some hard realities,' including 'immediate and serious challenges to the reliability of our region's electric grid.'" Lafser Decl., Attachment A. MISO has stated that while "several emerging

technologies may someday change that calculus, they are not yet proven at grid scale."
*Id.* Tim Lafser, Vice President of Operations at Ameren Missouri provides harm concerns, "EPA's GHG Rule raises serious concerns about Ameren Missouri's ability to serve customers reliably. For example, MISO, which manages the delivery of energy to roughly 45 million people living in the midwestern United States (including Missouri), is already operating close to its maximum resource capacity and recognizes the need for new dispatchable generation." Lafser Decl. ¶38. According to MISO, "a key risk is that many 'dispatchable' resources that can be turned on and off and adjusted as needed to meet customer demand minute-by-minute are being replaced with weather-dependent resources such as wind and solar," which lack "certain key reliability attributes that are needed to keep the grid reliable every hour of the year." *Id.*

In conclusion, the RTOs remain unconvinced EPA's "fix" will cure the reliability harms this Rule creates.

## IV. Power Companies' Concerns About Grid Reliability Have Not Been Addressed By The Rule.

In addition, the power industry has also identified grid reliability as a real harm resulting from the rule. AEP submitted the Beam declaration that asserted,

> . . ., if this rule is not stayed, AEP must decide if it will retire coal plants, convert them to natural gas, or replace them with new turbines or renewables, and it must make these decisions for multiple plants, across several states, each with unique circumstances and unique challenges, while trying to ensure that sufficient capacity exists to meet customer demand. Each of these choices is fraught with significant risks and requires that financial commitments begin to be made immediately, with no way for AEP to be made whole if successful in this litigation.

7

Beam Decl., ¶98. For planning purposes,

> AEP must also make decisions about how to meet load growth reliably, including deciding whether to purchase turbines that are likely to require a fuel that is not currently available - hydrogen - to meet the rule's intermediate subcategory emission limits or being forced to buy multiple new turbines that are each artificially limited to operate at low capacity to stay within the rule's low load category. The difficult choices AEP must make in the near term if this rule is not stayed will lead to harm to AEP's customers, communities, employees, and shareholders.

*Id.* Finally, Beam clarified the reliability impact,

> Everybody uses electricity. This rule increases the costs and reduces the reliability of our service - all in pursuit of a slight acceleration of a climate goal that we have been successfully marching towards on our own, even without the rule. For the foregoing reasons, AEP faces imminent and irreparable harms if the court does not stay the final rule.

*Id.*

Goffman's declaration notes retirements are business decisions and not decisions of EPA, "No source is required to limit its operation under this Rule." Goffman Decl., ¶103. J. Michael Brown, Environmental Safety and Health Director for Ohio Valley Electric Corporation highlights the dismissive nature of Goffman's glib statement as follows:

> the only viable option for the vast majority of base-load coal-fired generating units – including OVEC's units – will be to retire, and that will further exacerbate the tenuous hold the regional transmission organizations (RTOs) have on grid reliability, likely jeopardizing reliability for millions of people, and resulting in de-facto generation shifting from reliable thermal base-load generation to renewable generation that cannot provide the capacity needs of the RTOs.

Brown Decl., ¶24.

8

The near-term concerns of harm are equally as important to Arizona Public Service Company. Todd Komaromy, Director of Resource Planning for the company, states,

> The Final Rule, therefore, requires companies like APS to make near-term investment decisions associated with critical natural gas generation that threatens to impose unacceptable risks to reliability and significantly increase costs for APS customers. The loss of these investments and the cost to APS and its customers will be irreparable, should the courts later set aside the Final Rule.

Komaromy Decl., ¶43.

These companies with facilities in many states illustrate the level and significance of concern with the immediate harmful impacts on electric reliability.

## V.     The Final Rule Also Fails To Address The Concerns About Grid Reliability Expressed By Members Of Congress.

In an August 1, 2023, letter to EPA Administrator Regan, Senator Capito and thirty-eight other members of Congress highlighted the concerns of harm repeatedly raised by PJM, SPP, and MISO, noting:

> This proposed rule will drastically increase costs and reduce electricity supplies. These effects will not only be borne by the regulated community, but by every American, manufacturer, and small business that relies on the electricity grid. Federal Energy Regulatory Commissioners, as well as the Chief Executive Officers of the North American Electric Reliability Corporation, the Regional Transmission Organization PJM, and one of America's largest electric cooperatives all warned about increasing risks to the stability of the electric grids in the United States and agree that we are heading towards a reliability crisis that will be exacerbated by policy-driven plant retirements.

EPA-HQ-OAR-2023-0072-0909 at 5. EPA has ignored the concerns of power companies and grid operators to such a degree that members of Congress felt it was necessary to intervene to ensure their positions were heard.

The assertion that EPA "engaged with and resolved" the balancing authorities' concerns regarding grid reliability and the Rule "can be implemented without compromising the ability of power companies, grid operators, and state and Federal energy regulators to maintain resource adequacy and grid reliability" disregards the harmful reliability concerns. 89 Fed. Reg. 39,801. In short, EPA's Rule merely tips its hat at comments received concerning grid reliability and is arbitrary and capricious and will result in immediate and irreparable harm to the domestic electric grid.

## **CONCLUSION**

EPA notes the option of expediting briefing without the Rule being stayed. We remind the Court, however, of the option of expediting briefing while the Rule is stayed. Indeed, this is what this Court did in the Clean Power Plan litigation. ECF No. 1595922 (Jan. 28, 2016).

Based on the foregoing, the Midwest Ozone Group respectfully requests that the Court grant the Motion for Stay of the Rule to prevent irreparable harm to its membership and the domestic electricity grid.

Kathy G. Beckett

Kathy G. Beckett
*Counsel of Record*
David M. Flannery
Keeleigh S. Huffman
Steptoe & Johnson PLLC
707 Virginia Street, East
Post Office Box 1588
Charleston, WV 25326
(304) 353-8000
Kathy.Beckett@steptoe-johnson.com
Dave.Flannery@steptoe-johnson.com
Keeleigh.Huffman@steptoe-johnson.com

Edward L. Kropp
Steptoe & Johnson PLLC
Post Office Box 36425
Indianapolis, Indiana 46236
(317) 946-9882
Skipp.Kropp@steptoe-johnson.com

*Counsel for Petitioner Midwest Ozone Group*

Dated: June 18, 2024

11

## **CERTIFICATE OF COMPLIANCE**

The foregoing motion complies with the type-volume limitation of Fed. R. App. P. 28(c), Fed. R. App. P.32(f) and D.C. Cir. R. 32(e)(1), because it contains 2,575 words, excluding exempted parts, according to the count of Microsoft Word 2010. I further certify that the foregoing motion also complies with Fed. R. App. P. 32(a)(5)-(6) because it has been prepared using Microsoft Word 2010 in 14-point proportionally spaced Garamond typeface.

Kathy G. Beckett

Kathy G. Beckett
Steptoe & Johnson PLLC
707 Virginia Street, East
Post Office Box 1588
Charleston, West Virginia 25326
(304) 353-8000
Kathy.Beckett@steptoe-johnson.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of June 2024, the foregoing Reply was served

electronically on all registered counsel through the Court's CM/ECF system.


Kathy G. Beckett

Kathy G. Beckett
Steptoe & Johnson PLLC
707 Virginia Street, East
Post Office Box 1588
Charleston, West Virginia 25326
(304) 353-8000
Kathy.Beckett@steptoe-johnson.com