(Slip Opinion)                OCTOBER TERM, 2023                1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## OHIO ET AL *v.* ENVIRONMENTAL PROTECTION AGENCY ET AL

### ON APPLICATIONS FOR STAY

No. 23A349.   Argued February 21, 2024—Decided June 27, 2024*

The Clean Air Act envisions a collaborative effort between States and the federal government to regulate air quality. When the Environmental Protection Agency sets standards for common air pollutants, States must submit a State Implementation Plan, or SIP, providing for the "implementation, maintenance, and enforcement" of those standards in their jurisdictions. See 42 U. S. C. §7410(a)(1). Because air currents can carry pollution across state borders, States must also design their plans with neighboring States in mind. Under the Act's "Good Neighbor Provision," state plans must prohibit emissions "in amounts which will . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other State" of the relevant air-quality standard. §7410(a)(2)(D)(i)(I). Only if a SIP fails to satisfy the "applicable requirements" of the Act may EPA issue a Federal Implementation Plan, or FIP, for the noncompliant State that fails to correct the deficiencies in its SIP. §§7410(k)(3), (c)(1).

   In 2015, EPA revised its air-quality standards for ozone, thus triggering a requirement for States to submit new SIPs. Years later, EPA announced its intention to disapprove over 20 SIPs because the agency believed they had failed to address adequately obligations under the Good Neighbor Provision. During the public-comment period for the proposed SIP disapprovals, EPA issued a single proposed FIP to bind

——————

   *Together with No. 23A350, *Kinder Morgan, Inc.,* et al. v. *Environmental Protection Agency* et al.; No. 23A351, *American Forest & Paper Assn.* et al. v. *Environmental Protection Agency,* No. 23A384, *United States Steel Corp.* v. *Environmental Protection Agency et al.,* also on applications for stay.

all those States. EPA designed its proposed FIP based on which emissions-control measures would maximize cost-effectiveness in improving ozone levels downwind and on the assumption the FIP would apply to all covered States. Commenters warned that the proposed SIP disapprovals were flawed and that a failure to achieve all the SIP disapprovals as EPA envisioned would mean that EPA would need to reassess the measures necessary to maximize cost-effective ozone-level improvements in light of a different set of States. EPA proceeded to issue its final FIP without addressing this concern. Instead, EPA announced that its plan was severable: Should any jurisdiction drop out, the plan would continue to apply unchanged to the remaining jurisdictions. Ongoing litigation over the SIP disapprovals soon vindicated at least some of the commenters' concerns. Courts stayed 12 of the SIP disapprovals, which meant EPA could not apply its FIP to those States.

A number of the remaining States and industry groups challenged the FIP in the D. C. Circuit. They argued that EPA's decision to apply the FIP after so many other States had dropped out was "arbitrary" or "capricious," and they asked the court to stay any effort to enforce the FIP against them while their appeal unfolded. The D. C. Circuit denied relief, and the parties renewed their request in this Court.

*Held*: The applications for a stay are granted; enforcement of EPA's rule against the applicants shall be stayed pending the disposition of the applicants' petition for review in the D. C. Circuit and any petition for writ of certiorari, timely sought. Pp. 9–20.

(a) When deciding an application for a stay, the Court asks (1) whether the applicant is likely to succeed on the merits, (2) whether it will suffer irreparable injury without a stay, (3) whether the stay will substantially injure the other parties interested in the proceedings, and (4) where the public interest lies. *Nken* v. *Holder*, 556 U. S. 418, 434. When States and other parties seek to stay the enforcement of a federal regulation against them, often "the harms and equities [will be] very weighty on both sides." *Labrador* v. *Poe*, 601 U. S. ___, ___ (KAVANAUGH, J., concurring in grant of stay). Because that is true here, resolution of applicants' stay request ultimately turns on the first question: Who is likely to prevail at the end. See *Nken*, 556 U. S., at 434. Pp. 9–11.

(b) Applicants are likely to prevail on their arbitrary-or-capricious claim. An agency action qualifies as "arbitrary" or "capricious" if it is not "reasonable and reasonably explained." *FCC* v. *Prometheus Radio Project*, 592 U. S. 414, 423. Thus, the agency must offer "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made" and cannot simply ignore "an important aspect of the problem." *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43.

Cite as: 603 U. S. ____ (2024)                3

Syllabus

EPA's plan rested on an assumption that all the upwind States would adopt emissions-reduction measures up to a uniform level of costs to the point of diminishing returns. Commenters posed their concerns that if upwind States fell out of the planned FIP, the point at which emissions-control measures maximize cost-effective downwind air-quality improvements might shift. To this question, EPA offered no reasoned response. As a result, the applicants are likely to prevail on their argument that EPA's final rule was not "reasonably explained," *Prometheus Radio Project*, 592 U. S., at 423, and that it instead ignored "an important aspect of the problem" before it, *State Farm Mut. Automobile Ins. Co.*, 463 U. S., at 43. Pp. 11–13.

(c) EPA's alternative arguments are unavailing. First, EPA argues that adding a "severability" provision to its final rule—*i.e.,* providing the FIP would "continue to be implemented" without regard to the number of States remaining—responded to commenters' concerns. But EPA's response did not address those concerns so much as it side-stepped them. Nothing in the final rule's severability provision actually addressed whether and how measures found to maximize cost-effectiveness in achieving downwind ozone air-quality improvements with the participation of all the upwind States remain so when many fewer States might be subject to the agency's plan. Second, EPA insists that no one raised that concern during the public comment period. The Act's "reasonable specificity" requirement, however, does not mean a party must rehearse the identical argument made before the agency. Here, EPA had notice of the objection, and its own statements and actions confirm the agency appreciated the concern. Third, EPA argues that applicants must return to EPA and file a motion asking it to reconsider its final rule before presenting their objection in court because the "grounds for [their] objection arose after the period for public comment." §7607(d)(7)(B). Nothing requires the applicants to return to EPA to raise (again) a concern EPA already had a chance to address. Pp. 13–17.

Applications for stay granted.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, and KAVANAUGH, JJ., joined. BARRETT, J., filed a dissenting opinion, in which SOTOMAYOR, KAGAN, and JACKSON, JJ., joined.

Cite as: 603 U. S. ____ (2024)    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 23A349, 23A350, 23A351 and 23A384

———————

OHIO, ET AL.
23A349                              *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.


KINDER MORGAN, INC., ET AL.
23A350                              *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.


AMERICAN FOREST & PAPER ASSOCIATION, ET AL.
23A351                              *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.


UNITED STATES STEEL CORPORATION
23A384                              *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.

ON APPLICATIONS FOR STAY

[June 27, 2024]

JUSTICE GORSUCH delivered the opinion of the Court.

The Clean Air Act envisions States and the federal government working together to improve air quality. Under that law's terms, States bear "primary responsibility" for developing plans to achieve air-quality goals. 42 U. S. C. §7401(a)(3). Should a State fail to prepare a legally compliant plan, however, the federal government may sometimes step in and assume that authority for itself. §7410(c)(1).

Here, the federal government announced its intention to reject over 20 States' plans for controlling ozone pollution. In their place, the government sought to impose a single, uniform federal plan. This litigation concerns whether, in adopting that plan, the federal government complied with the terms of the Act.

## I

### A

"The Clean Air Act regulates air quality through a federal-state collaboration." *EME Homer City Generation, L.P.* v. *EPA*, 795 F. 3d 118, 124 (CADC 2015). Periodically, the Environmental Protection Agency (EPA) sets standards for common air pollutants, as necessary to "protect the public health." §§7409(a)(1), (b)(1). Once EPA sets a new standard, the clock starts ticking: States have three years to design and submit a plan—called a State Implementation Plan, or SIP—providing for the "implementation, maintenance, and enforcement" of that standard in their jurisdictions. §7410(a)(1); see *EPA* v. *EME Homer City Generation, L. P.*, 572 U. S. 489, 498 (2014). Under the Act, States decide how to measure ambient air quality. §7410(a)(2)(B). States pick "emission limitations and other control measures." §7410(a)(2)(A). And States provide for the enforcement of their prescribed measures. §7410(a)(2)(C).

At the same time, States must design these plans with their neighbors in mind. Because air currents can carry pollution across state borders, emissions in upwind States sometimes affect air quality in downwind States. See *EME Homer*, 572 U. S., at 496. To address that externality problem, under the Act's "Good Neighbor Provision," state plans must prohibit emissions "in amounts which will . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other State" of the relevant air-quality standard. §7410(a)(2)(D)(i)(I).

Opinion of the Court

Because the States bear "primary responsibility" for developing compliance plans, §7401(a)(3), EPA has "no authority to question the wisdom of a State's choices of emission limitations." *Train* v. *Natural Resources Defense Council, Inc.*, 421 U. S. 60, 79 (1975). So long as a SIP satisfies the "applicable requirements" of the Act, including the Good Neighbor Provision, EPA "shall approve" it within 18 months of its submission. §7410(k)(3); see §§7410(k)(1)(B), (k)(2). If, however, a SIP falls short, EPA "shall" issue a Federal Implementation Plan, or FIP, for the noncompliant State—that is, "unless" the State corrects the deficiencies in its SIP first. §7410(c)(1); *EME Homer*, 572 U. S., at 498. EPA must also ensure States meet the new air-quality standard by a statutory deadline. See §7511.

B

A layer of ozone in the atmosphere shields the world from the sun's radiation. See *National Resources Defense Council* v. *EPA*, 464 F. 3d 1, 3 (CADC 2006). But closer to earth, ozone can hurt more than it helps. Forming when sunlight interacts with a wide range of precursor pollutants, ground-level ozone can trigger and exacerbate health problems and damage vegetation. 80 Fed. Reg. 65299, 65302, 65370 (2015).

To mitigate those and other problems, in 2015 EPA revised its air-quality standards for ozone from 75 to 70 parts per billion. *Id.*, at 65293–65294. That change triggered a requirement for States to submit new SIPs. *Id.*, at 65437. Along the way, EPA issued a guidance document advising States that they had "flexibility" in choosing how to address their Good Neighbor obligations. See EPA, Memorandum, Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards 3 (Mar. 27, 2018). With that and other guidance in hand, many (though not all) States submitted SIPs. See 84 Fed. Reg. 66612 (2019). And many

Opinion of the Court

of the States that did submit SIPs said that they need not adopt emissions-control measures to comply with the Good Neighbor Provision because, among other things, they were not linked to downwind air-quality problems or they could identify no additional cost-effective methods of controlling the emissions beyond those they were currently employing. See, *e.g.*, 87 Fed. Reg. 9798, 9810 (2022); 87 Fed. Reg. 9545, 9552 (2022); see generally 88 Fed. Reg. 9336, 9354–9361 (2023).

For over two years, EPA did not act on the SIPs it received. See, *e.g.*, 87 Fed. Reg. 9838, 9845–9851 (2022). Then, in February 2022, the agency announced its intention to disapprove 19 of them on the ground that the States submitting them had failed to address adequately their obligations under the Good Neighbor Provision.[1]  A few months later, the agency proposed disapproving four more SIPs.[2] Pursuant to the Act, the agency issued its proposed SIP disapprovals for public comment before finalizing them.  See §7607(d)(3).

C

During that public comment period, the agency proposed a single FIP to bind all 23 States.[3]  87 Fed. Reg. 20036, 20038 (2022).  Rather than continue to encourage "'flexi-

––––––––––

[1] See 87 Fed. Reg. 9463 (2022) (Maryland); 87 Fed. Reg. 9484 (2022) (New York, New Jersey); 87 Fed. Reg. 9498 (2022) (Kentucky); 87 Fed. Reg. 9516 (2022) (West Virginia); 87 Fed. Reg. 9533 (2022) (Missouri); 87 Fed. Reg. 9545 (2022) (Alabama, Mississippi, Tennessee); 87 Fed. Reg. 9838 (2022) (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin); 87 Fed. Reg. 9878 (2022) (Arkansas, Louisiana, Oklahoma, Texas).

[2] See 87 Fed. Reg. 31443 (California); 87 Fed. Reg. 31470 (2022) (Utah); 87 Fed. Reg. 31485 (2022) (Nevada); 87 Fed. Reg. 31495 (2022) (Wyoming).

[3] EPA also added three more States: Pennsylvania and Virginia, which had not submitted SIPs, and Delaware, whose SIP, EPA said, it had approved in "error."  87 Fed. Reg. 20036, 20038 (2022).

bilit[y]'" and different state approaches, EPA now apparently took the view that "[e]ffective policy solutions to the problem of interstate ozone transport" demanded that kind of "uniform framework" and "[n]ationwide consistency." 87 Fed. Reg. 9841; see 87 Fed. Reg. 20073. The FIP the agency proposed set as its target the reduction of the emissions of one ozone precursor in particular: nitrous oxide. See *id.*, at 20038. And it sought to impose nitrous oxide emissions-control measures that "maximized cost-effectiveness" in achieving "downwind ozone air quality improvements." *Id.*, at 20055; see also *id.*, at 20043.

In broad strokes, here is how EPA's proposed rule worked to eliminate a State's "significant contribution" to downwind ozone problems. First, the agency identified various emissions-control measures and, using nationwide data, calculated how much each typically costs to reduce a ton of nitrous-oxide emissions. *Id.*, at 20076; see, *e.g.*, *id.*, at 20077–20081. Next, the agency sought to predict how much each upwind State's nitrous-oxide emissions would fall if emissions-producing facilities in the State adopted each measure. *Id.*, at 20076; see, *e.g.*, *id.*, at 20088–20089; EPA, Ozone Transport Policy Analysis Proposed Rule TSD 22–23 (EPA–HQ–OAR–2021–0668, 2022) (Proposed Ozone Analysis). In making those predictions, EPA often considered data specific to the emissions-producing facilities in the State, and fed "unit-level and state-level" values into its calculations. See *id.*, at 9–10, 13. Then, the agency estimated how much, on average, ozone levels would fall in downwind States with the adoption of each measure. 87 Fed. Reg. 20076; see, *e.g.*, *id.*, at 20092–20093, 20096–20097; Proposed Ozone Analysis 51–52. In making those estimations, too, EPA calibrated its modeling to each State's features, "determin[ing] the relationship between changes in emissions and changes in ozone contributions on a state-by-state . . . basis." *Id.*, at 33; see also *id.*, at 40, 42.

To pick which measures would "maximiz[e] cost-

6                    OHIO *v.* EPA

Opinion of the Court

effectiveness" in achieving "downwind ozone air quality improvements," 87 Fed. Reg. 20055, EPA focused on what it called the "'knee in the curve,'" or the point at which more expenditures in the upwind States were likely to produce "very little" in the way of "additional emissions reductions and air quality improvement" downwind, *id.*, at 20095 (hyphenation omitted). EPA used this point to select a "uniform level" of cost, and so a uniform package of emissions-reduction tools, for upwind States to adopt. *Id.*, at 20076. And EPA performed this analysis on two "parallel tracks"—one for power plants, one for other industries. *Ibid.* Pursuant to the Clean Air Act, §§7607(d)(1)(B), (d)(3)–(6), the agency published its proposed FIP for notice and comment in April 2022, 87 Fed. Reg. 20036.

Immediately, commenters warned of a potential pitfall in the agency's approach. EPA had determined which emissions-control measures were cost effective at addressing downwind ozone levels based on an assumption that the FIP would apply to all covered States. But what happens if some or many of those States are not covered? As the commenters portrayed the SIPs, this was not an entirely speculative possibility. Many believed EPA's disapprovals of the SIPs were legally flawed. See, *e.g.*, Comments of Missouri Dept. of Natural Resources 3 (June 17, 2022) (referencing "all the technical, legal, and procedural issues" with the proposed SIP disapproval); see also, *e.g.*, Comments of Louisiana Dept. of Environmental Quality 1–3 (June 21, 2022); Comments of Texas Comm'n on Environmental Quality 2–4 (June 21, 2022); EPA, Response to Public Comments on Proposed Rule 9–11 (EPA–HQ–OAR–2021–0668). They added that EPA's FIP was "inextricably linked" to the SIP disapprovals. *E.g.*, Comments of Missouri Dept. of Natural Resources, at 4. Without a SIP disapproval or missing SIP, after all, EPA could not include a State in its FIP. See, *e.g.*, *id.*, at 3; *supra*, at 3.

Commenters added that failing to include a State could

Opinion of the Court

have consequences for the proposed FIP. If the FIP did not wind up applying to all 23 States as EPA envisioned, commenters argued, the agency would need "to conduct a new assessment and modeling of contribution and subject those findings to public comment." *E.g.*, Comments of Air Stewardship Coalition 13–14 (June 21, 2022); Comments of Portland Cement Association 7 (June 21, 2022). Why? As noted above, EPA assessed "significant contribution" by determining what measures in upwind States would maximize cost-effective ozone-level improvements in the States downwind of them. *Supra*, at 5–6. And a different set of States might mean that the "knee in the curve" would shift. After all, each State differs in its mix of industries, in its pre-existing emissions-control measures, and in the impact those measures may have on emissions and downwind air quality. See 87 Fed. Reg. 20052, 20060, 20071–20073; EPA, Technical Memorandum, Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026, pp. 12–13 (2022).[4]

As it happened, ongoing litigation over the SIP disap-

---

[4] Commenters pointed out the variance among emissions-producing facilities too. See, *e.g.*, Comments of Indiana Municipal Power Agency 9 (June 20, 2022) (the "cost effectiveness" of one tool "will be highly variable" across different power plants); Comments of Lower Colorado River Authority 21 (June 21, 2022) (power plants that "have already invested" in one emissions-control tool "have already undertaken significant costs to achieve [nitrous oxide] reductions and have less to gain from additional control installation"); Comments of Air Stewardship Coalition 27 (June 21, 2022) (noting that the knee in the curve appeared to be at a different cost depending on which mix of industries were considered); Comments of Wisconsin Paper Council 2 (June 21, 2022) (the air-quality benefits from controlling one industry—pulp and paper mills—had a "maximum estimated improvement" in ozone levels in downwind States of just 0.0117 parts per billion).

Opinion of the Court

provals soon seemed to vindicate at least some of the com-
menters' concerns.  Two circuits issued stays of EPA's SIP
denials for four States.  See Order in No. 23–60069 (CA5,
May 1, 2023) (Texas and Louisiana); Order in No. 23–1320
(CA8, May 25, 2023) (Arkansas); Order in No. 23–1719
(CA8, May 26, 2023) (Missouri).

Despite those comments and developments, the agency
proceeded to issue its final FIP.  88 Fed. Reg. 36654 (2023).[5]
In response to the problem commenters raised, EPA
adopted a severability provision stating that, should any ju-
risdiction drop out, its rule would "continue to be imple-
mented as to any remaining jurisdictions."  *Id.*, at 36693.
But in doing so, EPA did not address whether or why the
same emissions-control measures it mandated would con-
tinue to further the FIP's stated purpose of maximizing
cost-effective air-quality improvement if fewer States re-
mained in the plan.

## D

After EPA issued its final FIP, litigation over the agency's
SIP disapprovals continued.  One court after another issued
one stay after another.[6]  Each new stay meant another

_____

[5]The final FIP covered 23 States.  88 Fed. Reg. 36654, 36656 (2023).
That plan included Pennsylvania and Virginia, but EPA declined to cover
Tennessee or Wyoming at the time, even though it had announced its
intention to disapprove those States' SIPs.  *Ibid.*; see also *supra*, at 4,
and nn. 1–2.  EPA has since proposed a plan for Tennessee and several
other States.  89 Fed. Reg. 12666 (2024).

[6]See, *e.g.*, Order in No. 23–60069 (CA5, June 8, 2023) (Mississippi);
Order in No. 23–682 (CA9, July 3, 2023) (Nevada); Order in
No. 23–1776 (CA8, July 5, 2023) (Minnesota); Order in No. 23–3216
(CA6, July 25, 2023) (Kentucky); Order in No. 23–9520 etc. (CA10, July
27, 2023) (Utah and Oklahoma); Order in No. 23–11173 (CA11, Aug. 17,
2023) (Alabama); see also Order in No. 23–1418 (CA4, Aug. 10, 2023)
(West Virginia, pending oral argument on preliminary motions to stay
and to transfer); Order in No. 23–1418 (CA4, Jan. 10, 2024) (West Vir-
ginia, after oral argument and pending merits review of petition).

Opinion of the Court

State to which EPA could not apply its FIP. See §7410(c)(1). Ultimately, EPA recognized that it could not apply its FIP to 12 of the 23 original States.[7] Together, these 12 States accounted for over 70 percent of the emissions EPA had planned to address through its FIP. See Application for Ohio et al. in No. 23A349, p. 1 (States' Application); see also 88 Fed. Reg. 36738–36739.[8]

A number of the remaining States and industry groups challenged the remnants of the FIP in the D. C. Circuit. They pointed to the Act's provisions authorizing a court to "reverse any . . . action" taken in connection with a FIP that is "arbitrary" or "capricious." §7607(d)(9)(A). And they argued that EPA's decision to apply the FIP to them even after so many other States had dropped out met that standard. As part of their challenge, they asked that court to stay any effort to enforce the FIP against them while their appeal unfolded. After that court denied relief, the applicants renewed their request here. The Court has received and reviewed over 400 pages of briefing and a voluminous record, held over an hour of oral argument on the applications, and engaged in months of postargument deliberations as we often do for the cases we hear.

## II

### A

Stay applications are nothing new. They seek a form of interim relief perhaps "as old as the judicial system of the nation." *Scripps-Howard Radio, Inc.* v. *FCC*, 316 U. S. 4, 17 (1942). Like any other federal court faced with a stay

_____

[7] See 88 Fed. Reg. 49295 (2023) (Arkansas, Kentucky, Louisiana, Mississippi, Missouri, and Texas); 88 Fed. Reg. 67102 (2023) (Alabama, Minnesota, Nevada, Oklahoma, Utah, and West Virginia). EPA has since proposed settling the litigation over the Nevada SIP disapproval. 89 Fed. Reg. 35091 (2024).

[8] Of course, this could change again as litigation over the SIP denials progresses past preliminary stay litigation and toward final decisions on the merits.

request, we must provide the applicants with an answer—
"grant or deny." *Labrador* v. *Poe*, 601 U. S. ___, ___ (2024)
(KAVANAUGH, J., concurring in grant of stay) (slip op., at 2).

In deciding whether to issue a stay, we apply the same
"sound . . . principles" as other federal courts. *Nken* v.
*Holder*, 556 U. S. 418, 434 (2009) (internal quotation marks
omitted). Specifically, in this litigation, we ask (1) whether
the applicant is likely to succeed on the merits, (2) whether
it will suffer irreparable injury without a stay, (3) whether
the stay will substantially injure the other parties inter-
ested in the proceedings, and (4) where the public interest
lies. *Ibid.*; States' Application 13; Response in Opposition
for Respondent EPA in No. 23A349 etc., p. 16 (EPA Re-
sponse).[9]

When States and other parties seek to stay the enforce-
ment of a federal regulation against them, often "the harms
and equities [will be] very weighty on both sides." *Labra-
dor*, 601 U. S., at ___ (opinion of KAVANAUGH, J.) (slip op.,
at 3). That is certainly the case here, for both sides have
strong arguments with respect to the latter three *Nken* fac-
tors. On one side of the ledger, the federal government
points to the air-quality benefits its FIP offers downwind
States. EPA Response 48–50. On the other side, the States
observe that a FIP issued unlawfully (as they contend this
one was) necessarily impairs their sovereign interests in
regulating their own industries and citizens—interests the
Act expressly recognizes. See Part I–A, *supra*; States' Ap-
plication 24–26; *Maryland* v. *King*, 567 U. S. 1301, 1303
(2012) (ROBERTS, C. J., in chambers). The States observe,
too, that having to comply with the FIP during the pen-
dency of this litigation risks placing them at a "competitive

—————

[9]Approaching the applications before us like any other stay request
both accords with the Clean Air Act's text, see 42 U. S. C. §7607(d), and
usual practice in this field, see, *e.g.*, *Texas* v. *EPA*, 829 F. 3d 405, 424
(CA5 2016); *West Virginia* v. *EPA*, 90 F. 4th 323, 331 (CA4 2024); *In re
Murray Energy Corp.*, 788 F. 3d 330, 335 (CADC 2015).

disadvantage" to their exempt peers. States' Application
21. The States and the private applicants also stress that
complying with the FIP during the pendency of this litiga-
tion would require them to incur "hundreds of millions[,]" if
not billions of dollars." Tr. of Oral Arg. 96. Those costs, the
applicants note, are "nonrecoverable." *Thunder Basin Coal
Co.* v. *Reich*, 510 U. S. 200, 220–221 (1994) (Scalia, J., con-
curring in part and concurring in judgment); see, *e.g.*,
States' Application 24; Application for American Forest &
Paper Association et al. 25; see also *Alabama Assn. of Real-
tors* v. *Department of Health and Human Servs.*, 594 U. S.
758, 765 (2021) (*per curiam*).

Because each side has strong arguments about the harms
they face and equities involved, our resolution of these stay
requests ultimately turns on the merits and the question
who is likely to prevail at the end of this litigation. See
*Nken*, 556 U. S., at 434; *Labrador*, 601 U. S., at ___ (opinion
of KAVANAUGH, J.) (slip op., at 4).

### B

When it comes to that question, the parties agree on the
rules that guide our analysis. The applicants argue that a
court is likely to hold EPA's final FIP "arbitrary" or "capri-
cious" within the meaning of the Act and thus enjoin its en-
forcement against them. 42 U. S. C. §7607(d)(9)(A); see,
*e.g.*, States' Application 15–16; Application for American
Forest & Paper Association et al. 14; see also 5 U. S. C.
§706(2)(A). An agency action qualifies as "arbitrary" or "ca-
pricious" if it is not "reasonable and reasonably explained."
*FCC* v. *Prometheus Radio Project*, 592 U. S. 414, 423 (2021).
In reviewing an agency's action under that standard, a
court may not "'substitute its judgment for that of the
agency.'" *FCC* v. *Fox Television Stations, Inc.*, 556 U. S.
502, 513 (2009). But it must ensure, among other things,
that the agency has offered "a satisfactory explanation for
its action[,] including a rational connection between the

facts found and the choice made." *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983) (internal quotation marks omitted). Accordingly, an agency cannot simply ignore "an important aspect of the problem." *Ibid.*

We agree with the applicants that EPA's final FIP likely runs afoul of these long-settled standards. The problem stems from the way EPA chose to determine which emissions "contribute[d] significantly" to downwind States' difficulty meeting national ozone standards. 42 U. S. C. §7410(a)(2)(D)(i)(I). Recall that EPA's plan rested on an assumption that all 23 upwind States would adopt emissions-reduction tools up to a "uniform" level of "costs" to the point of diminishing returns. 87 Fed. Reg. 20076, 20095; 88 Fed. Reg. 36661, 36683–36684, 36719; see Part I–C, *supra*. But as the applicants ask: What happens—as in fact did happen—when many of the upwind States fall out of the planned FIP and it may now cover only a fraction of the States and emissions EPA anticipated? See, *e.g.*, States' Application 16–21; Application for American Forest & Paper Association et al. 14–15, 19–20. Does that affect the "knee in the curve," or the point at which the remaining States might still "maximiz[e] cost-effectiv[e]" downwind ozone-level improvements? 87 Fed. Reg. 20055. As "the mix of states changes, . . . and their particular technologies and industries drop out with them," might the point at which emissions-control measures maximize cost-effective downwind air-quality improvements also shift? Tr. of Oral Arg. 6.

Although commenters posed this concern to EPA during the notice and comment period, see Part I–C, *supra*, EPA offered no reasoned response. Indeed, at argument the government acknowledged that it could not represent with certainty whether the cost-effectiveness analysis it performed collectively for 23 States would yield the same results and

Opinion of the Court

command the same emissions-control measures if conducted for, say, just one State. Tr. of Oral Arg. 58–59. Perhaps there is some explanation why the number and identity of participating States does not affect what measures maximize cost-effective downwind air-quality improvements. But if there is an explanation, it does not appear in the final rule. As a result, the applicants are likely to prevail on their argument that EPA's final rule was not "reasonably explained," *Prometheus Radio Project*, 592 U. S., at 423, that the agency failed to supply "a satisfactory explanation for its action[,]" *State Farm Mut. Automobile Ins. Co.*, 463 U. S., at 43, and that it instead ignored "an important aspect of the problem" before it, *ibid.* The applicants are therefore likely to be entitled to "revers[al]" of the FIP's mandates on them. §7607(d)(9).[10]

### III

### A

Resisting this conclusion, EPA advances three alternative arguments.

*First*, the government insists, the agency did offer a reasoned response to the applicants' concern, just not the one they hoped. When finalizing its rule in response to public comments, the government represents, "the agency *did* consider whether the [FIP] could cogently be applied to a subset of the 23 covered States." EPA Response 27; see also *post*, at 17–18 (BARRETT, J., dissenting). And that consideration, the government stresses, led EPA to add a "severability" provision to its final rule in which the agency announced that the FIP would "'continue to be implemented'" without regard to the number of States remaining, even if just one State remained subject to its terms. EPA Response

---

[10] Various applicants offer various other reasons why they believe they are likely to succeed in challenging EPA's FIP. Having found that they are likely to succeed on the basis discussed above, however, we have no occasion to address those other arguments.

14                          OHIO *v.* EPA

Opinion of the Court

27 (quoting 88 Fed. Reg. 36693). In support of its severability provision, EPA cited, among other things, its intent to address "'important public health and environmental benefits" and encourage reliance by others "on th[e] final rule in their planning.'" *Ibid.*

None of this, however, solves the agency's problem. True, the severability provision highlights that EPA was aware of the applicants' concern. But awareness is not itself an explanation. The severability provision highlights, too, the agency's desire to apply its rule expeditiously and "'to the greatest extent possible,'" no matter how many States it could cover. *Ibid.* But none of that, nor anything else EPA said in support of its severability provision, addresses whether and how measures found to maximize cost effectiveness in achieving downwind ozone air-quality improvements with the participation of 23 States remain so when many fewer States, responsible for a much smaller amount of the originally targeted emissions, might be subject to the agency's plan. Put simply, EPA's response did not address the applicants' concern so much as sidestep it.[11]

_____

[11] As the applicants conceded at oral argument, see Tr. of Oral Arg. 25–26, EPA did not need to address every possible permutation when it sought to adopt a multi-State FIP. Our conclusion is narrower: When faced with comments like the ones it received, EPA needed to explain why it believed its rule would continue to offer cost-effective improvements in downwind air quality with only a subset of the States it originally intended to cover. To be sure, after this Court heard argument, EPA issued a document in which it sought to provide further explanations for the course it pursued. See 89 Fed. Reg. 23526 (2024). But the government has not suggested that we should consult this analysis in assessing the validity of the final rule. See Letter from E. Prelogar, Solicitor General, to S. Harris, Clerk of Court 1 (Mar. 28, 2024). Nor could it, since the Clean Air Act prevents us (and courts that may in the future assess the FIP's merits) from consulting explanations and information offered after the rule's promulgation. See 42 U. S. C. §§7607(d)(6)(C) ("The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of

Opinion of the Court

*Second*, the government pivots in nearly the opposite di-rection.  Now, it says, if its final rule lacks a reasoned re-sponse to the applicants' concern, it is because no one raised that concern during the public comment period.  And, the agency stresses, a litigant may pursue in court only claims premised on objections first "'raised with reasonable speci-ficity'" before the agency during the public comment period. *Id*., at 19–20 (quoting §7607(d)(7)(B)); see also *post*, at 8–11.

We cannot agree.  The Act's "reasonable specificity" re-quirement does not call for "a hair-splitting approach." *Ap-palachian Power Co.* v. *EPA*, 135 F. 3d 791, 817 (CADC 1998).  A party need not "rehears[e]" the identical argument made before the agency; it need only confirm that the gov-ernment had "notice of [the] challenge" during the public comment period and a chance to consider "in substance, if not in form, the same objection now raised" in court. *Id*., at 818; see also, *e.g.*, *Bahr* v. *Regan*, 6 F. 4th 1059, 1070 (CA9 2021).

Here, EPA had notice of the objection the applicants seek to press in court.  Commenters alerted the agency that, should some States no longer participate in the plan, the agency would need to return to the drawing board and "con-duct a new assessment and modeling of contribution" to de-termine what emissions-control measures maximized cost effectiveness in securing downwind ozone air-quality im-provements.  Comments of Air Stewardship Coalition, at 13–14; see also Part I–C, *supra* (noting examples of other

———————
such promulgation"), 7607(d)(7)(A) (restricting the "record for judicial re-view").  We therefore look to only "the grounds that the agency invoked when it" promulgated the FIP. *Michigan* v. *EPA*, 576 U. S. 743, 758 (2015).  Should the applicants show the FIP was arbitrary or capricious on the existing record, as we have concluded is likely, the Clean Air Act entitles them to "revers[al]" of that rule's mandates on them. §7607(d)(9)(A).

Opinion of the Court

comments).  And, as we have just seen, EPA's own statements and actions confirm the agency appreciated that concern.  In preparing the final rule in response to public comments, the agency emphatically insists, it "*did* consider whether the [r]ule could cogently be applied to a subset of the 23 covered States."  EPA Response 27.  And as a result of that consideration, the agency observes, it opted to add a severability provision to its final rule.  *Ibid.*  By its own words and actions, then, the agency demonstrated that it was on notice of the applicants' concern.  Yet, as we have seen, it failed to address the concern adequately.[12]

*Third*, the government pursues one more argument in the alternative.  As the agency sees it, the applicants must return to EPA and file a motion asking it to reconsider its final rule before presenting their objection in court.  They must, the agency says, because the "grounds for [their] objection arose after the period for public comment." §7607(d)(7)(B); see EPA Response 20–21.  As just discussed,

———————

[12] The dissent resorts to a "hair-splitting approach" to the public comments.  *Post*, at 8–11.  It stresses, for example, that some comments highlighted variances among specific emissions-producing facilities and industries, "not States."  *Post*, at 8 (emphasis deleted).  But the dissent fails to acknowledge that, for purposes of the FIP, States are a sum of their emissions-producing facilities.  See, *e.g.*, Ozone Transport Policy Analysis Final Rule TSD 12 (EPA–HQ–OAR–2021–0668, 2023) (Final Ozone Analysis).  Similarly, the dissent characterizes the comment indicating EPA would need to "conduct a new assessment and modeling" if States dropped out of the FIP as a complaint about the "sequencing" of the proposed SIP disapprovals and the FIP.  *Post*, at 10.  But why would the sequencing matter?  Because the FIP cannot apply to a State if its SIP is not disapproved.  See Part I–A, *supra*.  And why would EPA need to perform a "new assessment and modeling of contribution"?  Because it may be that "the math . . . wouldn't necessarily turn out the same" if some States were not covered by the FIP.  Tr. of Oral Arg. 59.  Fairly on notice of the concern, EPA needed to, and by its own admission sought to, "consider" whether its FIP could apply to a subset of States.  EPA Response 27.

however, EPA had the basis of the applicants' objection before it during the comment period. It chose to respond with a severability provision that in no way grappled with their concern. Nothing requires the applicants to return to EPA to raise (again) a concern EPA already had a chance to address.

Taking the government's argument (much) further, the dissent posits that every "objection that [a] final rule was not reasonably explained" must be raised in a motion for reconsideration. *Post*, at 7 (internal quotation marks omitted; emphasis deleted). But there is a reason why the government does not go so far. The Clean Air Act opens the courthouse doors to those with objections the agency already ignored. If an "objection [is] raised with reasonable specificity during the period for public comment" but not reasonably addressed in the final rule, the Act permits an immediate challenge. §7607(d)(7)(B). A person need not go back to the agency and insist on an explanation a second time. Tellingly, the case on which the dissent relies involves an entirely different situation: a "'logical outgrowth' challeng[e]." *Post*, at 7. There, the objection was that EPA had supposedly "'significantly amend[ed] the [r]ule between the proposed and final versions,'" making it impossible for people to comment on the rule during the comment period. *Ibid.* (quoting *EME Homer*, 795 F. 3d, at 137). That is nothing like the challenge here, where EPA failed to address an important problem the public could and did raise during the comment period.

### B

With the government's theories unavailing, the dissent advances others of its own. It begins by suggesting that the problem the applicants raise was not "'*important*'" enough to warrant a reasoned reply from the agency because the methodology EPA employed in its FIP "appear[s] not to depend on the number of covered States." *Post*, at 12–17, 18–

Opinion of the Court

19.  Then, coming at the same point from another direction, the dissent seeks to excuse the agency's lack of a reasoned reply as "harmless" given, again, "the apparent lack of connection between the number of States covered and the FIP's methodology."  *Post*, at 20.

The trouble is, if the government had arguments along these lines, it did not make them.  It did not despite its ample resources and voluminous briefing.  See *supra*, at 9.  This Court "normally decline[s] to entertain" arguments "forfeited" by the parties.  *Kingdomware Technologies, Inc.* v. *United States*, 579 U. S. 162, 173 (2016).  And we see no persuasive reason to depart from that rule here.

If anything, we see one reason for caution after another.  Start with the fact the dissent itself expresses little confidence in its own theories, contending no more than it "*appear*[*s*]" EPA's methodology did not depend on the number of covered States.  *Post*, at 14 (emphasis added).  Add to that the fact that, at oral argument, even the government refused to say with certainty that EPA would have reached the same conclusions regardless of which States were included in the FIP.  See Tr. of Oral Arg. 59.  Combine all that with the further fact that, in developing the FIP, EPA said it used the "same regulatory framework" this Court described in *EME Homer City Generation, L. P.* v. *EPA*, 572 U. S. 489.  *E.g.*, EPA Response 7–8.  And, at least as the Court described that framework, state-level analyses play a significant role in EPA's work.[13]  Finally, observe that, while the Act seems to anticipate, as the dissent suggests,

---

[13]The agency, we said, "first calculated, for each upwind State, the quantity of emissions the State could eliminate at each of several cost [levels]"; next, it "conducted complex modeling to establish the combined effect of the upwind reductions projected at each cost [level] would have on air quality in downwind States"; and only after all that did the agency "then identif[y] significant cost [levels]" to use in setting its emissions budgets.  *EME Homer City*, 572 U. S., at 501–502.

Opinion of the Court

that the agency's "procedural determinations" may be subject to harmless-error review, §7607(d)(8), the Act also seems to treat separately challenges to agency "actions" like the FIP before us, authorizing courts to "reverse any . . . action," found to be "arbitrary" or "capricious," §7607(d)(9)(A) (emphasis added). With so many reasons for caution, we think sticking to our normal course of declining to consider forfeited arguments the right course here.[14]

\*

The applications for a stay in Nos. 23A349, 23A350, 23A351, and 23A384 are granted. Enforcement of EPA's rule against the applicants shall be stayed pending the disposition of the applicants' petitions for review in the United States Court of Appeals for the D. C. Circuit and any petition for writ of certiorari, if such writ is timely sought. Should the petition for certiorari be denied, this order will terminate automatically. If the petition is granted, this order shall terminate upon the sending down of the judgment of this Court.

*It is so ordered.*

––––––––––

[14]Admittedly, the dissent points to some statements in the FIP suggesting EPA considered nationwide data in parts of its analysis. See, *e.g.*, *post*, at 14; see also, *e.g.*, 88 Fed. Reg. 36721, 36727. But other statements in that rule and supporting documents also seem to suggest EPA considered state-specific information. See Part I–C, *supra*. If, as the dissent posits, only nationwide data informed EPA's analysis, why would EPA say that, "for purposes of identifying the appropriate level of control," it focused on "the 23 upwind states that were linked" to the downwind States, rather than, say, "all states in the contiguous U.S."? Final Ozone Analysis 3 (footnote omitted). Why would EPA explain that its "findings regarding air quality improvement" downwind were a "central component" of picking the appropriate cost levels and so defining a State's significant contribution? 88 Fed. Reg. 36741. And why would EPA bother to "determine the relationship between changes in emissions and changes in ozone contributions on a state-by-state . . . basis" and "calibrat[e]" that relationship "based on state-specific source apportionment"? Final Ozone Analysis 43. In asking these questions, we do not profess answers; we simply highlight further reasons for caution.

BARRETT, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

Nos. 23A349, 23A350, 23A351 and 23A384

————

OHIO, ET AL.
23A349                    *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.

KINDER MORGAN, INC., ET AL.
23A350                    *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.

AMERICAN FOREST & PAPER ASSOCIATION, ET AL.
23A351                    *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.

UNITED STATES STEEL CORPORATION
23A384                    *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.

ON APPLICATIONS FOR STAY

[June 27, 2024]

JUSTICE BARRETT, with whom JUSTICE SOTOMAYOR, JUSTICE KAGAN, and JUSTICE JACKSON join, dissenting.

The Court today enjoins the enforcement of a major Environmental Protection Agency rule based on an underdeveloped theory that is unlikely to succeed on the merits. In so doing, the Court grants emergency relief in a fact-intensive and highly technical case without fully engaging with both the relevant law and the voluminous record. While the Court suggests that the EPA failed to explain itself sufficiently in response to comments, this theory must surmount sizable procedural obstacles and contrary record

evidence.  Applicants therefore cannot satisfy the stringent conditions for relief in this posture.

## I

I will start by setting the record straight with respect to some important background.

*First*, the Court downplays EPA's statutory role in ensuring that States meet air-quality standards.  *Ante*, at 2–3.  The Clean Air Act directs EPA to "establish national ambient air quality standards (NAAQS) for pollutants at levels that will protect public health."  *EPA* v. *EME Homer City Generation, L. P.*, 572 U. S. 489, 498 (2014); see 42 U. S. C. §§7408, 7409.  States must create State Implementation Plans (SIPs) to ensure that their air meets these standards.  §7410(a)(1).  But States also face an externality problem: "Pollutants generated by upwind sources are often transported by air currents . . . to downwind States," relieving upwind States "of the associated costs" and making it difficult for downwind States to "maintain satisfactory air quality."  *EME*, 572 U. S., at 496.  So the Act's Good Neighbor Provision requires SIPs to "prohibi[t]" the State's emissions sources from "emitting any air pollutant in amounts which will . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]."  §7410(a)(2)(D)(i)(I).

Given the incentives of upwind States to underregulate the pollution they send downwind, the Act requires EPA to determine whether a State "has failed to submit an adequate SIP."  *EME*, 572 U. S., at 498; see §7410(c)(1).  If a SIP does not prevent the State's polluters from significantly contributing to nonattainment in downwind States, EPA "shall" promulgate a Federal Implementation Plan (FIP) that does.  §7410(c)(1).  And EPA must stop the State's significant contributions by the statutory deadline for the affected downwind States to achieve compliance.  See *Wisconsin* v. *EPA*, 938 F. 3d 303, 313–314 (CADC 2019)

Cite as: 603 U. S. ____ (2024)           3

BARRETT, J., dissenting

(*per curiam*); §7511.

*Second*, the Court fails to recognize that EPA's SIP dis-approvals may, in fact, be valid. EPA justified its findings that 23 States had failed to submit adequate SIPs. It found that these States all significantly contributed to ozone pol-lution in downwind States. See 88 Fed. Reg. 36656 (2023). But 21 of these States, including applicants, proposed to do *nothing* to reduce their ozone-precursor (*i.e.*, NO$_x$) emissions—arguing that they did not actually contribute to downwind nonattainment or that there were no other cost-effective emissions-reduction measures they could impose. See 88 Fed. Reg. 9354–9361 (2023). The other two States failed to submit a SIP at all. See 84 Fed. Reg. 66614 (2019). While 12 of EPA's SIP disapprovals have been *temporarily* stayed, no court yet has invalidated one. So EPA's replace-ment FIP—the Good Neighbor Plan—may yet apply to all 23 original States. Indeed, EPA and the plaintiffs who chal-lenged Nevada's SIP disapproval have proposed a settle-ment that would lift that stay. 89 Fed. Reg. 35091 (2024).

*Third*, the Court claims that commenters on the proposed FIP warned that its emissions limits might change if it cov-ered fewer States, but EPA failed to respond. *Ante*, at 6–8. Not exactly. As I will elaborate below, commenters merely criticized EPA's decision to propose a FIP before its SIP dis-approvals were final. EPA responded that this sequencing was "consistent with [its] past practice in [its] efforts to timely address good neighbor obligations": Given the Au-gust 2024 deadline for certain States to comply with the 2015 ozone NAAQS, EPA was "obligated" to start the years-long process of promulgating a FIP so that one could be ef-fective in time. EPA, Response to Public Comments on Pro-posed Rule 149–150, (EPA–HQ–OAR–2021–0668–1127, June 2023) (Response to Comments); see *Wisconsin*, 938 F. 3d, at 313–314.

*Finally*, the Court repeatedly characterizes the FIP as re-lying on an "assumption that [it] would apply to all covered

States." *Ante*, at 6; see *ante*, at 12.  But try as it might, the
Court identifies no evidence that the FIP's emissions limits
would have been different for a different set of States or
that EPA's consideration of state-specific inputs was any-
thing but confirmatory of the limits it calculated based on
nationwide data.  See *ante*, at 5–6, 19, n. 14.  The Court
leans on the fact that EPA "considered data specific to the
emissions-producing facilities in [each] State" to calculate
"how much each upwind State's [$NO_x$] emissions would fall"
if the State's emitters "adopted each [emissions-control]
measure."  *Ante*, at 5 (citing EPA, Ozone Transport Policy
Analysis Proposed Rule TSD 9–10, 13, 22–23, (EPA–HQ–
OAR–2021–0668–0133, Feb. 2022) (Proposed Ozone Analy-
sis)).  But the Proposed Ozone Analysis makes clear that
EPA did these state-specific calculations to determine each
State's "emissions budget."  Proposed Ozone Analysis 7–13.
A State's budget consists of the "emissions that would re-
main" *after* the State's power plants meet the emissions
limits that EPA independently calculated.  88 Fed. Reg.
36762; see Proposed Ozone Analysis 13 ("adjust[ed]" "unit-
level emissions are summed up to the state level"); n. 6, *in-
fra*.  Of course each State's emissions budget will depend on
the emitters in that State.  What matters is whether the
*limits the FIP imposes on each emitter* depend on the num-
ber of States the FIP covers.  Tellingly, the Court does not
identify any $NO_x$ limit for any industry that relied on state-
specific data.

  On the contrary, as I will explain in Part II–B, the final
rule and its supporting documents suggest that EPA's
methodology for setting emissions limits did not depend on
the number of States in the plan, but on nationwide data
for the relevant industries—and the FIP contains many ex-
amples of emissions limits that EPA created using nation-
wide inputs.  Moreover, EPA has now confirmed this inter-
pretation.  During this litigation, EPA received petitions
seeking reconsideration of the FIP on the ground that it

should not be implemented in just a subset of the original States.  EPA denied these petitions on April 4, 2024.  89 Fed. Reg. 23526.  It thoroughly explained how its "methodology for defining" each State's emissions obligations is "independent of the number of states included in the Plan" because it "relies on a determination regarding what emissions reductions each type of regulated source can cost-effectively achieve."  EPA, Basis for Partial Denial of Petitions for Reconsideration on Scope 1, (EPA–HQ–OAR–2021–0668–1255, Apr. 2024) (Denial).  The "control technologies and cost-effectiveness figures the EPA consider[ed] . . . do not depend in any way on the number of states included."  *Id.*, at 2.  So "[s]ources in the remaining upwind states currently regulated by the Plan . . . would bear the same actual emission reduction obligations" regardless of the number of covered States.  *Id.*, at 3–4.

## II

To obtain emergency relief, applicants must, at a minimum, show that they are likely to succeed on the merits, that they will be irreparably injured absent a stay, and that the balance of the equities favors them.  *Nken* v. *Holder*, 556 U. S. 418, 425–426 (2009).  Moreover, we should grant relief only if we would be likely to grant certiorari were the applicants' case to come to us in the usual course.  See *Does 1–3* v. *Mills*, 595 U. S. ___, ___ (2021) (BARRETT, J., concurring in denial of application for injunctive relief); *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*).  In my view, the applicants cannot satisfy the stay factors.  Most significantly, they have not shown a likelihood of success on the merits.

The Court holds that applicants are likely to succeed on a claim that the Good Neighbor Plan is "arbitrary" or "capricious."  42 U. S. C. §7607(d)(9).  The "arbitrary-and-capricious standard requires that agency action" be both

"[1] reasonable and [2] reasonably explained." *FCC* v. *Prometheus Radio Project*, 592 U. S. 414, 423 (2021). The Court's theory is that EPA did not "'reasonably *explai[n]*'" "why the number and identity of participating States does not affect what measures maximize cost-effective downwind air-quality improvement." *Ante*, at 13 (quoting only the second part of *Prometheus Radio*'s formulation (emphasis added)). So to be clear, the Court does not conclude that EPA's actions were *substantively* unreasonable—*e.g.*, that the FIP cannot rationally be applied to fewer States because a change in the number of participants would undermine its rationale or render it ineffective. Nor could it, given the significant evidence in the record (not to mention EPA's denial of reconsideration) that the covered States did not, in fact, affect the plan's emissions-reduction obligations. See Part II–B, *infra*. Thus, the only basis for the Court's decision is the argument that EPA failed to provide "'a satisfactory explanation for its action'" and a "reasoned response" to comments. *Ante*, at 12–13 (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983)). There are at least three major barriers to success on such a claim.

### A

The Clean Air Act imposes a procedural bar on the challenges that a plaintiff can bring in court: Only objections that were "raised with reasonable specificity during the period for public comment . . . may be raised during judicial review." §7607(d)(7)(B). If it was "impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment," the challenger may petition for reconsideration of the rule and can obtain judicial review only if EPA refuses. *Ibid.* While EPA has now separately denied petitions for reconsideration of the Good Neighbor Plan, this case came to us directly; we are assessing applicants' likelihood of success in

BARRETT, J., dissenting

challenging the plan itself, not the denial of reconsideration. So the procedural bar on objections not raised in the comments presents a significant obstacle—in two ways.

*First*, consider the Court's basic theory: that EPA offered "no reasoned response" to comments allegedly questioning whether the plan's emissions limits depend on the States covered. *Ante*, at 12. That EPA failed to adequately explain its final rule in response to comments is "an objection to the notice and comment process itself," which applicants "obviously did not and could not have raised . . . during the period for public comment." *EME Homer City Generation, L. P.* v. *EPA*, 795 F. 3d 118, 137 (CADC 2015) (Kavanaugh, J.). No one could have raised *during the proposal's comment period* the objection that the "*final* rule was not 'reasonably explained.'" *Ante*, at 13 (emphasis added).

The D. C. Circuit, on remand in *EME Homer*, considered a similar objection that EPA had "violated the Clean Air Act's notice and comment requirements": EPA had "significantly amend[ed] the Rule between the proposed and final versions without providing additional opportunity for notice and comment." 795 F. 3d, at 137. But because this procedural objection could not have been raised during the comment period, "the only appropriate path for petitioners" under §7607(d)(7)(B) was to raise it "through an initial petition for reconsideration to EPA." *Ibid.* So the D. C. Circuit lacked "authority at th[at] time to reach this question." *Ibid.* While such "logical outgrowth" challenges typically are cognizable under the Administrative Procedure Act, see *Shell Oil Co.* v. *EPA*, 950 F. 2d 741, 747 (CADC 1991), the Clean Air Act channels these challenges through reconsideration proceedings. This Court's failure-to-explain objection may face the same problem: It is not judicially reviewable in its current posture.[1]

_____
[1] The Court offers a feeble response to this application of

BARRETT, J., dissenting

*Second*, even putting aside this aspect of §7607(d)(7)(B), it is not clear that any commenter raised with "reasonable specificity" the underlying substantive issue: that the exclusion of some States from the FIP would undermine EPA's cost-effectiveness analyses and resulting emissions controls. §7607(d)(7)(B); see *ante*, at 13. The Court concludes otherwise only by putting in the commenters' mouths words they did not say. It first cites a bevy of comments arguing that EPA's "disapprovals of the SIPs were legally flawed" and noting the obvious point that EPA cannot "include a State in its FIP" unless it validly disapproves the State's SIP. *Ante*, at 6. These comments do not address the continued efficacy of a FIP that applies to a subset of the originally covered States.

Another collection of the Court's inapposite comments relates to the inclusion of specific sources, emissions controls, and industries in the proposed plan—*not* States. See *ante*, at 7, n. 4. For example, one commenter argued that the "cost effectiveness of the requirement to employ SNCR will be highly variable, and is unlikely to meet EPA expecta-

---

§7607(d)(7)(B)'s procedural bar. *Ante*, at 17. It simply quotes §7607(d)(7)(B) and asserts without support that it means that a plaintiff "need not go back to the agency and insist on an explanation a second time." *Ibid.* The Court fails to engage with the logic of this argument: The objection that the final rule did not contain sufficient explanation was not and could not have been raised during the comment period, so it must be raised in a petition for reconsideration. *EME Homer*, 795 F. 3d, at 137. The Court claims that its theory is different from the logical-outgrowth challenge the D. C. Circuit considered in *EME Homer*. *Ante*, at 17. But the Court ignores the fact that its failure-to-explain challenge and logical-outgrowth challenges are both "objection[s] to the notice and comment process itself" that depend on the content of the final rule. *EME Homer*, 795 F. 3d, at 137. Even if the public raised an "important problem . . . during the comment period," *ante*, at 17, the Court's basis for enjoining the FIP's enforcement is not that the alleged problem is real, but that the final rule did not address it.

Cite as: 603 U. S. ____ (2024)          9

BARRETT, J., dissenting

tions in even the most optimistic case." Comments of Indiana Municipal Power Agency 9 (June 20, 2022). That is a challenge to EPA's endorsement of a particular emissions-control technology; it says nothing about the FIP's dependence on a particular number of States. See also, *e.g.*, Comments of Lower Colorado River Authority 21–22 (June 21, 2022). Similarly, another commenter argued that pulp and paper mills should not be included because the "maximum estimated improvement" in ozone levels from controlling their emissions would be "too small to even measure." Comments of Wisconsin Paper Council 2 (June 21, 2022).[2] An argument that the *maximum* benefits from regulating an industry are too small is not an argument that those benefits *would become* too small if fewer States were covered.[3]

The closest comment that the Court can find—which it quotes repeatedly—is one sentence that obliquely refers to some "new assessment and modeling of contribution" that EPA might need to perform. Comments of Air Stewardship Coalition 13–14 (June 21, 2022). The Court dresses up this

—————

[2] The Court claims that in distinguishing comments about particular industries from comments that question whether the plan depends on a number of States, I "fai[l] to acknowledge" that the FIP treats States as the "sum of their emissions-producing facilities." *Ante*, at 16, n. 12. But in reality, it is the Court that ignores how the FIP works. The FIP determines emissions limits for particular *sources* based on their *industries*; the total $NO_x$ emissions limit for each State is simply the sum of the limits the plan imposes on each of the State's sources. See, *e.g.*, 88 Fed. Reg. 36678, 36762; Part II–B, *infra*. So comments critiquing a particular industry-specific emissions limit or technology assumption say nothing about the FIP's dependence on a certain number of States.

[3] Nor did the Air Stewardship Coalition's comment about the "knee in the curve" raise concerns about which States are included. See *ante*, at 7, n. 4. Rather, this comment questioned EPA's proposed average cost-effectiveness threshold of $7,500 per ton for non-power-plant sources; it argued that EPA should use different thresholds for different industries. Comments of Air Stewardship Coalition 27 (June 21, 2022) (Air Stewardship Comments). It did not link its concern about cost thresholds to the States covered by the plan.

BARRETT, J., dissenting

comment by characterizing it as a warning about what might happen "[i]f the FIP did not wind up applying to all 23 States" and responding to the concern that a "different set of States might mean that the 'knee in the curve' might shift" and change the cost-effective "emissions-control measures." *Ante*, at 7. But those words are the Court's, not the commenter's.

The commenter's actual objection was to EPA's sequencing of its actions—proposing a FIP before it finalized its SIP disapprovals. The commenter titled this section "EPA Step Two Screening is Premised on the Premature Disapproval of 19 Upwind States['] Good Neighbor SIPs." Air Stewardship Comments 13 (boldface omitted). And the relevant sentence reads in full:

> "The proposed FIP essentially prejudges the outcome of those pending SIP actions and, in the event EPA takes a different action on those SIPs than contemplated in this proposal, it would be required to conduct a new assessment and modeling of contribution and subject those findings to public comment." *Id.*, at 14.

This sentence says nothing about what would be required if *after* EPA finalizes its SIP disapprovals and issues a final FIP, some States drop out of the plan. Nor does it suggest that the plan's cost-effectiveness thresholds or emissions controls would change with a different number of States. Nor is it clear what the comment means by its bare reference to a "new assessment and modeling of contribution": Would EPA be required to perform a new evaluation of which upwind States cause pollution in downwind States? A new analysis of how much pollution each source must eliminate? A new assessment of the plan's impact on downwind States?

It is therefore difficult to see how this comment raised with "reasonable specificity" the objection that the removal of some States from the final plan would invalidate EPA's

BARRETT, J., dissenting

cost-effectiveness thresholds and chosen emissions-control measures.[4]  That is not how EPA understood it.  EPA characterized this comment as arguing that "by taking action before considering comments on the proposed disapprovals, the EPA is presupposing the outcome of its proposed rulemakings on the SIPs."  Response to Comments 147 (noting this comment's ID number, 0518).  And EPA explained that it "disagree[d]" with the argument that the "sequence" of its actions was "improper, unreasonable, or bad policy"; EPA had a statutory obligation to promulgate a FIP by the August 2024 NAAQS attainment deadline.  *Id.*, at 150.  If a *commenter* had said with reasonable specificity what *the Court* says today—that "a different set of States might mean that the 'knee in the curve' might shift," *ante*, at 7— EPA could have responded with more explanation of why its methodology did not depend on the number of covered States—as it has recently explained.  But EPA cannot be penalized if it did not have reasonable notice of this objection.[5]

_____

[4] So too with Portland Cement's comment.  See *ante*, at 7.  That comment simply echoes the quoted sentence from the Air Stewardship Coalition almost word for word, also in the context of objecting to EPA's decision to propose a FIP before finalizing its SIP disapprovals.  Comments of Portland Cement Association 7 (June 21, 2022).

[5] The Court concludes to the contrary only by building out the comment's bare reference to a "new assessment and modeling" with its own inferences about the possible effect of different numbers of States on "the math."  *Ante*, at 16, n. 12 (internal quotation marks omitted).  But as explained above, the comment itself said nothing about States dropping out of the final plan or the possible impact of different numbers of States on the FIP's cost thresholds or emissions limits.  It is hard to believe that a single sentence with no elaboration or explanation of the potential issue—in a sea of thousands of pages of comments—gave EPA reasonable notice that it should have included in its final rule a detailed explanation of why the FIP's emissions limits did not depend on the number of States.  Cf. *Public Citizen, Inc.* v. *FAA*, 988 F. 2d 186, 197 (CADC 1993) (An "agency need not respond at all to comments that are 'purely speculative and do not disclose the factual or policy basis on which they rest'").

12     OHIO *v.* EPA

BARRETT, J., dissenting

In sum, §7607(d)(7)(B)'s procedural bar likely forecloses both the failure-to-explain objection that the Court credits and any substantive challenge to the reasonableness of applying the FIP to a subset of the originally covered States.

### B

Even if applicants clear §7607(d)(7)(B)'s procedural bar, they face an uphill battle on the merits. To prevail on the Court's theory, applicants must show that EPA's actions were "arbitrary" or "capricious." §§7607(d)(9)(A), (D). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U. S., at 43. A rule is arbitrary and capricious if the agency "*entirely failed* to consider an *important* aspect of the problem." *Ibid.* (emphasis added). But we will "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Ibid.* (quoting *Bowman Transp., Inc.* v. *Arkansas-Best Freight System, Inc.*, 419 U. S. 281, 286 (1974)). Given the explanations and state-agnostic methodology apparent in the final rule and its supporting documentation—and the paucity of comments specifically raising the issue—EPA may well have done enough to justify its plan's severability.

To begin, the rule and its supporting documents arguably make clear that EPA's methodology for calculating cost-effectiveness thresholds and imposing emissions controls did not depend on the number of covered States. The rule applied EPA's longstanding "4-step interstate transport framework" to create emissions limits that will prevent $NO_x$ sources in upwind States from significantly contributing to ozone pollution in downwind States. 88 Fed. Reg. 36659; see 42 U. S. C. §7410(a)(2)(D). Under that framework, EPA (1) identifies "downwind receptors that are expected to have problems attaining or maintaining the NAAQS"; (2) identifies which upwind States are "'link[ed]'" to those downwind receptors because they contribute at least 1% of a receptor's

BARRETT, J., dissenting

ozone; (3) determines which $NO_x$ sources in the linked up-wind States "significantly contribute" to downwind nonat-tainment or interference; and (4) implements emissions limits to stop those sources' significant contributions. 88 Fed. Reg. 36659; see *EME*, 572 U. S., at 500–501 (describ-ing similar approach used in earlier FIP). The first two steps determine which States the FIP must cover. The rub-ber meets the road at steps 3 and 4: How much do sources in those States "significantly contribute" to downwind pol-lution, and what must they do about it?

Here is how EPA explains that methodology. A source "significantly contributes" to downwind pollution if there are cost-effective measures it could implement to reduce its emissions: It must halt those emissions that can be elimi-nated at a cost "under the cost threshold set by the Agency" for sources in that industry. *EME*, 572 U. S., at 518 (up-holding this approach). So the "'amount' of pollution" that sources must eliminate is "that amount . . . in excess of the emissions control strategies the EPA has deemed cost effec-tive." 88 Fed. Reg. 36676. EPA calculates for each type of source a "uniform level of $NO_x$ emissions control stringency" expressed as a "cost per ton of emissions reduction." *Id*., at 36719. This cost-effectiveness threshold is based on the point "at which further emissions mitigation strategies be-come excessively costly on a per-ton basis while also deliv-ering far fewer additional emissions reductions." *Id*., at 36683 (describing this "'knee in the curve'" analysis). The plan requires sources in each covered State to reduce their emissions accordingly.[6]

_____

[6] For power plants, EPA implements these requirements by allocating each State an "'emissions budget' . . . representing the EPA's quantifica-tion of the emissions that would remain" if plants in that State elimi-nated all the emissions that EPA determines can be eliminated for less than the cost threshold. 88 Fed. Reg. 36762. EPA then allocates trade-able "'allowances'" proportionally among the State's sources, creating a

Barrett, J., dissenting

Crucially, the final rule suggests that EPA calculated cost-effectiveness thresholds based on the likely cost and impact of available emissions-reduction technology given *national, industry-wide data*. Contrary to the Court's speculations, *ante*, at 12, these thresholds and the FIP's resulting emissions limits appear not to depend on the number of covered States. Consider the plan's approach to power plants ("electric generating units," or EGUs). EPA assessed the cost and impact of different $NO_x$ mitigation strategies that EGUs could implement. One strategy was to fully operate "selective catalytic reduction" (SCR) technology. 88 Fed. Reg. 36655; see *id.*, at 36720. EPA estimated that a "representative marginal cost" for this strategy would be $1,600 per ton, and a "reasonable level of performance" would be 0.08 lb/mmBtu—based on "nationwide" power plant "emissions data." *Id.*, at 36720–36721. EPA thus determined that SCR optimization was a "viable mitigation strategy for the 2023 ozone season" and built this assumption into the plan's emissions limits. *Id.*, at 36720. In other words, EPA relied on nationwide industry data to select cost thresholds that corresponded to how much it would cost to use particular emissions-reduction technologies, and it applied that "uniform control stringency to EGUs within the covered upwind states." *Id.*, at 36680.[7]

—————————

marketplace for emissions. *Ibid.* With respect to other sources, EPA determined that nine industries in the covered States produced the most significant emissions. *Id.*, at 36817. The rule requires sources in each of those industries to meet specific emissions limits that were calculated based on the reductions that they can cost-effectively achieve. *Ibid.*

[7] EPA ultimately selected (based on nationwide data) a cost threshold of $1,800 per ton of $NO_x$ reduction that would apply in earlier years, and a cost threshold of $11,000 per ton that would apply in later years. 88 Fed. Reg. 36749, 36846. These cost thresholds corresponded to the cost of different emissions-control measures: For example, EGUs can "retrofi[t] state-of-the-art combustion controls" and "[o]ptimiz[e] idled SCRs" for less than $1,800 per ton, and they can "instal[l new] SCRs" for less

BARRETT, J., dissenting

In fact, some commenters criticized EPA's reliance on a "nationwide data set" to calculate emissions limits, arguing that EPA should "limit the dataset to . . . just the covered states"—an approach that *would* have made the cost-effectiveness thresholds depend on which States were covered.  *Id.*, at 36723.  But EPA expressly defended its approach based on its "intention to identify a *technology-specific* representative emissions rate" and its interest in "the performance potential *of a technology*"—which were best served by the "largest dataset possible (*i.e.*, *nationwide*)."  *Id.*, at 36723–36724 (emphasis added).  EPA explained that it used the same approach it had successfully applied in previous rulemakings: It "derive[d] technology performance averages" based on nationwide data.  *Id.*, at 36724.  Then it applied the relevant industry standard "on a uniform basis" to each emitter across the covered States.  *Id.*, at 36817.[8]

_____

than $11,000 per ton.  Ozone Transport Policy Analysis Final Rule TSD 5 (EPA–HQ–OAR–2021–0668–1080, Mar. 2023) (Final Ozone Analysis).  EPA then calculated each State's emissions budget based on the assumption that the State's EGUs would implement the emissions-reductions strategies that cost less than the chosen thresholds.  See n. 6, *supra*; 88 Fed. Reg. 36762; Final Ozone Analysis 6, 9.  Given the likelihood that EPA selected cost thresholds based on nationwide data, each State's budget would be the same even if the FIP covered different States.

[8]While EPA's methodology with respect to other industrial sources (non-EGUs) was more complicated, it also seems to have relied on nationwide data.  EPA chose a "$7,500 marginal cost-per-ton threshold," 88 Fed. Reg. 36740, which corresponded to the point of diminishing returns (the "knee in the curve") when EPA assessed the impact of emissions controls in the highest impact industries and in "all industries" on the total "ozone season $NO_x$ reduction potential," Technical Memorandum, Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs From Non-EGU Emissions Units for 2026, p. 4, (EPA–HQ–OAR–2021–0668–150, Feb. 2022) (boldface omitted).  This figure thus appears to have been determined based on industry-wide cost and emissions data rather than state-specific calculations.  So too with the specific emissions limits EPA decided could be implemented for less than that cost.  See, *e.g.*, 88 Fed. Reg. 36825 ("EPA based the proposed

BARRETT, J., dissenting

The Court, perhaps recognizing the problem that the FIP's seemingly state-agnostic methodology poses for its theory, throws at the wall a cherry-picked assortment of EPA statements mentioning state data. See *ante*, at 5–6, 19, n. 14. None stick. The fundamental problem with the Court's citations is that they discuss analyses that EPA performed *after* it chose cost thresholds and emissions limits based on nationwide industry data. EPA did assess the impact on downwind States if particular upwind States met the proposed emissions limits, and that impact depended on the States included in the modeling. *Ante*, at 5, 19, n. 14. But EPA said that these "'findings regarding air quality improvement,'" *ante*, at 19, n. 14 (quoting 88 Fed. Reg. 36741), served only to "*cement* EPA's identification of the selected . . . mitigation measures as the appropriate control stringency," 88 Fed. Reg. 36741 (emphasis added); see Denial 18. EPA explained that the statutory requirement to "eliminate significant contribution" depends on the implementation of cost-effective emissions controls at individual "industrial sources," *not* some overall impact on "downwind areas' non-attainment and maintenance problems." 88 Fed. Reg. 36741. EPA assessed the FIP's impact assuming the participation of particular States primarily to ensure that its emissions limits did not result in "overcontrol"—*i.e.*, more reductions than necessary to help downwind States comply with the NAAQS. *Ibid.*; see *EME Homer City*, 572 U. S., at 521. The technical document that the Court cites, *ante*, at 5, makes this point clear: "The downwind air quality impacts are used to inform EPA's assessment of potential overcontrol." Proposed Ozone Analysis 31.

EPA's analysis confirmed that its chosen emissions limits would not result in overcontrol if they were implemented in the States originally covered by the FIP. 88 Fed. Reg.

_____

emissions limits for cement kilns on the types of limits being met across the nation").

BARRETT, J., dissenting

36741. Importantly, implementing the FIP "in fewer up-wind states does not (and cannot possibly) result in overcontrol" given that "there was no overcontrol even when more states, making more emission reductions, were included." Denial 22. So the fact that EPA used state-specific data in its overcontrol analysis does not mean that the FIP's emissions limits depended on the number of States it covered. And the inclusion of fewer States in that analysis logically could not have affected the results.

Thus, EPA generally characterized the FIP's emissions limits as dependent on nationwide data, not on any particular set of States.[9] Confirming this interpretation, the final rule contemplates its application to a different number of States. It recognizes that "states may replace FIPs with SIPs if EPA approves them," and several sections explain how States may exit *this* FIP. 88 Fed. Reg. 36753, 36838–36843. And the rule's severability provision explains that EPA views the plan as "severable along . . . state and/or tribal jurisdictional lines." *Id.*, at 36693.

Moreover, EPA justified the FIP's severability: EPA "must address good neighbor obligations as expeditiously as practicable and by no later than the next applicable attainment date"; severability serves "important public health and environmental benefits" and ensures that stakeholders can "rely on this final rule in their planning." *Ibid.* These

---

[9] The Court argues that EPA equated the framework it used here with the one that we described in *EME Homer City*. *Ante*, at 18, and n. 13. But even if *EME* described an approach that selected cost thresholds "only after" conducting downwind air-quality assessments, *ibid.*, it is not clear that the Good Neighbor Plan adopted *this* aspect of the *EME* framework. In fact, there are other key similarities between this FIP and *EME*'s approach. For example, the final FIP refers to *EME* in order to note that EPA's "uniform framework of policy judgments"—*i.e.*, applying the same cost thresholds with "[n]ationwide consistency"—was upheld in that case. 88 Fed. Reg. 36673. And the final FIP identifies cost thresholds that EPA chose based on nationwide data—like $1,800 based on the cost of EGUs "optimiz[ing] . . . existing SCRs and SNCRs." *Id.*, at 36749.

BARRETT, J., dissenting

rationales align with EPA's response to critics of its decision to propose a FIP before finalizing its SIP disapprovals: Quickly proposing a FIP—just like keeping the FIP in place even if some States drop out—"is a reasonable and prudent means of assuring that [EPA's] statutory obligation to reduce air pollution affecting the health and welfare of people in downwind states is implemented without delay." Response to Comments 151.

Given these justifications and the state-agnostic methodology apparent in the final rule, EPA's "'path may reasonably be discerned.'" *State Farm*, 463 U. S., at 43. The FIP's cost thresholds and emissions limits did not depend in any significant way on the number of States included, so the drawbacks of severability were minimal. On the other hand, severability was necessary so that EPA could fulfill, to the greatest extent possible, its statutory obligation to eliminate the significant ozone contributions of upwind States and reduce harmful pollution in downwind States in time to meet the attainment deadlines. See Response to Comments 150 (noting the August 2024 ozone-NAAQS attainment deadline). If the FIP were not severable, EPA would have to go back to the drawing board for *all* States whenever a single State is removed—thwarting its mission for little reason.[10]

Finally, it is unlikely that EPA's response to comments evinces a "fail[ure] to consider an *important* aspect of the problem." *State Farm*, 463 U. S., at 43 (emphasis added).

---

[10]The Court claims that the severability clause is evidence that EPA "had notice of the objection the applicants seek to press in court," yet EPA's justifications for it did not address (alleged) concerns about how the cost-effectiveness thresholds would change with fewer States. *Ante*, at 15–16. But as explained above, commenters did not raise that issue with specificity; they simply pointed out that some SIP disapprovals might be invalid. The severability clause is evidence that EPA was aware of *that* possibility, and the clause was EPA's response to it.

BARRETT, J., dissenting

An agency must respond to "'*relevant*' and '*significant*' public comments," and that requirement is not "particularly demanding"; the "agency need not respond at all to comments that are 'purely speculative and do not disclose the factual or policy basis on which they rest.'" *Public Citizen, Inc.* v. *FAA*, 988 F. 2d 186, 197 (CADC 1993) (quoting *Home Box Office, Inc.* v. *FCC*, 567 F. 2d 9, 35, and n. 58 (CADC 1977); emphasis added); see §7607(d)(6)(B) (EPA must respond to "significant" comments). EPA received hundreds of comments, and its response numbered nearly 1,100 pages. Given the likelihood that the FIP's emissions limits did not depend on the covered States, the risk of it applying to fewer States may not be "important," and comments purportedly raising that possibility might not be "relevant" and "significant." Moreover, the one comment that vaguely referred to a need for a "new assessment and modeling," Air Stewardship Comments 14, was "purely speculative" and "disclose[d]" no "factual or policy basis"; it likely merited no response, *Home Box Office*, 567 F. 2d, at 35, n. 58. Requiring more from EPA risks the "sort of unwarranted judicial examination of perceived procedural shortcomings" that might "seriously interfere with that process prescribed by Congress." *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U. S. 519, 548 (1978).[11]

## C

Applicants face one more impediment: the Clean Air Act's stringent harmless-error rule. A court "reviewing alleged procedural errors . . . may invalidate [an EPA] rule only if

---

[11] Despite the Court's suggestion of forfeiture, *ante*, at 17, EPA could not have forfeited the argument that the comments the Court cites were too insubstantial to merit a response. The Court relies on comments that were not raised until the applicants' reply briefs or that were uncovered later by the Court itself. See, *e.g.*, Reply Brief in No. 23A351, p. 11 (raising the Air Stewardship Coalition "modeling" comment for the first time).

BARRETT, J., dissenting

the errors were *so serious* and related to matters of *such central relevance* to the rule that there is a *substantial likelihood* that the rule would have been *significantly changed* if such errors had not been made." §7607(d)(8) (emphasis added). This provision appears "tailor-made to undo" any "rigid presumption of vacatur" that might apply in other contexts. N. Bagley, Remedial Restraint in Administrative Law, 117 Colum. L. Rev. 253, 291 (2017).

The alleged error here plausibly is subject to §7607(d)(8)'s harmless-error rule. As explained above, the Court does not suggest that it is *substantively* "[un]reasonable" to apply the FIP to fewer States, only that EPA did not "reasonably explai[n]" the FIP's severability in response to comments. *Prometheus*, 592 U. S., at 423. That is arguably an "alleged procedural error" within the meaning of §7607(d)(8). In fact, the Act contemplates that at least some "arbitrary or capricious" challenges allege failures to "observ[e] . . . procedure required by law," and such challenges may only succeed if §7607(d)(8)'s "condition is . . . met." §7607(d)(9)(D).

If the Act's harmless-error rule applies, applicants are unlikely to prevail. Given the apparent lack of connection between the number of States covered and the FIP's methodology for determining cost thresholds and emissions limits, it is difficult to imagine a "substantial" likelihood that the rule would have been "significantly" different had EPA just responded more thoroughly. In fact, applicants seem to have conceded as much. See Tr. of Oral Arg. 6 ("[W]ith full candor to the Court, [the cost threshold] could be the same or even more expensive"); *id.*, at 9 ("I can't tell you what that looks like, whether there is a difference in the obligations or not"). And EPA, the Court says, had "notice" of the alleged concern that the cost thresholds might change with different States. *Ante*, at 15. Yet EPA *still* chose to make the FIP severable because of its statutory obligation to reduce downwind pollution—an obligation it repeatedly

BARRETT, J., dissenting

referenced. See, *e.g.*, 88 Fed. Reg. 36693; Response to Comments 149–151. Would that same EPA have "significantly changed" the FIP had it just explained more thoroughly why the plan did not depend on the States covered?[12] And on top of all this, EPA has in fact refused to reconsider the FIP now that it applies to fewer States, explaining in detail why its methodology was unaffected by the States it covered.[13]

\*    \*    \*

With little to say in response to the FIP's apparent state-agnostic methodology for setting emissions limits and the Clean Air Act's stringent harmless-error rule, the Court resorts to raising forfeiture. *Ante*, at 17–19. But it is the Court that goes out of its way to develop a failure-to-explain

―――――――――
[12] The Court faults EPA for "refus[ing] to say with certainty" at oral argument that it would have reached the same conclusions if different States were included in the FIP. *Ante*, at 18. But §7607(d)(8) does not require the Government to show that the rule would be the same; it is most naturally read to require the challenger to demonstrate a "substantial likelihood that the rule *would have been significantly changed* if such errors had not been made." (Emphasis added.)    And though §7607(d)(9)(A) appears to allow reversal of "'any'" arbitrary or capricious "'action,'" *ante*, at 19, §7607(d)(8)'s more specific harmless-error rule and §7607(d)(9)(D)'s more specific requirements for reversal based on arbitrary or capricious procedural errors would seem to control.

[13] The Court claims that the Clean Air Act prevents us from considering EPA's denial of reconsideration. *Ante*, at 14–15, n. 11. But it is not obvious that the relevant provision of the Act—§7607(d)(7)(A)'s definition of the "record for judicial review"—bars consideration of later developments for purposes of the Act's stringent harmless-error rule, §7607(d)(8). Even assuming that the denial of reconsideration *itself* cannot count as evidence of harmlessness, we are judging applicants' *likelihood* of success on the merits. On the merits, we can expect EPA to make just the sort of arguments it made in its denial: EPA likely will explain why the covered States did not matter by citing and interpreting material in the record. See, *e.g.*, Denial 11 ("Record Basis Establishing Why the Plan Functions Independently by State"); *id.*, at 15, and nn. 16–18 (citing the final rule and technical support documents on the rulemaking docket).

BARRETT, J., dissenting

theory largely absent from applicants' briefs. One can search diligently in the hundreds of pages of applicants' opening briefs for the Court's theory—that EPA failed to explain in its final rule why the FIP's cost-effectiveness thresholds for imposing emissions limits do not shift with a different mix of States—and be left wondering where the Court found it. That theory appears not to have crystallized until oral argument, during which counsel for the state applicants struggled to locate it in the States' brief. Tr. of Oral Arg. 11–12. Consider just one illustrative example. Given the importance to the Court's theory of how the "knee in the curve" might change with different States, see *ante*, at 6, 7, and n. 4, 12, one might expect to find some mention of that idea in applicants' briefs. One would be wrong.

Given that applicants' theory has evolved throughout the course of this litigation, we can hardly fault EPA for failing to raise every potentially meritorious defense in its response brief. That is particularly true given the compressed briefing schedule in this litigation's emergency posture: The Court gave EPA less than two weeks to respond to multiple applications raising a host of general and industry-specific technical challenges, filed less than a week earlier. Even still, EPA raised §7607(d)(7)(B)'s procedural bar. Brief for Respondents 19. And on the merits, EPA expressly argued that the FIP's "viability and validity do not depend on the number of jurisdictions it covers"; the "Rule need not apply to any minimum number of States in order to operate coherently." *Id.*, at 24. EPA could also have demonstrated how the FIP's state-agnostic methodology for selecting cost thresholds was apparent in the final rule. But EPA cannot have forfeited that more specific point because applicants did not raise it to begin with.

Because EPA did not forfeit these responses to the merits of applicants' arbitrary-or-capricious challenge, there is no need to consider whether a departure from our typical approach to forfeited arguments is justified. See *ante*, at 18.

BARRETT, J., dissenting

It remains *applicants'* burden to show that the FIP's alleged dependence on the covered States likely was an "important" problem that EPA "entirely failed to consider." *State Farm*, 463 U. S., at 43.  And that is on top of their burden to overcome §7607(d)(7)(B)'s procedural bar and the lack of "significant," specific comments raising this issue.  §7607(d)(6)(B).

Finally, I would exercise our discretion to consider §7607(d)(8)'s harmless-error rule.  Even putting aside the expedited briefing schedule and the limited discussion of the Court's theory in applicants' briefs, applicants bear the burden in seeking emergency relief to show a *likelihood* of success on the merits.  In other words, we must *predict* whether applicants will overcome every barrier to relief at the end of the day, after full merits briefing and argument in the lower courts and, potentially, again in this Court.  Section 7607(d)(8)'s harmless-error rule is one such important obstacle, and EPA has already signaled that it will raise it as litigation progresses.  See Denial 35, n. 38 (arguing that any failure to more fully explain "how the Rule is not interdependent" is harmless error under §7607(d)(8)).  I see no reason not to consider it now.

### III

Given the emergency posture of this litigation, my views on the merits of the failure-to-explain objection and the application of the Clean Air Act's procedural bar and harmless-error rule are tentative.  But even a tentative adverse conclusion can undermine applicants' likelihood of success.  And applicants, to prevail, must run the table; they face the daunting task of surmounting *all* of these significant obstacles.  They are unlikely to succeed.

The Court, seizing on a barely briefed failure-to-explain theory, grants relief anyway.  It enjoins the Good Neighbor Plan's enforcement against any state or industry applicant pending review in the D. C. Circuit and any petition for cer-

tiorari.  *Ante*, at 19.  Given the number of companies in-
cluded and the timelines for review, the Court's injunction
leaves large swaths of upwind States free to keep contrib-
uting significantly to their downwind neighbors' ozone
problems for the next several years—even though the tem-
porarily stayed SIP disapprovals may all be upheld and the
FIP may yet cover all the original States.  The Court justi-
fies this decision based on an alleged procedural error that
likely had no impact on the plan.  So its theory would re-
quire EPA only to confirm what we already know: EPA
would have promulgated the same plan even if fewer States
were covered.  Rather than require this years-long exercise
in futility, the equities counsel restraint.

  Our emergency docket requires us to evaluate quickly the
merits of applications without the benefit of full briefing
and reasoned lower court opinions.  See *Does 1–3*, 595 U. S.,
at ___ (opinion of BARRETT, J.).  Given those limitations, we
should proceed all the more cautiously in cases like this one
with voluminous, technical records and thorny legal ques-
tions.  I respectfully dissent.